**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LAURA TIMMEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 11 C 6034 |
| JANICE GRIFFIN, DCFS Investigator, in her individual | ) | James B. Zagel |
| capacity, KENNETH LEGGIN, DCFS Supervisor, | ) | Judge Presiding |
| in his individual capacity, KIMBERLY SMITH-FOOTE, | ) | |
| Child Protection Manager, in her individual capacity, | ) | |
| and MARIA MILLER, DCFS Administrator, in her | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ANSWER</u>

1.     This civil rights complaint, brought pursuant to 42 U.S.C. § 1983, seeks redress for the actions of four employees of the Division of Child Protection of the Illinois Department of Children and Family Services ("DCFS") that deprived Plaintiff Laura Timmel of her rights to due process under the Fourteenth Amendment to the United States Constitution.  Defendants refused to consider plainly exculpatory evidence that any responsible child protection investigator or administrator in their position would consider and, in flagrant disregard of this evidence, unconstitutionally caused the impairment of Plaintiff Laura Timmel's constitutionally protected liberty interest in her career as a social worker.

ANSWER:     Defendants admit that Plaintiff purports to bring this action pursuant to 42

U.S.C. § 1983.  Defendants deny each and every remaining allegation contained in Paragraph 1.

2.     Laura Timmel sues all four Defendants for violation of their clearly-established constitutional duty to fully consider all available exculpatory evidence before they issue and register a so-called "indicated" finding of abuse or neglect against any professional pursuing a career working with children, such as a social worker. The Defendants also violated a basic principle of law by disregarding the state circuit court order finding "no probable cause" that had already exonerated Plaintiff Laura Timmel and, oblivious to the requirement that they respect final legal rulings, they proceeded to indicate Laura as guilty of child abuse, placing her name in the State Central Register ("Register") despite the state circuit court's order that had exonerated her of any wrongdoing as to her children.

ANSWER:     Defendants admit that Plaintiff purports to bring this action but deny that

she is entitled to do so.  Defendants deny each and every allegation contained in Paragraph 2.

3. The DCFS Defendants' decision to "indicate" Plaintiff for child abuse in derogation of the juvenile court's order impaired her ability to function as a mother, threatened permanently to ruin her career and her ability to support herself and her children, and caused her great emotional distress. Plaintiff Timmel was compelled to expend thousands of dollars to exculpate herself from this utterly baseless indicated finding, issued against her without due process of law. As relief from these injuries in violation of Plaintiff's constitutional rights, she seeks compensatory damages, an award of punitive damages, and an award of attorneys' fees under 42 U.S.C. § 1988 and costs.

ANSWER:     Defendants deny the allegations contained in Paragraph 3.

4. This Court has jurisdiction over Plaintiff's claims below pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343.

ANSWER:     Defendants admit that if this action were proper, this Court would have

jurisdiction under 28 U.S.C. §§ 1331 and 1343(3). Defendants deny each and every remaining

allegation contained in Paragraph 4.

5. Venue is proper in this district under 28 U.S.C. § 1391 because:

(a) the Northern District of Illinois is the judicial district in which substantially all of the events or omissions giving rise to Plaintiff's claims occurred; and

(b) the Defendants Griffin, Leggin, and Smith-Foote are found or are employed in the Northern District of Illinois.

ANSWER: Defendants admit the allegations contained in Paragraph 5 and its subparts.

6. Plaintiff Laura Timmel, a licensed clinical social worker who holds a degree with honors from Jane Addams School of Social Work at the University of Illinois, resides in Western Springs, Illinois, with her husband Brian Timmel and her three children, N. and B., twins whose birth date is in the summer of 2007, and R., whose birth date is in the late summer of 2009.

ANSWER:     Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 6. To the extent an answer is

required, Defendants deny the allegation contained in Paragraph 6.

7. Defendant Janice Griffin is the DCFS investigator who had primary responsibility for the investigation as to R. Timmel and for making the determination that Laura Timmel should be "indicated" for child abuse even after Plaintiff had been cleared of liability by the juvenile court. She is sued in her individual capacity

ANSWER: Defendants admit that Janice Griffin is a DCFS investigator and that she was assigned to the investigation concerning R. Timmel. Defendants admit that Plaintiff purports to sue Janice Griffin in her individual capacity. Defendants deny each and every remaining allegation contained in Paragraph 7.

8. At all times relevant to this complaint, Defendant Kenneth Leggin was Defendant Griffin's supervisor, and in that capacity he had responsibility for directing the investigation as to R. Timmel and overseeing and approving the recommendations of Defendant Griffin. He is sued in his individual capacity.

ANSWER: Defendants admit that Kenneth Leggin was Janice Griffin's supervisor. Defendants admit that Plaintiff purports to sue Kenneth Leggin in his individual capacity. Defendants deny each and every remaining allegation contained in Paragraph 8.

9. Defendant Kimberly Smith-Foote is a Child Protection Manager, and at all times relevant to this complaint, she was the direct supervisor of Defendant Leggin. She approved the decision to recommend indicating Laura Timmel for child abuse on November 24, four days after the juvenile court exonerated Plaintiff. Defendant Smith-Foote is sued in her individual capacity.

ANSWER: Defendants admit that Kimberly Smith-Foote is a Child Protection Manager and that she was Kenneth Leggin's supervisor. Defendants admit that Plaintiff purports to sue Kimberly Smith-Foote in her individual capacity. Defendants deny each and every remaining allegation contained in Paragraph 9.

10. At all times relevant to this complaint, Defendant Maria Miller was a DCFS administrator for the Central Region of DCFS. Defendant Miller was the assigned administrator who made the final review of the recommendation to indicate Plaintiff Timmel and, as such, Defendant Miller made the ultimate decision to register Plaintiff Timmel as a perpetrator of child abuse.

ANSWER: Defendants admit that Maria Miller was a DCFS administrator. Defendants deny each and very remaining allegation contained in Paragraph 10.

11. Pursuant to the Illinois Abused and Neglected Child Reporting Act ("ANCRA"), 325 ILCS 5/1 *et seq*, DCFS receives Hotline calls when any person makes a call based upon "reasonable cause to believe a child may be an abused child or a neglected child." 325 ILCS 5/4, 5/7, 5/7.6.

ANSWER:  Paragraph 11 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendants aver that the cited law

speaks for itself.  Defendants deny each and every remaining allegation contained in Paragraph

11 inconsistent with the law.  To the extent an answer is required, Defendants deny the

allegations contained in Paragraph 11.

12.   Under ANCRA, and consistent with a federal law known as the Child Abuse
Prevention and Treatment Act (alternatively called "the Mondale Act,"), 42 U.S.C. 5101 *et seq.*,
42 U.S.C. 5116 *et seq*., certain persons are "mandated reporters" of child abuse if a child known
to them in their professional capacity is reasonably suspected of being an abused or neglected
child.  Persons other than mandated reporters are permitted to make such reports, though they are
not penalized by law for failure to report; however, mandated reporters may be subject to
criminal and civil penalties if they fail to report reasonably suspected child abuse. 325 ILCS 5/4,
5/4.02.

ANSWER:  Paragraph 12 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendants aver that the cited law

speaks for itself.  Defendants deny each and every remaining allegation contained in Paragraph

12 inconsistent with the law.  To the extent an answer is required, Defendants deny the

allegations contained in Paragraph 12.

13. ANCRA requires that DCFS promptly initiate an investigation of the merits of calls it
accepts, sometimes working jointly with law enforcement authorities if the allegations in the call
give rise to a potential criminal complaint.  *Id*. at 5/7, 5/7.3, 5/7.4.

ANSWER:  Paragraph 13 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendants aver that the cited law

speaks for itself.  Defendants deny each and every remaining allegation contained in Paragraph

13 inconsistent with the law.  To the extent an answer is required, Defendants deny the

allegations contained in Paragraph 13.

14.  To be accepted as a Hotline call and subject to an investigation, the specific incident
of harm alleged in the report must meet an allegation definition in the DCFS allegation system.
Each of these allegations is defined in DCFS Manual of Rules and Procedures 300, Appendix B.
*See* 89 Ill. Admin. Code § 300, App'x B.  Physical abuse allegations, which are coded with a
one- or two-digit number under 50 in the DCFS allegation coding system, include specific

allegations of harm alleged to have been caused by the direct action of an alleged perpetrator, including "#2 Head Injuries"; "#5 Burns"; "#7 Wounds"; "#9 Bone Fractures"; "#10 Substantial Risk of Physical Injury"; "#11 Cuts, Bruises, Welts, Abrasions and Oral Injuries"; "#12 Human Bites"; and "#16 Torture." Neglect allegations of harm, which are coded with a two-digit number greater than 50, include injuries that are alleged to have been caused by the blatant disregard of the alleged perpetrator (such as "#52 Head Injuries," "#57 Bone Fractures," and "#62 Human Bites") as well as additional defined areas of harm to children, such as "#74 Inadequate Supervision" and "#79 Medical Neglect."

ANSWER: Paragraph 14 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendants aver that the cited law

speaks for itself. Defendants deny each and every remaining allegation contained in Paragraph

14 inconsistent with the law. To the extent an answer is required, Defendants deny the

allegations contained in Paragraph 14.

15. The specific allegations relevant to the investigation and indicated findings involving the Timmel children are allegation of harm "#9 Bone Fractures by Abuse" (alleged as to R. Timmel due to a fracture he sustained to his left femur in September 2009) and allegation of harm "#60 Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect" (alleged as to N. and B. Timmel insofar as they were assumed to be at risk of harm as a result of the injury to R.).

ANSWER: Paragraph 15 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendants aver that the cited law

speaks for itself. Defendants deny each and every remaining allegation contained in Paragraph

15 inconsistent with the law. To the extent an answer is required, Defendants deny the

allegations contained in Paragraph 15.

16. DCFS regulations require DCFS to complete investigations of Hotline calls within 60 days, except where this time may be extended for good cause. 325 ILCS 5/7.12. At the conclusion of the investigation, DCFS investigators determine if the allegations under investigation are "indicated"—meaning that some credible evidence of abuse or neglect was found—or "unfounded"—meaning that DCFS did not find credible evidence of abuse or neglect. *Id.*

ANSWER: Paragraph 16 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendants aver that the cited law

speaks for itself. Defendants deny each and every remaining allegation contained in Paragraph

16 inconsistent with the law.  To the extent an answer is required, Defendants deny the

allegations contained in Paragraph 16.

17. The final determination of "indicated" or "unfounded" must be reported forthwith to the Register. *Id* at 7/7, 7/12. However, if an individual is licensed to work with children or otherwise is engaged in employment involving the care of children, DCFS is not permitted to issue an indicated finding without first allowing the child care professional an opportunity to have the recommendation to "indicate" her reviewed by an administrator by way of an Administrator's Conference. The pre-deprivation Administrator's Conference is one of the procedural due process protections that the federal court, in *Dupuy v. McDonald*, directed DCFS to adopt in order to remedy the then-constitutionally inadequate indicated report decision-making policies as applied to child care professionals. *Dupuy v. McDonald*, 141 F. Supp. 2d 1090 (N.D. Ill. 2001); Preliminary Injunction Memorandum Opinion and Order at *Dupuy v. McDonald*, 2003 U.S. Dist. LEXIS 12019, at *21-26 (N.D. Ill. July 10, 2003), *aff'd in relevant part sub nom Dupuy v. Samuels*, 397 F. 3d 493, 512 (7th Cir. 2005).  The requirements for Administrator's Conferences are now codified in DCFS rules and procedures. *See* 89 Ill. Admin. Code § 300.160.

ANSWER:  Paragraph 17 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendants aver that the cited law

speaks for itself.  Defendants deny each and every remaining allegation contained in Paragraph

17 inconsistent with the law.  To the extent an answer is required, Defendants deny the

allegations contained in Paragraph 17.

18. Only if the Administrator, after reviewing the basis for the recommended finding as well as any information or evidence the child care professional presents at the conference, determines that there is sufficient evidence of abuse or neglect, upon consideration of all of the inculpatory as well as the exculpatory evidence,  is DCFS authorized to issue an indicated report and register an individual's name identifying him or her as a perpetrator of child abuse or neglect in the State Central Register. *Dupuy*, U.S. LEXIS 12019, at *25; 89 Ill. Admin. Code § 300.160(c)(4).

ANSWER:  Paragraph 18 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendants aver that the cited law

speaks for itself.  Defendants deny each and every remaining allegation contained in Paragraph

18 inconsistent with the law.  To the extent an answer is required, Defendants deny the

allegations contained in Paragraph 18.

19. Once registered, indicated findings for physical abuse such as bone fractures are registered for a period of 20 years, and indicated findings for most forms of neglect are

registered for a period of 5 years.  325 ILCS 5/7.14; DCFS Procedures 300.100(c). These findings are registered and maintained unless the person named as a perpetrator appeals the finding and, at the subsequent administrative hearing, DCFS fails to meet is burden of proof (by a preponderance of the evidence) that the finding should be maintained. 325 ILCS 5/7.16.

ANSWER:  Paragraph 19 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendants aver that the cited law

speaks for itself.  Defendants deny each and every remaining allegation contained in Paragraph

19 inconsistent with the law.  To the extent an answer is required, Defendants deny the

allegations contained in Paragraph 19.

20.  At the same time as DCFS investigators are expected to make determinations as to whether allegations of abuse or neglect are "indicated" or "unfounded," they are also authorized by state law to take emergency protective custody of children whom they reasonably believe cannot be cared for at home without endangering their health or safety, but only if there is not time to apply for a court order requesting temporary custody. 325 ILCS 5/5. (Doctors and law enforcement authorities also are given such authority by state law but it is DCFS that has the exclusive responsibility to hold a child in its custody after emergency protective custody has been taken. *Id.*)

ANSWER:  Paragraph 20 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendants aver that the cited law

speaks for itself.  Defendants deny each and every remaining allegation contained in Paragraph

20 inconsistent with the law.  To the extent an answer is required, Defendants deny the

allegations contained in Paragraph 20.

21.  If DCFS intends to maintain temporary custody after taking emergency protective custody of a child without a court order, however, the Juvenile Court Act requires: (a) that a Petition for Adjudication of Wardship as to the child be filed within 48 hours of the taking of custody, otherwise the child is to be released back to his parents' care, 705 ILCS 405/2-9; and (b) upon such petition, the court must find that there is "probable cause" to believe the child is abused or neglected, that there is "immediate and urgent necessity" for the safety of the child that he or she be placed outside the custody of his or her parents, and that "reasonable efforts" were made to avoid removing the child from his or her parent, 705 ILCS 405/2-10.

ANSWER:  Paragraph 21 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendants aver that the cited law

speaks for itself.  Defendants deny each and every remaining allegation contained in Paragraph

21 inconsistent with the law. To the extent an answer is required, Defendants deny the

allegations contained in Paragraph 21.

22. DCFS rules and regulations set forth detailed requirements as to the types of
evidence to be considered in each type of investigation. For example, in an investigation of an
allegation of "Bone Fractures," DCFS Procedures 300, Appendix B, provide that DCFS
investigators must consider the opinion of radiologists or orthopedists and the procedures direct
investigators to weight the opinion of doctors with higher degrees of relevant specialization more
highly than the opinions of less specialized doctors.

ANSWER: Paragraph 22 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendants aver that the cited law

speaks for itself. Defendants deny each and every remaining allegation contained in Paragraph

22 inconsistent with the law. To the extent an answer is required, Defendants deny the

allegations contained in Paragraph 22.

23. Any person who is indicated for child abuse or neglect has the right to appeal the
finding to a neutral decision-maker—a DCFS administrative law judge. 325 ILCS 5/7.16, 89 Ill.
Admin. Code § 336, "Appeal of Child Abuse and Neglect Investigation Findings." Ordinarily,
such appeals must be decided within 90 days, *Lyon v. Dep't of Children & Family Servs.*, 209 Ill.
2d 264, 807 N.E.2d 423 (Ill. 2004); 89 Ill. Admin. Code § 336.220, but for persons who work
with children (i.e., *Dupuy* class members, *see* ¶ 17 *supra*), DCFS is required to issue a final
administrative hearing decision within 35 days of the filing of an administrative appeal request if
the child care professional has requested an expedited appeal, *Dupuy*, LEXIS 12019, at *26-29;
89 Ill. Admin. Code § 336.85.

ANSWER: Paragraph 23 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendants aver that the cited law

speaks for itself. Defendants deny each and every remaining allegation contained in Paragraph

23 inconsistent with the law. To the extent an answer is required, Defendants deny the

allegations contained in Paragraph 23.

24. Prior to the Hotline call in this case, which occurred in the late evening on Thursday,
September 10, 2009, Laura Timmel's sole contact with DCFS had been as a Licensed Clinical
Social Worker herself: she had been employed as a social worker by the Division of Specialized
Care for Children and, before that, as a school-based social worker. In these capacities, Laura
Timmel herself had several occasions to contact the Hotline as a mandated child abuse reporter
seeking help for children she reasonably believed were seriously abused or neglected and
required DCFS's intervention.

8

ANSWER: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24. To the extent an answer is required, Defendants deny the allegations contained in Paragraph 24.

25. Neither Plaintiff Laura Timmel nor her husband Brian ever had any prior interaction with law enforcement either, except for traffic stops.

ANSWER: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25. To the extent an answer is required, Defendants deny the allegations contained in Paragraph 25.

26. During the week leading up to the Hotline call that gave rise to this action, Laura Timmel had been the primary caregiver for her three children, except during a few hours when her husband Brian Timmel watched the children.

ANSWER: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26. To the extent an answer is required, Defendants deny the allegations contained in Paragraph 26.

27. On the morning of Thursday, September 10, 2009, Laura took R., who was then four weeks old, to a medical appointment with an audiologist at Children's Memorial Hospital and left the twins, who were then two years old, at home with her husband for the day. After the medical appointment, Laura visited friend and former neighbor John Matthew Peluse and changed R.'s diaper and nursed R. while there, then went for lunch at a Panera Bread restaurant before going to a hair salon appointment in the afternoon. She returned home with R. in the late afternoon.

ANSWER: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27. To the extent an answer is required, Defendants deny the allegations contained in Paragraph 27.

28. While at the hair salon, Laura nursed R. and changed R.'s diaper. As she placed R. in his car seat to leave, Laura noticed that R.'s leg seemed slightly swollen and asked the stylist, Sasha Staerkel, who had recently held R. for several minutes, if it appeared swollen to her. The stylist said that it did perhaps look a little different from the other leg. The stylist later testified that she did not think that R.'s leg looked injured.

ANSWER: Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 28. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 28.

29. During the entire time Laura and R. were at the salon, R. appeared content and comfortable with no unusual crying or behaviors suggesting that he had been injured in any way. Indeed, despite Laura having been in public with R. all day on September 10, no one—including medical staff with whom Laura and R. had contact on September 10—had any concern about R.'s condition.

ANSWER:     Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 29. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 29.

30.  Laura and R. returned home in the late afternoon shortly before Brian and the twins came home. When Brian arrived home, he held R. because he hadn't seen him all day, and he did not notice anything unusual about R.

ANSWER:     Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 30. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 30.

31. At approximately 5:00 p.m., Laura fed R. and then changed R.'s diaper and clothes, taking note that his left leg still appeared as though it might be a little swollen. R. was not exhibiting any signs of distress or pain.

ANSWER:     Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 31. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 31.

32. That evening, Laura prepared dinner for the family and R. was placed in his swing while the family ate. At about 7:00 p.m., after dinner, Laura went to change R.'s diaper and noticed that his left leg had become extremely swollen and that his leg seemed slightly out of alignment.  When Laura moved his leg to change his diaper, he cried out in pain but he did not cry inconsolably.  She called to Brian to take a look at R.'s leg, whereupon both Laura and Brian agreed that it looked like R. might have been bitten by a spider or insect.

ANSWER:     Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 32. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 32.

33. Because the Timmels had just moved to the western suburbs from Chicago, they called one of their new neighbors for a recommendation as to where to take R. to be examined by a doctor. Upon receiving the recommendation to take R. to Hinsdale Hospital, Brian Timmel took R. there while Laura remained home with the twins.

ANSWER: Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 33. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 33.

34. While at Hinsdale Hospital, R. was examined by several medical personnel, including Nurse Robert Ditto and an emergency room doctor. At approximately 11:00 p.m., the ER doctor informed Brian Timmel that an x-ray had identified a fracture to R.'s left femur and that DCFS would be called based on a suspicion that the fracture may have been caused by child abuse.

ANSWER: Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 34. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 34.

35. After Brian notified Laura that R. had a fracture to his leg, Laura arranged for a neighbor to sit with the twins and she met Brian at Hinsdale Hospital. Medical personnel at Hinsdale recommended transferring R. to Children's Memorial Hospital ("CMH") and Brian and Laura acted in accordance with this recommendation. Laura travelled by ambulance to CMH with R. while Brian returned home to care for the twins.

ANSWER: Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 35. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 35.

36. Upon arriving at CMH at approximately 1:00 a.m. on Friday, September 11, Laura was interviewed by the DCFS on-call investigator Moises Cruz, who was considered the "mandate worker"—i.e., the DCFS investigator who was assigned to see R. within 24 hours of the Hotline Call. Mr. Cruz directed Laura to immediately arrange for someone to supervise Brian's and her own contact with their children at all times. Mr. Cruz threatened Laura that if she did not immediately make such an arrangement, he would take protective custody of all of her children.

ANSWER: Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 36. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 36.

37. During the early morning hours of September 11, Mr. Cruz also visited the family home and spoke with Brian. Brian and Laura made immediate arrangements for Brian's mother, Janice Timmel, to travel to Chicago from Cincinnati, Ohio, in order to supervise Brian and Laura, and also arranged for a neighbor to supervise their contact until Janice Timmel could arrive.

ANSWER: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37. To the extent an answer is required, Defendants deny the allegations contained in Paragraph 37.

38. While at the hospital on September 11, Laura was also interviewed by Dr. Sarah Monahan-Estes ("Estes"), a non-board-certified fellow with CMH's Child Protective Unit. This unit is part of MPEEC (Multidisciplinary Pediatric Education and Evaluation Consortium), a consortium of child abuse divisions at area hospitals that provide evaluations to DCFS. Unbeknownst to Laura at the time, pursuant to a pre-existing contract between CMH and DCFS, Dr. Estes would be reporting her conclusions directly to DCFS, and specifically to Defendant Griffin, and not to them as parents.

ANSWER: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38. To the extent an answer is required, Defendants deny the allegations contained in Paragraph 38.

39. Dr. Michelle Sagan was the treating pediatric orthopedist for R. while he was admitted at CMH. At no point during the ensuing DCFS investigation did any person with DCFS, including the Defendants to this action, make any attempt to speak with Dr. Sagan despite the DCFS requirement that in a bone fracture investigation, DCFS must contact all treating physicians and must obtain "[v]erification of the injury . . . from a physician, preferably an orthopedist or radiologist." 89 Ill. Admin. Code, § 300, App'x B, "# 9/59 Bone Fractures." Further, DCFS procedures require that DCFS investigators give the greatest weight to the specialist with the greatest expertise in the relevant area of medicine, which Defendant Griffin acknowledged would be the area of orthopedics in the present case, but none of the DCFS Defendants sought or considered Dr. Sagan's opinion at any relevant time.

ANSWER: Plaintiff is attempting to paraphrase Illinois law and Defendants aver that the cited law speaks for itself. Defendants deny the allegations contained in Paragraph 39.

40. R. was discharged from CMH on the evening of Friday, September 11.

ANSWER: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 40. To the extent an answer is required, Defendants deny the allegations contained in Paragraph 40.

41. Officer Craig Balon with the LaGrange Police Department interviewed both Brian and Laura at the family home, on September 11 and September 12, respectively. On September 15, Officer Wardlaw with the LaGrange Police reported to Defendant Griffin that after speaking with the family, the police department "did not have a sense of abuse."

ANSWER: Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 41. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 41.

42. On September 11, 2009, DCFS Supervisor Lucia Greer directed that the ensuing investigation in this case should include "an exact description of the fracture," interviews with "all physicians directly involved with the treatment of the reported injury (e.g., attending physician, radiologist or orthopedist)," and "a TIME LINE starting with when they noticed the injury; activity throughout the past week [] with both parents." [emphasis in original]. In addition, she directed that "any other person with knowledge" should be interviewed.

ANSWER: Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 42. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 42.

43. On Friday, September 11, 2009, DCFS assigned Janice Griffin as the primary investigator of the allegations against Brian and Laura Timmel. Griffin was obligated to conduct the investigation in accordance with DCFS Rules and Procedures and in accordance with the *Dupuy* orders, cited at ¶¶17 and 18, above and she later testified in the juvenile court action that ensued on October 2 that she handled the investigation in accordance with her understanding of the applicable policies and procedures. However, her understanding of these requirements was lacking, as described below.

ANSWER: Defendants admit that Janice Griffin was the assigned investigator.

Defendants deny each and every remaining allegation contained in Paragraph 43.

44. Between September 11, 2009, the day Griffin was assigned as the primary investigator, and October 1, 2009, which was the day that Griffin decided (with Defendant Leggin, Defendant Smith-Foote, and Division of Child Protection Associate Deputy Director Meryl Paniak) to take protective custody of the Timmels' children, she had conducted very little investigation of the facts either supporting or refuting the allegations that Brian or Laura Timmel had abused or neglected their children. Indeed, not *one* of Supervisor Greer's September 11 directives had been satisfied, nor had the directive of Defendant Leggin, dated September 23, 2009, to secure additional information including "how old is the fracture" been satisfied.

ANSWER: Defendants deny the allegations contained in Paragraph 44.

45. Between September 11 and October 1, only the following minimal investigative steps

had occurred:

(i) On September 11, Griffin spoke briefly with two CMH social workers merely to learn that the case had been assigned to Dr. Estes for MPEEC review and confirm that R. was ready for discharge and that, pursuant to Griffin's direction, he would be discharged to the care of Janice Timmel and not to Brian or Laura;

(ii) On September 11, Griffin spoke briefly with Janice Timmel, Brian's mother, merely to confirm that she would supervise any contact Laura and Brian had with their own children per DCFS directive that during the investigation they could no longer have unsupervised contact with their own children;

(iii) On September 15, Griffin spoke with Office Wardlaw from the LaGrange Police Department, who informed Griffin that after speaking with the family, the police "did not have a sense of abuse;"

(iv) On September 15, Griffin visited the home where she interviewed Brian Timmel and Laura Timmel, though the interview of Laura Timmel did not comport with a number of DCFS requirements, including the requirement that DCFS ask her for collateral contacts and conduct a domestic violence and substance abuse screen;

(v) On September 15 and September 22, Griffin observed the children in their home (where they were found to be healthy except for R.'s fracture);

(vi) On September 16, Griffin spoke with Nurse Ditto, who reported that while at Hinsdale Hospital, R. did not cry inconsolably but, rather, would cry while he was repositioned but not cry while at rest; and

(vii) During this time period of September 11 through October 1, Griffin spoke to only a single doctor: Dr. Estes, a non-board-certified child abuse fellow who offered her opinion that based merely on the absence of an explanation for the fracture, she concluded that the injury was more than likely caused by abuse. Dr. Estes' opinion was based upon the theory that the fracture would have been so painful that R. would have cried inconsolably.

ANSWER:    Defendants deny the allegations contained in Paragraph 45 and its

subparts.

46.  The following investigative steps were not taken between September 11 and October 1, 2009, despite the clear requirements of DCFS rules and procedures and the due process requirement, as directed by the *Dupuy* orders, that DCFS investigators are to gather and consider all available exculpatory evidence:

(i) Identification of and contact with two eyewitnesses who saw R. on the date his fracture was discovered (i.e., John Matthew Peluse, who saw R. at approximately 11:00 a.m. on September 10, and Sasha Staerkel, the hairstylist who observed R. from approximately 1:00 p.m. to 3:30 p.m. on September 10 and held him briefly herself). Eye witness contacts are required by DCFS Procedures 300, Appendix B (defining direct evidence as "a statement taken from an eyewitness . . . **It is imperative that the CPSW seeks objective corroboration of . . . self-reports**" and "consider information developed through personal observation . . . or required interviews that will establish the accuracy of [parents'] reports. . . .  **There is no substitute for independent verification of this sort of information.**") (bold in original). *See also* DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, (subsection (C)(4)(F), requiring the investigator to "[i]nterview all identified witnesses who are reported to have knowledge of the incident that resulted in a bone fracture");

(ii) contact with *all* pediatric orthopedists, radiologists, or attending physicians who

treated the injury as required by DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, at subsections (C)(2)(F) and (C)(4)(E). Such doctors were Dr. Michelle Sagan, the pediatric orthopedist who had treated R.'s fracture at CMH, and Dr. Christopher Sullivan, the Chief of Pediatric Orthopedics at University of Chicago's Comer Children's Hospital, who provided further treatment for R.'s fracture on September 30, 2009. Griffin later denied knowing that Dr. Sullivan was a treating physician, but acknowledged she knew he had put a new splint on R.'s leg;

(iii) contact with R.'s primary care pediatrician, Dr. Danielle Cherian, required by DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, subsection (C)(4)(L);

(iv) contact with Laura Timmel's obstetrician, Dr. Brian Foley, as required by *id.* (insofar as he was a physician who had seen the child in past six months). Griffin did not even request consents from Ms. Timmel to speak to any of her own doctors or secure her own medical records, including her obstetrical records;

(v) assessment of the credentials of the doctors upon whom DCFS was relying for its opinion as required by DCFS Procedures 300 (specifying that a professional's expertise is to be assessed according to their amount of training, experience, and specialization, specifically stating that the opinion of a pediatric radiologist is more credible than that of a radiologist, and the opinion of a radiologist as to a bone fracture is more credible than that of a pediatrician; also stating that the opinion of a doctor on "hospital staff is more credible than a pediatric resident.") Griffin later testified that she N.r took steps to identify any doctors Dr. Estes may have consulted, while wrongly assuming that Dr. Estes had "consulted with an orthopedic doctor" and "other doctors who have training in [radiology];"

(vi) determination as to the relative weight to be given to the opposing opinions of doctors when their opinions were in conflict, based on the specific expertise and level of experience of the opposing doctors. Griffin later acknowledged that the "relevant specialization" in a case involving bone fractures would be orthopedics;

(vii) consideration of whether a *third* opinion is needed to reconcile divergent medical views and render a sound determination as to the likelihood of abuse versus accidental trauma where experts disagree, as required by Procedures 300, Appendix B, #9/59, Bone Fractures, (subsection (C)(5)(F)).

ANSWER:     Defendants deny the allegations contained in Paragraph 46 and its

subparts.

47.  Defendant Griffin made only *pro forma* contact with the police officers who were also investigating the case and the initial child abuse reporter, Nurse Robert Ditto. Neither she nor Defendants Leggin or Smith-Foote, nor Defendant Miller at the later Administrator's Conference, considered the information these persons had to provide that was exculpatory. Specifically:

(i) On September 15, Officer Wardlaw informed Griffin that after speaking with the family, the police department officials did not have a "sense of abuse."

(ii) Nurse Ditto at Hinsdale Hospital made observations of R. that *supported* the Timmels' contentions that R. was not inconsolable (Nurse Ditto ultimately testified that when R.'s leg was manipulated, he would cry for only 10-20 seconds) and discounted the claim of Dr. Estes (which was that the fracture would have been so painful and so obvious thereafter that R. would have cried inconsolably and, therefore, the lack of an explanation for the fracture by the parents was not credible).

15

ANSWER:    Defendants deny the allegations contained in Paragraph 47 and its

subparts.

48.  On September 30, R. was examined and treated by Dr. Christopher Sullivan, Chief of Pediatric Orthopedics, University of Chicago Comer Children's Hospital. On September 30, Dr. Sullivan reported to the Timmels his expert opinion that R.'s fracture was *unlikely* to be due to abuse.

ANSWER:    Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 48. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 48.

49. On the afternoon of October 1, 2009, Defendant Griffin contacted Brian Timmel and requested that he come to the DCFS offices the next day with Laura and their children.  That morning, Defendant Griffin had received a written report from Dr. Estes documenting her opinion. Though Defendant Griffin concealed her true motives from Brian Timmel, her intention was to take protective custody of the Timmels' children during the next day's meeting.

ANSWER:    Defendants deny the allegations contained in Paragraph 49.

50. On the afternoon of October 1, 2009,  upon learning of the request that Brian Timmel bring the children to the DCFS offices the next day, the Timmels' counsel called Defendant Griffin at approximately 4:30 p.m. and spoke to her and her supervisor, Defendant Leggin. The counsel (Diane L. Redleaf and Melissa L. Staas, both attorneys with the Family Defense Center) confirmed  to Defendants Griffin and Leggin the availability of Dr. Sullivan's opinion that the injury was more than likely *not* caused by abuse and urged Defendants to contact him immediately. While the Timmels' counsel offered a phone number for Dr. Sullivan's office so that the DCFS investigative staff could speak to him immediately about his opinion, Defendants Griffin and Leggin deliberately ignored this information.

ANSWER:    Defendants deny the allegations contained in Paragraph 50.

51. Instead of calling Dr. Sullivan or reviewing his opinion or seeking out further opinion of the MPEEC doctors or other medical opinions, Defendants Griffin and Leggin, with the approval of Defendant Kimberly Smith-Foote, decided to "go with our MPEEC doctor" without so much as any serious efforts to notify Dr. Estes, their own MPEEC consultant, that a second opinion disagreed with hers.

ANSWER:    Defendants deny the allegations contained in Paragraph 51.

52.  At 4:51 p.m. on October 1, Defendants Griffin, Leggin, and Smith-Foote consulted with each other and with their superiors and decided to take protective custody of the Timmel children that very night instead of waiting until the following day as had been originally planned, showing that the DCFS Defendants refused to wait even a few *hours* for the newly-available

evidence that the Timmels had secured from the head of pediatric orthopedics at the University of Chicago. By contrast, the DCFS Defendants had by that point waited for Dr. Estes' report for *twenty* days after the date on which Dr. Estes examined R. Timmel (*i.e.*, from September 11 to October 1). Their refusal to wait even *one* hour to fulfill the requirement under DCFS policy that they consult with a pediatric orthopedic expert demonstrates their disregard for the truth and their rush to judgment against the Timmels as guilty of child abuse. Griffin and Leggin made these decisions in consultation with their superiors, Defendant Smith-Foote and Division of Child Protection Associate Deputy Director Meryl Paniak.

ANSWER: Defendants deny the allegations contained in Paragraph 52.

53. After deciding to take protective custody, Defendant Griffin arranged for police squad cars to assist her in removing the Timmels' three children from their home. Griffin went to the home at approximately 6:30 p.m. Janice Timmel, who was at the home with Laura and the children, answered the door but would not allow Griffin to enter. Griffin saw N. in the window and observed that N. looked healthy and happy.

ANSWER: Defendants deny the allegations contained in Paragraph 53.

54. Brian Timmel, who had not yet arrived home from work, contacted his counsel. Based on the advice of counsel, Janice Timmel notified Defendant Griffin that she would not be allowed into the home without a warrant. Lacking a warrant to remove the children from their home, the police and Griffin left.

ANSWER: Defendants deny the allegations contained in Paragraph 54.

55. Fearful that the children would be seized from them in the middle of the night, the family found shelter with a family friend for the evening and awaited word from their counsel in the morning as to DCFS's intended actions concerning their family. Throughout that night, DCFS personnel went to the family home in La Grange on at least two additional occasions—at approximately 10:45 p.m. on October 1, and again at 3:30 a.m. on October 2—in an attempt to seize the Timmel children without a warrant or court order.

ANSWER: Defendants deny the allegations contained in Paragraph 55.

56. On the morning of October 2, 2009, counsel for the Timmels sent a letter to Defendants Griffin, Leggin, and Smith-Foote documenting that Dr. Sullivan had determined that the fracture was fully consistent with accidental causes and urging the Defendants to refrain from making critical decisions in the case until they had received and reviewed Dr. Sullivan's written medical opinion, which was at that time forthcoming.

ANSWER: Defendants deny the allegations contained in Paragraph 56.

57. On October 2, 2009, Defendant Griffin sought, and the Cook County State's Attorney's Office approved, without any review or consideration of the orthopedic opinions of Drs. Sullivan and Sagan undermining the conclusion that R.'s fracture was likely to be due to child abuse, the filing of petitions for Adjudication of Warship and Temporary Custody as to all three Timmel children. These petitions cited only the opinion of Dr. Estes and omitted the

contrary opinions of Drs. Sullivan and Sagan. Furthermore, these petitions were filed upon the false representation of Defendant Griffin that she had made "reasonable efforts" to keep the family together though no such efforts were documented and none had been made.

ANSWER: Defendants admit that Petitions for Adjudication of Wardship and

Temporary Custody were filed. Defendants deny each and every remaining allegation contained

in Paragraph 57.

58. In the afternoon of October 2, based solely on the representations the State and DCFS had made in the petitions, an order taking the children into DCFS temporary custody was entered "without prejudice," albeit with the agreement that the children would remain in their home with their grandparents, either Tim and Janice Timmel (Brian's parents) or Hon. Nancy Dreher and Roger Dreher (Laura's parents), as their caregivers while the parents, Laura and Brian Timmel, were required to reside elsewhere. As of that date, no DCFS employee, including Defendants, and no person employed by the State's Attorney's office had spoken to any orthopedist or radiologist regarding the likelihood of the fracture being caused by child abuse.

ANSWER: Plaintiff is attempting to paraphrase and quote a court order and

Defendants aver that the court order speaks for itself. Defendants deny each and every allegation

contained in Paragraph 58.

59. On October 2, the court scheduled the preliminary temporary custody hearing to commence on October 14, 2009. Pursuant to 705 ILCS 405/2-10, this hearing was held to determine: (a) whether there was any probable cause to believe that the Timmel children had been abused or neglected and, if so; (b) whether it was a matter of immediate and urgent necessity that the Timmel children be placed in the temporary custody of DCFS and, if so; (c) whether DCFS made reasonable efforts to prevent or eliminate the necessity of removing the Timmel children from the custody of their parents. *See ¶ 21 supra*. As is discussed below, *see ¶ 69 infra*, at the conclusion of the temporary custody hearing regarding the Timmel family, the juvenile court found no probable cause to believe that any of the Timmel children had been abused or neglect.

ANSWER: Plaintiff is attempting to paraphrase Illinois law and Defendants aver that

the cited law speaks for itself. Defendants deny each and every allegation contained in

Paragraph 59.

60. On October 7, 2009, counsel for the Timmels sent to Defendants Griffin and Leggin the written report of Dr. Sullivan in which he concluded that the probability that the fracture to R.'s left femur was caused by abuse was extremely low.

ANSWER: Defendants deny the allegations contained in Paragraph 60.

61. Among the opinions and references Defendants ignored was that of Dr. Brian Foley, Laura Timmel's obstetrician. In a letter to DCFS dated October 8, 2009, he stated:

> I was shocked to hear that DCFS was investigating this couple for abuse. I understand the situation warrants attention, and I can understand the unknown cause of the injury could raise suspicion on your department's behalf. However, being a caregiver for this couple for the last four plus years and seeing their interpersonal interactions with each other and their children I found it unfathomable that either is capable of inflicting that type of injury on any child. I would expect your department to do a more thorough investigation and follow up with myself and the Timmel's [sic] pediatrician as to their personalities and parenting skills.

During the DCFS investigation, DCFS Defendants made no attempt to speak with Dr. Foley.

ANSWER: Defendants deny the allegations contained in Paragraph 61.

62. During the DCFS investigation, nobody from DCFS, including the Defendants, spoke with Dr. Danielle Cherian, the primary care pediatrician for R. and the other two Timmel children.

ANSWER: Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 62. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 62.

63. Throughout the ensuing juvenile court hearing as to whether there was probable cause to believe R. was abused by either Brian or Laura Timmel (or both), Defendants Griffin and Leggin pointed exclusively to Estes' MPEEC report and opinions as the exclusive source of the factual allegations throughout this case. On October 14, 2009, Defendant Griffin testified that DCFS did not need to consider the opinions of orthopedists because "we had our MPEEC report" and "we decided to go with our MPEEC report." This exclusive reliance on Dr. Estes' opinion, and refusal to consider the opinions and testimony of others, was unreasonable on its own terms for Dr. Estes herself acknowledged, in testimony given on October 16, that an MPEEC report is *not* by itself a complete child abuse investigation. It was the responsibility of DCFS, assigned to Defendants Griffin and Leggin, and not of the MPEEC team, to make investigative contacts confirming or rebutting a parents' account of the facts.

ANSWER: Defendants deny the allegations contained in Paragraph 63.

64. In addition to failing to investigate medical evidence and eyewitness accounts, the DCFS Defendants failed to investigate any facts that would either confirm or refute the credibility and good character of the Timmels, as persons and as parents. Indeed, they held it as a mark against them that they had personal relationships with federal judges, lawyers, and doctors and refused to speak to any of these individuals prior to taking protective custody, and for days after initiating the juvenile court action. At the same time, Defendant Griffin claimed she had "no opinion" as to Laura's denial of abuse and acknowledged that the parents acted appropriately with their children and that she had no reports that they had ever behaved other

19

than as model parents.  In addition, the DCFS Defendants also refused to consider at all relevant the fact that Laura Timmel had a career working extensively with children as a school social worker and as a social worker in the Division of Specialized Services for Children.

ANSWER:    Defendants deny the allegations contained in Paragraph 64.

65.  Even though Dr. Este's opinion was the sole opinion upon which the DCFS Defendants relied, Dr. Estes' opinion was not as strongly inculpatory as the Defendants Griffin and Leggin assumed:  she had no opinion as to *who* had abused R., nor as to whether custody of the children should have been taken, nor as to whether either parent posed any danger to the children, nor as to whether the parents should be allowed to be alone with their children and she acknowledged that siblings can cause a fracture in a newborn baby and that infants being removed from car seats or baby carriers can experience a leg fracture.

ANSWER:    Defendants deny the allegations contained in Paragraph 65.

66.  On October 16, 2009, though the juvenile court "probable cause" hearing had not yet concluded, the juvenile court directed that the Timmels should be allowed to return to their home under supervision, over the objection of DCFS counsel, representing Defendants Leggin, Griffin, and Smith-Foote.  On November 4, 2009, the juvenile court allowed the Timmels unsupervised visits with their children, again over the objection of DCFS counsel. Throughout the proceedings in the juvenile court, Defendants Griffin and Leggin continued to press for a finding of abuse against both of the Timmels, even though they had failed to consider all the exculpatory evidence set forth above.

ANSWER:    Defendants deny the allegations contained in Paragraph 66.

67.  In the course of the juvenile court proceedings, while claiming to follow the law governing her investigation, *see* ¶ 43 *supra*, Defendant Griffin testified she was not aware of the DCFS requirement that she obtain the opinion of an orthopedist.  DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, at subsections (C)(2)(F) and (C)(4)(E).

ANSWER:    Plaintiff is attempting to paraphrase DCFS Procedure and Defendants aver

that the cited DCFS Procedure speaks for itself.  Plaintiff is also attempting to paraphrase

testimony at a juvenile court hearing which is of record and the testimony before that court in

those proceedings speaks for itself in the context of that case.  Defendants deny each and every

allegation contained in Paragraph 67.

68. On November 4, R.'s treating orthopedist at CMH, Dr. Sagan, testified in the juvenile court proceedings that she could not conclude R. was more likely than not to have been abused based on available evidence. Dr. Sagan also disagreed with the "inconsolable cry" theory put forth by Dr. Estes as the linchpin of her contention that R. was abused.

ANSWER:    Plaintiff is attempting to paraphrase testimony at a juvenile court hearing

which is of record and the testimony before that court in those proceedings speaks for itself in

the context of that case. Defendants deny each and every allegation contained in Paragraph 68.

69. On November 20, 2009, after five separate days of hearing and closing arguments, the juvenile court ruled that there was no probable cause to believe R. Timmel had been abused. The court found the testimony of Brian and Laura Timmel "clear and compelling." The court also found Dr. Sullivan's testimony to be "convincing." Upon finding no probable cause, the court dismissed the Petition for Adjudication of Wardship as to the Timmel children.

ANSWER:     Plaintiff is attempting to paraphrase the court's ruling at a juvenile court

hearing which is of record and the proceedings in that case speak for themselves in the context of

that case. Defendants deny each and every allegation contained in Paragraph 69.

70. Despite the judicial finding that R. was not abused and that there was not even probable cause to believe that he had been abused, DCFS Defendants Griffin, Leggin, and Smith-Foote continued to pursue the investigation they had started on September 10 rather than close it out immediately, as the finding of no probable cause required. The sole change in the focus of the ongoing investigation they started on September 10 was that they narrowed their focus to only Plaintiff Laura Timmel, not Brian Timmel.

ANSWER:     Defendants deny the allegations contained in Paragraph 70.

71. On December 3, 2009, Defendant Griffin issued a recommended decision, approved by Defendants Leggin and Smith-Foote, that the report of abuse be "indicated" as to Laura Timmel only. The Defendants issued a notice of their intent to indicate the report against her and sent her an Investigation Summary. This Summary recites their continuing reliance on the opinion of Dr. Estes and omits mention of Dr. Sagan altogether.

ANSWER:     Defendants deny the allegations contained in Paragraph 71.

72. As was her right pursuant to the *Dupuy* decisions, Plaintiff Laura Timmel invoked her right to an Administrator's Conference and retained counsel, at significant continued expense, in order to present to the DCFS administrator the mountain of exculpatory evidence she had by now collected. On December 15, 2009, Defendant Miller convened an Administrator's Conference in which Defendants Griffin and Leggin participated.

ANSWER:     Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 72. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 72.

73. During the December 15 conference, Defendants Griffin and Leggin stated they still had not interviewed Dr. Sagan, they were not aware of Dr. Sagan's involvement in this case, and they "[didn't] know who she [was]" even though the juvenile court's November 20 ruling

specifically cites Dr. Sagan's opinion and her testimony.

ANSWER:    Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 73. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 73.

74.    Defendant Griffin and Defendant Leggin asserted that they had read the juvenile court's final order in the case, but it was clear from their statements during the December 15 Administrator's Conference that they did not consider it, apply it, or obey it, and nor did Defendant Smith-Foote, who on November 24, 2009, had personally approved the indicated finding recommendation.

ANSWER:  Defendants deny the allegations contained in Paragraph 74.

75.    Despite the overwhelming and legally binding exculpatory evidence that had already been determined to preclude a finding of abuse as to Laura Timmel, including a binding and final court order, on or about January 8, 2010, Defendant Maria Miller affirmed the recommendation to indicate Laura Timmel as guilty of child abuse in causing the fracture of her son R.'s leg and as guilty of child neglect in creating a substantial risk of physical injury as to N. and B.. No rationale for overriding the juvenile court's final order was provided in Defendant Miller's decision to indicate Laura, nor have any of the Defendants provided any explanation for their decision to override and ignore the juvenile court's order (such as a claim of newly-discovered evidence, as there was none).

ANSWER:    Defendants deny the allegations contained in Paragraph 75.

76.    Based upon Defendant Miller's decision to affirm the recommended indicated finding, Laura Timmel's name was entered into the State Central Register as a perpetrator of child abuse and neglect.  Absent a successful appeal, by operation of law the Registry would continue for 20 years and would bar Laura from working in any social work position during that time.  It would also prevent her from volunteering at her children's school, becoming a scout leader and had a chilling effect on Laura's ability to pursue activities with her children while the finding remained on the register.

ANSWER:    Defendants admit that there was an indicated finding and that Laura

Timmel's name was placed on the State Central Register.  Defendants deny each and every

remaining allegation contained in Paragraph 76.

77.    Plaintiff Timmel appealed the indicated finding that had been registered against her and requested an expedited hearing as was her right as a *Dupuy* class member.  She retained counsel at considerable expense to present her case for expungement to the assigned DCFS administrative law judge on her behalf.

ANSWER:    Defendants admit that Plaintiff appealed the indicated finding.  Defendants

deny each and every remaining allegation contained in Paragraph 77.

78.     On or about February 19, 2010, DCFS Director Erwin McEwen approved the administrative law judge's recommended order granting Plaintiff Timmel's request for expungement of the indicated findings on the basis of the November 20, 2009, juvenile court order that exonerated Plaintiff Timmel of any alleged wrongdoing.

ANSWER:     Plaintiff is attempting to paraphrase the final administrative decision

issued by the DCFS Director and the final administrative decision speaks for itself in the context

of that case.  Defendants deny each and every allegation contained in Paragraph 78.

79. On information and belief, Defendants Griffin, Leggin, and Smith-Foote recommended indicating Laura Timmel in retaliation for her assertion of her rights, for her refusal to turn her children over to DCFS on the evening of October 1, for her prevailing before the juvenile court, and/or in order to exercise arbitrary power against her, all in violation of her substantive due process rights.

ANSWER:     Defendants deny the allegations contained in Paragraph 79.

80.  In addition to causing her to expend money on legal fees in order to clear her name, the decision to indicate Plaintiff Laura Timmel caused her extreme emotional distress, including fear for her future ability to work in her chosen career (given an indicated finding of bone fractures is registered for 20 years), concern as to her ability to be involved in her children's schooling and after-school activities,  intense fear about any future accidents that might occur to her children,  and a reasonably-based belief that she was being persecuted and harassed by governmental officials who might again seize her children or undertake other unwarranted actions against her.

ANSWER:     Defendants deny the allegations contained in Paragraph 80.

81. At all relevant times, Defendants Griffin, Leggin, Smith-Foote, and Miller acted with respect to Plaintiff Timmel under color of state law.

ANSWER:  Defendants admit that they acted under color of state law.  Defendants deny

each and every remaining allegation contained in Paragraph 81.

82. After the case with DCFS and Laura Timmel was completely closed, the Timmels continued to receive medical care and treatment for R.  In early January, 2011, R. was diagnosed with a condition that is consistent with higher-than-normal pain tolerance, a symptom that the Timmels have consistently reported was the case for R. since he was a baby.

ANSWER:     Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 82. To the extent an answer is

required, Defendants deny the allegations contained in Paragraph 82.

83.     Defendants Griffin, Leggin, Smith-Foote, and Miller violated Plaintiff Laura Timmel's clearly established rights, about which a reasonable person in their position should have known.

ANSWER:     Defendants deny the allegations contained in Paragraph 83.

84.  In recommending and in issuing an indicated finding against Laura Timmel, Defendants Griffin, Leggin, Smith-Foote, and Miller each acted intentionally or recklessly or with deliberate indifference to the consequences of their actions.

ANSWER:     Defendants deny the allegations contained in Paragraph 84.

85.   Defendants' actions complained of herein have caused severe and long-lasting harm and long-lasting injury to Plaintiff. Plaintiff Timmel's right to pursue her career was seriously threatened without basis and without constitutionally required process.  Defendants' actions complained of herein proximately caused her emotional and financial harm. Plaintiff is entitled to compensatory damages in an amount not less than $50,000 from each Defendant, jointly and severally.

ANSWER:     Defendants deny the allegations contained in Paragraph 85.

86.  Defendants Griffin and Leggin acted with callous disregard for the rights of Plaintiff. Plaintiff seeks punitive damages against defendants Griffin and Leggin.

ANSWER:     Defendants the allegations contained in Paragraph 86.

87.  Plaintiff also seeks a declaratory judgment in her favor as to the claims set forth in this Count, an award of civil rights attorneys' fees pursuant to 42 U.S.C. § 1988 and costs against all Defendants, jointly and severally, and such other relief as this Court deems just and equitable.

ANSWER:     Defendants deny the allegations contained in Paragraph 87.

## AFFIRMATIVE DEFENSES

For their affirmative defenses, Defendants state as follows:

FIRST AFFIRMATIVE DEFENSE

The allegations in Plaintiffs' Amended Complaint against Defendants fail to state a claim

upon which relief may be granted.

SECOND AFFIRMATIVE DEFENSE

Defendants affirmatively state that actions taken relating to the underlying allegations in this Amended Complaint were in conformance with all applicable constitutional, statutory, and regulatory rules of law.

THIRD AFFIRMATIVE DEFENSE

This Court lacks jurisdiction to award the relief requested in the Complaint.

FOURTH AFFIRMATIVE DEFENSE

Defendants affirmatively state that their alleged conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known, and they are each therefore entitled to qualified immunity from civil damages.

FIFTH AFFIRMATIVE DEFENSE

Defendants assert that the Eleventh Amendment prohibits Plaintiffs from recovering any judgment against them for actions undertaken in their official capacity and that the actions nominally brought against them are, in fact, a suit against the State of Illinois and could operate to control the State or subject it to liability.

JURY DEMAND

The Defendants request trial by jury.

Respectfully submitted,

LISA MADIGAN
Illinois Attorney General

By:    s/Barbara L. Greenspan
       Barbara L. Greenspan
       Teresa M. Cullen
       Assistant Attorneys General
       100 W. Randolph St., 11-200
       Chicago, Illinois  60601
       (312) 814-7087
       (312) 814-6833