**FILED**
2/10/2012
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LAURA TIMMEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 11 C 6034 |
| JANICE GRIFFIN, DCFS Investigator, in her individual | ) | James B. Zagel |
| capacity, KENNETH LEGGIN, DCFS Supervisor, | ) | Judge Presiding |
| in his individual capacity, KIMBERLY SMITH-FOOTE, | ) | |
| Child Protection Manager, in her individual capacity, | ) | |
| and MARIA MILLER, DCFS Administrator, in her | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT JANICE GRIFFIN'S AMENDED ANSWER

1.       This civil rights complaint, brought pursuant to 42 U.S.C. § 1983, seeks redress for the actions of four employees of the Division of Child Protection of the Illinois Department of Children and Family Services ("DCFS") that deprived Plaintiff Laura Timmel of her rights to due process under the Fourteenth Amendment to the United States Constitution. Defendants refused to consider plainly exculpatory evidence that any responsible child protection investigator or administrator in their position would consider and, in flagrant disregard of this evidence, unconstitutionally caused the impairment of Plaintiff Laura Timmel's constitutionally protected liberty interest in her career as a social worker.

ANSWER:       Defendant Griffin admits that Plaintiff purports to bring this action

pursuant to 42 U.S.C. § 1983. Defendant Griffin denies each and every remaining allegation

contained in Paragraph 1.

2.       Laura Timmel sues all four Defendants for violation of their clearly-established constitutional duty to fully consider all available exculpatory evidence before they issue and register a so-called "indicated" finding of abuse or neglect against any professional pursuing a career working with children, such as a social worker. The Defendants also violated a basic principle of law by disregarding the state circuit court order finding "no probable cause" that had already exonerated Plaintiff Laura Timmel and, oblivious to the requirement that they respect final legal rulings, they proceeded to indicate Laura as guilty of child abuse, placing her name in the State Central Register ("Register") despite the state circuit court's order that had exonerated her of any wrongdoing as to her children.

ANSWER:       Defendant Griffin admits that Laura Timmel sues all four Defendants.

Defendant Griffin admits that she recommended that the report of abuse against Laura Timmel

be indicated and admits that Laura Timmel was indicated for child abuse, and that her name was

placed on the State Central Register. Paragraph 2 of the Complaint improperly collectivizes the

actions of the Defendants and as such does not apprise Defendant Griffin of what she is charged

with and she therefore denies each and every remaining allegation contained in Paragraph 2.

3. The DCFS Defendants' decision to "indicate" Plaintiff for child abuse in derogation of the juvenile court's order impaired her ability to function as a mother, threatened permanently to ruin her career and her ability to support herself and her children, and caused her great emotional distress. Plaintiff Timmel was compelled to expend thousands of dollars to exculpate herself from this utterly baseless indicated finding, issued against her without due process of law. As relief from these injuries in violation of Plaintiff's constitutional rights, she seeks compensatory damages, an award of punitive damages, and an award of attorneys' fees under 42 U.S.C. § 1988 and costs.

ANSWER: Defendant Griffin denies the allegations contained in Paragraph 3.

4. This Court has jurisdiction over Plaintiff's claims below pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343.

ANSWER: Defendant Griffin admits that if this action were proper, this Court would

have jurisdiction under 28 U.S.C. §§ 1331 and 1343(3). Defendant Griffin denies each and

every remaining allegation contained in Paragraph 4.

5. Venue is proper in this district under 28 U.S.C. § 1391 because:

(a) the Northern District of Illinois is the judicial district in which substantially all of the events or omissions giving rise to Plaintiff's claims occurred; and

(b) the Defendants Griffin, Leggin, and Smith-Foote are found or are employed in the Northern District of Illinois.

ANSWER: Defendant Griffin admits the allegations contained in Paragraph 5 and its

subparts.

6. Plaintiff Laura Timmel, a licensed clinical social worker who holds a degree with honors from Jane Addams School of Social Work at the University of Illinois, resides in Western Springs, Illinois, with her husband Brian Timmel and her three children, N. and B., twins whose birth date is in the summer of 2007, and R., whose birth date is in the late summer of 2009.

ANSWER: Defendant Griffin admits that Plaintiff Laura Timmel is a licensed clinical

social worker and that she resides with her husband and her three children, N. and B., twins

whose birth date is in the summer of 2007, and R., whose birth date is in the late summer of

2009. Defendant Griffin is without knowledge or information sufficient to form a belief as to the

truth of the allegations contained in Paragraph 6 and therefore denies the remaining allegations in

Paragraph 6.

7. Defendant Janice Griffin is the DCFS investigator who had primary responsibility for
the investigation as to R. Timmel and for making the determination that Laura Timmel should be
"indicated" for child abuse even after Plaintiff had been cleared of liability by the juvenile court.
She is sued in her individual capacity

ANSWER: Defendant Griffin admits that she is a DCFS investigator and that she was

assigned to the investigation concerning R. Timmel. Defendant Griffin admits that Plaintiff

purports to sue her in her individual capacity. Defendant Griffin denies each and every

remaining allegation contained in Paragraph 7.

8. At all times relevant to this complaint, Defendant Kenneth Leggin was Defendant
Griffin's supervisor, and in that capacity he had responsibility for directing the investigation as to
R. Timmel and overseeing and approving the recommendations of Defendant Griffin. He is
sued in his individual capacity.

ANSWER: Defendant Griffin admits that Defendant Kenneth Leggin was her

supervisor, and in that capacity he had responsibility for directing the investigation as to R.

Timmel and overseeing and approving the recommendations of Defendant Griffin. Defendant

Griffin admits that Plaintiff purports to sue Defendant Leggin in his individual capacity.

9. Defendant Kimberly Smith-Foote is a Child Protection Manager, and at all times
relevant to this complaint, she was the direct supervisor of Defendant Leggin. She approved the
decision to recommend indicating Laura Timmel for child abuse on November 24, four days
after the juvenile court exonerated Plaintiff. Defendant Smith-Foote is sued in her individual
capacity.

ANSWER: Defendant Griffin admits that Defendant Smith-Foote is a Child Protection

Manager and was the direct supervisor of Defendant Leggin. Defendant Griffin admits that

Defendant Smith-Foote approved the recommendation to indicate Laura Timmel for child abuse

on November 24.  Defendant Griffin admits that Plaintiff purports to sue Defendant Smith-Foote

in her individual capacity and denies each and every remaining allegation in Paragraph 9.

10.  At all times relevant to this complaint, Defendant Maria Miller was a DCFS administrator for the Central Region of DCFS.  Defendant Miller was the assigned administrator who made the final review of the recommendation to indicate Plaintiff Timmel and, as such, Defendant Miller made the ultimate decision to register Plaintiff Timmel as a perpetrator of child abuse.

ANSWER:     Defendant Griffin admits that Defendant Maria Miller was a DCFS

administrator for the Central Region of DCFS, that Defendant Miller was the assigned

administrator who made the final review of the recommendation to indicate Plaintiff Timmel.

Defendant Griffin avers that Defendant Miller concurred with the field recommendation to

indicate Plaintiff as a perpetrator of child abuse and denies each and every remaining allegation

in Paragraph 10.

11.  Pursuant to the Illinois Abused and Neglected Child Reporting Act ("ANCRA"), 325 ILCS 5/1 *et seq*, DCFS receives Hotline calls when any person makes a call based upon "reasonable cause to believe a child may be an abused child or a neglected child."  325 ILCS 5/4, 5/7, 5/7.6.

ANSWER:  Paragraph 11 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Griffin avers that the cited

law speaks for itself.  Defendant Griffin denies each and every remaining allegation contained in

Paragraph 11 inconsistent with the law.  To the extent an answer is required, Defendant Griffin

denies the allegations contained in Paragraph 11.

12.  Under ANCRA, and consistent with a federal law known as the Child Abuse Prevention and Treatment Act (alternatively called "the Mondale Act,"), 42 U.S.C. 5101 *et seq.*, 42 U.S.C. 5116 *et seq.*, certain persons are "mandated reporters" of child abuse if a child known to them in their professional capacity is reasonably suspected of being an abused or neglected child.  Persons other than mandated reporters are permitted to make such reports, though they are not penalized by law for failure to report; however, mandated reporters may be subject to criminal and civil penalties if they fail to report reasonably suspected child abuse. 325 ILCS 5/4, 5/4.02.

ANSWER:  Paragraph 12 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Griffin avers that the cited

law speaks for itself. Defendant Griffin denies each and every remaining allegation contained in

Paragraph 12 inconsistent with the law. To the extent an answer is required, Defendant Griffin

denies the allegations contained in Paragraph 12.

13. ANCRA requires that DCFS promptly initiate an investigation of the merits of calls it accepts, sometimes working jointly with law enforcement authorities if the allegations in the call give rise to a potential criminal complaint. *Id*. at 5/7, 5/7.3, 5/7.4.

ANSWER: Paragraph 13 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Griffin avers that the cited

law speaks for itself. Defendant Griffin denies each and every remaining allegation contained in

Paragraph 13 inconsistent with the law. To the extent an answer is required, Defendant Griffin

denies the allegations contained in Paragraph 13.

14. To be accepted as a Hotline call and subject to an investigation, the specific incident of harm alleged in the report must meet an allegation definition in the DCFS allegation system. Each of these allegations is defined in DCFS Manual of Rules and Procedures 300, Appendix B. *See* 89 Ill. Admin. Code § 300, App'x B. Physical abuse allegations, which are coded with a one- or two-digit number under 50 in the DCFS allegation coding system, include specific allegations of harm alleged to have been caused by the direct action of an alleged perpetrator, including "#2 Head Injuries"; "#5 Burns"; "#7 Wounds"; "#9 Bone Fractures"; "#10 Substantial Risk of Physical Injury"; "#11 Cuts, Bruises, Welts, Abrasions and Oral Injuries"; "#12 Human Bites"; and "#16 Torture." Neglect allegations of harm, which are coded with a two-digit number greater than 50, include injuries that are alleged to have been caused by the blatant disregard of the alleged perpetrator (such as "#52 Head Injuries," "#57 Bone Fractures," and "#62 Human Bites") as well as additional defined areas of harm to children, such as "#74 Inadequate Supervision" and "#79 Medical Neglect."

ANSWER: Paragraph 14 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Griffin avers that the cited

law speaks for itself. Defendant Griffin denies each and every remaining allegation contained in

Paragraph 14 inconsistent with the law. To the extent an answer is required, Defendant Griffin

denies the allegations contained in Paragraph 14.

15. The specific allegations relevant to the investigation and indicated findings involving the Timmel children are allegation of harm "#9 Bone Fractures by Abuse" (alleged as to R.

Timmel due to a fracture he sustained to his left femur in September 2009) and allegation of harm "#60 Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect" (alleged as to N. and B. Timmel insofar as they were assumed to be at risk of harm as a result of the injury to R.).

ANSWER: Defendant Griffin admits the allegations in Paragraph 15 and avers that

Paragraph 15 calls for a legal conclusion to which no answer is required. Also, Plaintiff is

attempting to paraphrase Illinois law and Defendant Griffin avers that the cited law speaks for

itself.

16. DCFS regulations require DCFS to complete investigations of Hotline calls within 60 days, except where this time may be extended for good cause. 325 ILCS 5/7.12. At the conclusion of the investigation, DCFS investigators determine if the allegations under investigation are "indicated"—meaning that some credible evidence of abuse or neglect was found—or "unfounded"—meaning that DCFS did not find credible evidence of abuse or neglect. *Id*.

ANSWER: Paragraph 16 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Griffin avers that the cited

law speaks for itself. Defendant Griffin denies each and every remaining allegation contained in

Paragraph 16 inconsistent with the law. To the extent an answer is required, Defendant Griffin

denies the allegations contained in Paragraph 16.

17. The final determination of "indicated" or "unfounded" must be reported forthwith to the Register. *Id* at 7/7, 7/12. However, if an individual is licensed to work with children or otherwise is engaged in employment involving the care of children, DCFS is not permitted to issue an indicated finding without first allowing the child care professional an opportunity to have the recommendation to "indicate" her reviewed by an administrator by way of an Administrator's Conference. The pre-deprivation Administrator's Conference is one of the procedural due process protections that the federal court, in *Dupuy v. McDonald*, directed DCFS to adopt in order to remedy the then-constitutionally inadequate indicated report decision-making policies as applied to child care professionals. *Dupuy v. McDonald*, 141 F. Supp. 2d 1090 (N.D. Ill. 2001); Preliminary Injunction Memorandum Opinion and Order at *Dupuy v. McDonald*, 2003 U.S. Dist. LEXIS 12019, at *21-26 (N.D. Ill. July 10, 2003), *aff'd in relevant part sub nom Dupuy v. Samuels*, 397 F. 3d 493, 512 (7th Cir. 2005). The requirements for Administrator's Conferences are now codified in DCFS rules and procedures. *See* 89 Ill. Admin. Code § 300.160.

ANSWER: Paragraph 17 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Griffin avers that the cited

law speaks for itself. Defendant Griffin denies each and every remaining allegation contained in

Paragraph 17 inconsistent with the law. To the extent an answer is required, Defendant Griffin

denies the allegations contained in Paragraph 17.

18. Only if the Administrator, after reviewing the basis for the recommended finding as well as any information or evidence the child care professional presents at the conference, determines that there is sufficient evidence of abuse or neglect, upon consideration of all of the inculpatory as well as the exculpatory evidence, is DCFS authorized to issue an indicated report and register an individual's name identifying him or her as a perpetrator of child abuse or neglect in the State Central Register. *Dupuy*, U.S. LEXIS 12019, at *25; 89 Ill. Admin. Code § 300.160(c)(4).

ANSWER: Paragraph 18 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Griffin avers that the cited

law speaks for itself. Defendant Griffin denies each and every remaining allegation contained in

Paragraph 18 inconsistent with the law. To the extent an answer is required, Defendant Griffin

denies the allegations contained in Paragraph 18.

19. Once registered, indicated findings for physical abuse such as bone fractures are registered for a period of 20 years, and indicated findings for most forms of neglect are registered for a period of 5 years. 325 ILCS 5/7.14; DCFS Procedures 300.100(c). These findings are registered and maintained unless the person named as a perpetrator appeals the finding and, at the subsequent administrative hearing, DCFS fails to meet is burden of proof (by a preponderance of the evidence) that the finding should be maintained. 325 ILCS 5/7.16.

ANSWER: Paragraph 19 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Griffin avers that the cited

law speaks for itself. Defendant Griffin denies each and every remaining allegation contained in

Paragraph 19 inconsistent with the law. To the extent an answer is required, Defendant Griffin

denies the allegations contained in Paragraph 19.

20. At the same time as DCFS investigators are expected to make determinations as to whether allegations of abuse or neglect are "indicated" or "unfounded," they are also authorized by state law to take emergency protective custody of children whom they reasonably believe cannot be cared for at home without endangering their health or safety, but only if there is not time to apply for a court order requesting temporary custody. 325 ILCS 5/5. (Doctors and law enforcement authorities also are given such authority by state law but it is DCFS that has the exclusive responsibility to hold a child in its custody after emergency protective custody has been taken. *Id.*)

ANSWER: Paragraph 20 calls for a legal conclusion to which no answer is required. Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Griffin avers that the cited law speaks for itself. Defendant Griffin denies each and every remaining allegation contained in Paragraph 20 inconsistent with the law. To the extent an answer is required, Defendant Griffin denies the allegations contained in Paragraph 20.

21. If DCFS intends to maintain temporary custody after taking emergency protective custody of a child without a court order, however, the Juvenile Court Act requires: (a) that a Petition for Adjudication of Wardship as to the child be filed within 48 hours of the taking of custody, otherwise the child is to be released back to their parents' care, 705 ILCS 405/2-9; and (b) upon such petition, the court must find that there is "probable cause" to believe the child is abused or neglected, that there is "immediate and urgent necessity" for the safety of the child that he or she be placed outside the custody of his or her parents, and that "reasonable efforts" were made to avoid removing the child from his or her parent, 705 ILCS 405/2-10.

ANSWER: Paragraph 21 calls for a legal conclusion to which no answer is required. Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Griffin avers that the cited law speaks for itself. Defendant Griffin denies each and every remaining allegation contained in Paragraph 21 inconsistent with the law. To the extent an answer is required, Defendant Griffin denies the allegations contained in Paragraph 21.

22. DCFS rules and regulations set forth detailed requirements as to the types of evidence to be considered in each type of investigation. For example, in an investigation of an allegation of "Bone Fractures," DCFS Procedures 300, Appendix B, provide that DCFS investigators must consider the opinion of radiologists or orthopedists and the procedures direct investigators to weight the opinion of doctors with higher degrees of relevant specialization more highly than the opinions of less specialized doctors.

ANSWER: Paragraph 22 calls for a legal conclusion to which no answer is required. Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Griffin avers that the cited law speaks for itself. Defendant Griffin denies each and every remaining allegation contained in Paragraph 22 inconsistent with the law. To the extent an answer is required, Defendant Griffin denies the allegations contained in Paragraph 22.

23. Any person who is indicated for child abuse or neglect has the right to appeal the finding to a neutral decision-maker—a DCFS administrative law judge. 325 ILCS 5/7.16, 89 Ill.

Admin. Code § 336, "Appeal of Child Abuse and Neglect Investigation Findings." Ordinarily, such appeals must be decided within 90 days, *Lyon v. Dep't of Children & Family Servs.*, 209 Ill. 2d 264, 807 N.E.2d 423 (Ill. 2004); 89 Ill. Admin. Code § 336.220, but for persons who work with children (i.e., *Dupuy* class members, *see* ¶ 17 *supra*), DCFS is required to issue a final administrative hearing decision within 35 days of the filing of an administrative appeal request if the child care professional has requested an expedited appeal, *Dupuy*, LEXIS 12019, at *26-29; 89 Ill. Admin. Code § 336.85.

ANSWER: Paragraph 23 calls for a legal conclusion to which no answer is required. Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Griffin avers that the cited law speaks for itself. Defendant Griffin denies each and every remaining allegation contained in Paragraph 23 inconsistent with the law. To the extent an answer is required, Defendant Griffin denies the allegations contained in Paragraph 23.

24. Prior to the Hotline call in this case, which occurred in the late evening on Thursday, September 10, 2009, Laura Timmel's sole contact with DCFS had been as a Licensed Clinical Social Worker herself: she had been employed as a social worker by the Division of Specialized Care for Children and, before that, as a school-based social worker. In these capacities, Laura Timmel herself had several occasions to contact the Hotline as a mandated child abuse reporter seeking help for children she reasonably believed were seriously abused or neglected and required DCFS's intervention.

ANSWER: Defendant Griffin admits that a hotline call was placed and avers that it occurred on September 11, 2009 at 12:18 a.m. Defendant Griffin is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 24. To the extent an answer is required, Defendant Griffin denies the remaining allegations contained in Paragraph 24.

25. Neither Plaintiff Laura Timmel nor her husband Brian ever had any prior interaction with law enforcement either, except for traffic stops.

ANSWER: Defendant Griffin is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25. To the extent an answer is required, Defendant Griffin denies the allegations contained in Paragraph 25.

26. During the week leading up to the Hotline call that gave rise to this action, Laura Timmel had been the primary caregiver for her three children, except during a few hours when her husband Brian Timmel watched the children.

ANSWER:    Defendant Griffin is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26.  To the extent an answer is required, Defendant Griffin denies the allegations contained in Paragraph 26.

27. On the morning of Thursday, September 10, 2009, Laura took R., who was then four weeks old, to a medical appointment with an audiologist at Children's Memorial Hospital and left the twins, who were then two years old, at home with her husband for the day.  After the medical appointment, Laura visited friend and former neighbor John Matthew Peluse and changed R.'s diaper and nursed R. while there, then went for lunch at a Panera Bread restaurant before going to a hair salon appointment in the afternoon.  She returned home with R. in the late afternoon.

ANSWER:    Defendant Griffin is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27. To the extent an answer is required, Defendant Griffin denies the allegations contained in Paragraph 27.

28. While at the hair salon, Laura nursed R. and changed R.'s diaper.  As she placed R. in his car seat to leave, Laura noticed that R.'s leg seemed slightly swollen and asked the stylist, Sasha Staerkel, who had recently held R. for several minutes, if it appeared swollen to her. The stylist said that it did perhaps look a little different from the other leg. The stylist later testified that she did not think that R.'s leg looked injured.

ANSWER:    Defendant Griffin is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28. To the extent an answer is required, Defendant Griffin denies the allegations contained in Paragraph 28.

29. During the entire time Laura and R. were at the salon, R. appeared content and comfortable with no unusual crying or behaviors suggesting that he had been injured in any way. Indeed, despite Laura having been in public with R. all day on September 10, no one—including medical staff with whom Laura and R. had contact on September 10—had any concern about R.'s condition.

ANSWER:    Defendant Griffin is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29. To the extent an answer is required, Defendant Griffin denies the allegations contained in Paragraph 29.

30.  Laura and R. returned home in the late afternoon shortly before Brian and the twins came home. When Brian arrived home, he held R. because he hadn't seen him all day, and he did not notice anything unusual about R.

ANSWER:     Defendant Griffin is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 30. To the extent an answer is

required, Defendant Griffin denies the allegations contained in Paragraph 30.

31. At approximately 5:00 p.m., Laura fed R. and then changed R.'s diaper and clothes, taking note that his left leg still appeared as though it might be a little swollen. R. was not exhibiting any signs of distress or pain.

ANSWER:     Defendant Griffin is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 31. To the extent an answer is

required, Defendant Griffin denies the allegations contained in Paragraph 31.

32. That evening, Laura prepared dinner for the family and R. was placed in his swing while the family ate. At about 7:00 p.m., after dinner, Laura went to change R.'s diaper and noticed that his left leg had become extremely swollen and that his leg seemed slightly out of alignment.  When Laura moved his leg to change his diaper, he cried out in pain but he did not cry inconsolably.  She called to Brian to take a look at R.'s leg, whereupon both Laura and Brian agreed that it looked like R. might have been bitten by a spider or insect.

ANSWER:     Defendant Griffin is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 32. To the extent an answer is

required, Defendant Griffin denies the allegations contained in Paragraph 32.

33. Because the Timmels had just moved to the western suburbs from Chicago, they called one of their new neighbors for a recommendation as to where to take R. to be examined by a doctor.  Upon receiving the recommendation to take R. to Hinsdale Hospital, Brian Timmel took R. there while Laura remained home with the twins.

ANSWER:     Defendant Griffin is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 33.  To the extent an answer is

required, Defendant Griffin denies the allegations contained in Paragraph 33.

34.  While at Hinsdale Hospital, R. was examined by several medical personnel, including Nurse Robert Ditto and an emergency room doctor.  At approximately 11:00 p.m., the ER doctor informed Brian Timmel that an x-ray had identified a fracture to R.'s left femur and that DCFS would be called based on a suspicion that the fracture may have been caused by child abuse.

ANSWER:     Defendant Griffin is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 34. To the extent an answer is

required, Defendant Griffin denies the allegations contained in Paragraph 34.

35. After Brian notified Laura that R. had a fracture to his leg, Laura arranged for a
neighbor to sit with the twins and she met Brian at Hinsdale Hospital. Medical personnel at
Hinsdale recommended transferring R. to Children's Memorial Hospital ("CMH") and Brian and
Laura acted in accordance with this recommendation. Laura travelled by ambulance to CMH
with R. while Brian returned home to care for the twins.

ANSWER: Defendant Griffin is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 35. To the extent an answer is

required, Defendant Griffin denies the allegations contained in Paragraph 35.

36. Upon arriving at CMH at approximately 1:00 a.m. on Friday, September 11, Laura
was interviewed by the DCFS on-call investigator Moises Cruz, who was considered the
"mandate worker"—i.e., the DCFS investigator who was assigned to see R. within 24 hours of
the Hotline Call. Mr. Cruz directed Laura to immediately arrange for someone to supervise
Brian's and her own contact with their children at all times. Mr. Cruz threatened Laura that if she
did not immediately make such an arrangement, he would take protective custody of all of her
children.

ANSWER: Defendant Griffin admits the first sentence of Paragraph 36. Defendant

Griffin denies the remaining allegations contained in Paragraph 36.

37. During the early morning hours of September 11, Mr. Cruz also visited the family
home and spoke with Brian. Brian and Laura made immediate arrangements for Brian's mother,
Janice Timmel, to travel to Chicago from Cincinnati, Ohio, in order to supervise Brian and
Laura, and also arranged for a neighbor to supervise their contact until Janice Timmel could
arrive.

ANSWER: Defendant Griffin admits the allegations contained in Paragraph 37.

38. While at the hospital on September 11, Laura was also interviewed by Dr. Sarah
Monahan-Estes ("Estes"), a non-board-certified fellow with CMH's Child Protective Unit. This
unit is part of MPEEC (Multidisciplinary Pediatric Education and Evaluation Consortium), a
consortium of child abuse divisions at area hospitals that provide evaluations to DCFS.
Unbeknownst to Laura at the time, pursuant to a pre-existing contract between CMH and DCFS,
Dr. Estes would be reporting her conclusions directly to DCFS, and specifically to Defendant
Griffin, and not to them as parents.

ANSWER: Defendant Griffin admits that on September 11, Laura Timmel was

interviewed by Dr. Sarah Monahan-Estes with CMH's child protective unit and that this unit is

part of MPEEC (Multidisciplinary Pediatric Education and Evaluation Consortium), a

consortium of child abuse divisions at area hospitals that provide evaluations to DCFS and avers

that Dr. Estes is a Fellow with the protective services team at CMH.  Defendant Griffin is

without knowledge or information sufficient to form a belief as to the truth of the remaining

allegations contained in Paragraph 38.  To the extent an answer is required, Defendant Griffin

denies the remaining allegations.

39. Dr. Michelle Sagan was the treating pediatric orthopedist for R. while he was admitted at CMH. At no point during the ensuing DCFS investigation did any person with DCFS, including the Defendants to this action, make any attempt to speak with Dr. Sagan despite the DCFS requirement that in a bone fracture investigation, DCFS must contact all treating physicians and must obtain "[v]erification of the injury . . . from a physician, preferably an orthopedist or radiologist." 89 Ill. Admin. Code, § 300, App'x B, "# 9/59 Bone Fractures." Further, DCFS procedures require that DCFS investigators give the greatest weight to the specialist with the greatest expertise in the relevant area of medicine, which Defendant Griffin acknowledged would be the area of orthopedics in the present case, but none of the DCFS Defendants sought or considered Dr. Sagan's opinion at any relevant time.

ANSWER:  Defendant Griffin admits the first sentence of Paragraph 39.  Defendant

Griffin avers that in testimony at the juvenile court proceedings on October 14, 2009 in response

to the question "what do you consider to be the relevant specialization in a case involving bone

fractures?" she responded "It would be an orthopedic doctor.  And in my case where I'm

involved, it would be child abuse.  And that's what the determination was that I was trying to

determine."  The remaining allegations of Paragraph 39 of the Complaint improperly collectivize

the actions of the Defendants and as such do not apprise Defendant Griffin of what she is

charged with. Plaintiff is attempting to paraphrase Illinois law and Defendant Griffin avers that

the cited law speaks for itself.  Defendant Griffin denies the remaining allegations contained in

Paragraph 39.

40. R. was discharged from CMH on the evening of Friday, September 11.

ANSWER:     Defendant Griffin admits that R. was discharged from CMH on September

11 and lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations and therefore denies the remaining allegations contained in Paragraph 40.

41. Officer Craig Balon with the LaGrange Police Department interviewed both Brian and Laura at the family home, on September 11 and September 12, respectively. On September 15, Officer Wardlaw with the LaGrange Police reported to Defendant Griffin that after speaking with the family, the police department "did not have a sense of abuse."

ANSWER:     Defendant Griffin admits the first sentence of Paragraph 41 and admits

that on September 15, Officer Wardlaw with the LaGrange Police reported to Defendant Griffin

and avers that the initial police "investigator did not have a sense of abuse." Defendant Griffin

denies the remaining allegations contained in Paragraph 41.

42. On September 11, 2009, DCFS Supervisor Lucia Greer directed that the ensuing investigation in this case should include "an exact description of the fracture," interviews with "all physicians directly involved with the treatment of the reported injury (e.g., attending physician, radiologist or orthopedist)," and "a TIME LINE starting with when they noticed the injury; activity throughout the past week [] with both parents." [emphasis in original]. In addition, she directed that "any other person with knowledge" should be interviewed.

ANSWER:     Defendant Griffin admits the allegations contained in Paragraph 42.

43. On Friday, September 11, 2009, DCFS assigned Janice Griffin as the primary investigator of the allegations against Brian and Laura Timmel. Griffin was obligated to conduct the investigation in accordance with DCFS Rules and Procedures and in accordance with the *Dupuy* orders, cited at ¶¶17 and 18, above and she later testified in the juvenile court action that ensued on October 2 that she handled the investigation in accordance with her understanding of the applicable policies and procedures. However, her understanding of these requirements was lacking, as described below.

ANSWER:     Defendant Griffin admits the first sentence of Paragraph 43. Defendant

Griffin admits that she was obligated to conduct the investigation in accordance with DCFS

rules, procedures, the law and any applicable court orders and that she later testified in the

juvenile court action that ensued on October 2, 2009 that she handled the investigation in

accordance with her understanding of the applicable policies and procedures. Defendant Griffin

avers that the cited law speaks for itself and denies the remaining allegations contained in

Paragraph 43.

44. Between September 11, 2009, the day Griffin was assigned as the primary investigator, and October 1, 2009, which was the day that Griffin decided (with Defendant

Leggin, Defendant Smith-Foote, and Division of Child Protection Associate Deputy Director Meryl Paniak) to take protective custody of the Timmels' children, she had conducted very little investigation of the facts either supporting or refuting the allegations that Brian or Laura Timmel had abused or neglected their children. Indeed, not *one* of Supervisor Greer's September 11 directives had been satisfied, nor had the directive of Defendant Leggin, dated September 23, 2009, to secure additional information including "how old is the fracture" been satisfied.

ANSWER:    Defendant Griffin admits that on September 11, 2009 she was assigned as

the primary investigator and avers that the decision to take protective custody was approved by

Defendant Leggin and Defendant Smith-Foote in consultation with Associate Deputy Director

Meryl Paniak.  Defendant Griffin denies each and every remaining allegation contained in

Paragraph 44.


45.  Between September 11 and October 1, only the following minimal investigative steps had occurred:

(i) On September 11, Griffin spoke briefly with two CMH social workers merely to learn that the case had been assigned to Dr. Estes for MPEEC review and confirm that R. was ready for discharge and that, pursuant to Griffin's direction, he would be discharged to the care of Janice Timmel and not to Brian or Laura;

(ii) On September 11, Griffin spoke briefly with Janice Timmel, Brian's mother, merely to confirm that she would supervise any contact Laura and Brian had with their own children per DCFS directive that during the investigation they could no longer have unsupervised contact with their own children;

(iii) On September 15, Griffin spoke with Office Wardlaw from the LaGrange Police Department, who informed Griffin that after speaking with the family, the police "did not have a sense of abuse;"

(iv) On September 15, Griffin visited the home where she interviewed Brian Timmel and Laura Timmel, though the interview of Laura Timmel did not comport with a number of DCFS requirements, including the requirement that DCFS ask her for collateral contacts and conduct a domestic violence and substance abuse screen;

(v) On September 15 and September 22, Griffin observed the children in their home (where they were found to be healthy except for R.'s fracture);

(vi) On September 16, Griffin spoke with Nurse Ditto, who reported that while at Hinsdale Hospital, R. did not cry inconsolably but, rather, would cry while he was repositioned but would not cry while at rest; and

(vii) During this time period of September 11 through October 1, Griffin spoke to only a single doctor: Dr. Estes, a non-board-certified child abuse fellow who offered her opinion that based merely on the absence of an explanation for the fracture, she concluded that the injury was more than likely caused by abuse. Dr. Estes' opinion was based upon the theory that the fracture would have been so painful that R. would have cried inconsolably.

ANSWER: The allegations contained in Paragraph 45 of the Complaint improperly

collectivize the actions of the Defendants and as such do not apprise Defendant Griffin of what she is charged with.  Defendant Griffin answers the subparts of Paragraph 45 as follows:

(i) Defendant Griffin admits that on September 11, she spoke with two CMH social workers and avers that CMH social worker Hickey told her that the case was assigned to Estes for MPEEC review at 11:30 a.m. and further avers that at 3:30 p.m. CMH social worker Gronin told her that R. was ready for discharge "pending the results of the background check, R. would be discharged in the care of paternal grandmother, Janice Timmel."  Defendant Griffin denies the remaining allegations contained in subpart (i) of Paragraph 45.

(ii) Defendant Griffin admits that she spoke with Janice Timmel, admits that she confirmed that Janice Timmel would supervise contact between Laura and Brian and their three children.  Defendant Griffin denies the remaining allegations contained in subpart (ii) of Paragraph 45.

(iii) Defendant Griffin admits that she spoke to Office [sic] Wardlaw from the LaGrange Police Department and avers that he informed her that after speaking with the family, "the initial investigator did not have a sense of abuse." Defendant Griffin denies the remaining allegations contained in subpart (iii) of Paragraph 45.

(iv) Defendant Griffin admits that on September 15 she visited the home where she interviewed Brian Timmel and Laura Timmel and admits that she did not conduct a domestic violence and substance abuse screen on that date.  Defendant Griffin denies that the interview of Laura Timmel did not comport with a number of DCFS requirements and denies the remaining allegations contained in subpart (iv) of Paragraph 45.

(v) Defendant Griffin denies the allegations contained in subpart (v) of Paragraph 45 and avers that on September 15, 2009, she observed N. in her home and saw no signs of abuse or neglect and further avers that on September 22, 2009, she observed R. and B. in their home and

saw no signs of abuse or neglect.

(vi) Defendant Griffin admits that she spoke with Ditto who reported that R. would cry when he was repositioned but not while he was at rest. Defendant Griffin denies the remaining allegations contained in subpart (vi) of Paragraph 45.

(vii) Defendant Griffin admits that she spoke to Dr. Estes who offered her opinion that the injury was more than likely caused by abuse. Defendant Griffin denies the remaining allegations contained in subpart (vii) of Paragraph 45 and avers that Dr. Estes is a Fellow with the Protective Services Team at CMH.

46. The following investigative steps were not taken between September 11 and October 1, 2009, despite the clear requirements of DCFS rules and procedures and the due process requirement, as directed by the *Dupuy* orders, that DCFS investigators are to gather and consider all available exculpatory evidence:

(i) Identification of and contact with two eyewitnesses who saw R. on the date his fracture was discovered (i.e., John Matthew Peluse, who saw R. at approximately 11:00 a.m. on September 10, and Sasha Staerkel, the hairstylist who observed R. from approximately 1:00 p.m. to 3:30 p.m. on September 10 and held him briefly herself). Eye witness contacts are required by DCFS Procedures 300, Appendix B (defining direct evidence as "a statement taken from an eyewitness . . . **It is imperative that the CPSW seeks objective corroboration of . . . self-reports**" and "consider information developed through personal observation . . . or required interviews that will establish the accuracy of [parents'] reports. . . . **There is no substitute for independent verification of this sort of information.**") (bold in original). *See also* DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, (subsection (C)(4)(F), requiring the investigator to "[i]nterview all identified witnesses who are reported to have knowledge of the incident that resulted in a bone fracture");

(ii) contact with *all* pediatric orthopedists, radiologists, or attending physicians who treated the injury as required by DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, at subsections (C)(2)(F) and (C)(4)(E). Such doctors were Dr. Michelle Sagan, the pediatric orthopedist who had treated R.'s fracture at CMH, and Dr. Christopher Sullivan, the Chief of Pediatric Orthopedics at University of Chicago's Comer Children's Hospital, who provided further treatment for R.'s fracture on September 30, 2009. Griffin later denied knowing that Dr. Sullivan was a treating physician, but acknowledged she knew he had put a new splint on R.'s leg;

(iii) contact with R.'s primary care pediatrician, Dr. Danielle Cherian, required by DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, subsection (C)(4)(L);

(iv) contact with Laura Timmel's obstetrician, Dr. Brian Foley, as required by *id.* (insofar as he was a physician who had seen the child in past six months). Griffin did not even request consents from Ms. Timmel to speak to any of her own doctors or secure her own medical records, including her obstetrical records;

(v) assessment of the credentials of the doctors upon whom DCFS was relying for its opinion as required by DCFS Procedures 300 (specifying that a professional's expertise is to be

17

assessed according to their amount of training, experience, and specialization, specifically stating that the opinion of a pediatric radiologist is more credible than that of a radiologist, and the opinion of a radiologist as to a bone fracture is more credible than that of a pediatrician; also stating that the opinion of a doctor on "hospital staff is more credible than a pediatric resident.") Griffin later testified that she N.r took steps to identify any doctors Dr. Estes may have consulted, while wrongly assuming that Dr. Estes had "consulted with an orthopedic doctor" and "other doctors who have training in [radiology];"

(vi) determination as to the relative weight to be given to the opposing opinions of doctors when their opinions were in conflict, based on the specific expertise and level of experience of the opposing doctors. Griffin later acknowledged that the "relevant specialization" in a case involving bone fractures would be orthopedics;

(vii) consideration of whether a *third* opinion is needed to reconcile divergent medical views and render a sound determination as to the likelihood of abuse versus accidental trauma where experts disagree, as required by Procedures 300, Appendix B, #9/59, Bone Fractures, (subsection (C)(5)(F)).

ANSWER: The allegations contained in Paragraph 46 of the Complaint improperly collectivize the actions of the Defendants and as such do not apprise Defendant Griffin of what she is charged with. Defendant Griffin avers that the cited law in each subpart speaks for itself and that the Department's rules and procedures set forth the applicable time frames for all aspects of the child abuse investigation. Defendant Griffin answers the subparts of Paragraph 46 as follows:

(i) Defendant Griffin admits that she did not have contact with John Peluse or Sasha Staerkel between September 11 and October 1, 2009. Defendant Griffin denies the remaining allegations and avers that the cited law speaks for itself.

(ii) Defendant Griffin admits that between September 11 and October 1, 2009 she did not contact Dr. Michelle Sagan who was the pediatric orthopedist who treated R.'s fracture at CMH or Dr. Christopher Sullivan, the chief of Pediatric Orthopedics at University of Chicago's Comer Children's Hospital, who provided further treatment for R.'s fracture on September 30, 2009. Defendant Griffin's testimony in the juvenile court proceedings concerning her understanding of Dr. Sullivan's treatment of R. speaks for itself in the context in which it was given and she therefore denies each and every remaining allegation contained in subpart (ii) of Paragraph 46.

(iii) Defendant Griffin admits that she did not contact R.'s primary care pediatrician, Dr. Danielle Cherian between September 11 and October 1, 2009. Defendant Griffin avers that the cited law speaks for itself and denies the remaining allegations contained in subpart (iii) of Paragraph 46.

(iv) Defendant Griffin admits that she did not contact Dr. Brian Foley between September 11 and October 1, 2009. Defendant Griffin admits that between September 11 and October 1, 2009 she did not request consents from Ms. Timmel to speak to any of her own doctors or secure her own medical records, including her obstetrical records. Defendant Griffin denies the remaining allegations contained in subpart (iv) of Paragraph 46.

(v) Defendant Griffin avers that the cited law speaks for itself and her testimony at the juvenile court proceeding speaks for itself in the context in which it was given. Defendant Griffin denies the remaining allegations contained in subpart (v) of Paragraph 46.

(vi) Defendant Griffin avers that her testimony at the juvenile court proceedings speaks for itself in the context in which it was given as to the allegations set forth in the second sentence of subpart (vi) of Paragraph 46. Defendant Griffin denies the remaining allegations contained in subpart (vi) of Paragraph 46.

(vii) Defendant Griffin denies each and every allegation contained in subpart (vii) of Paragraph 46. Defendant Griffin avers that the cited law speaks for itself.

47. Defendant Griffin made only *pro forma* contact with the police officers who were also investigating the case and the initial child abuse reporter, Nurse Robert Ditto. Neither she nor Defendants Leggin or Smith-Foote, nor Defendant Miller at the later Administrator's Conference, considered the information these persons had to provide that was exculpatory. Specifically:

(i) On September 15, Officer Wardlaw informed Griffin that after speaking with the family, the police department officials did not have a "sense of abuse."

(ii) Nurse Ditto at Hinsdale Hospital made observations of R. that *supported* the Timmels' contentions that R. was not inconsolable (Nurse Ditto ultimately testified that when R.'s leg was manipulated, he would cry for only 10-20 seconds) and discounted the claim of Dr. Estes (which was that the fracture would have been so painful and so obvious thereafter that R. would have cried inconsolably and, therefore, the lack of an explanation for the fracture by the

parents was not credible).

ANSWER:     Defendant Griffin denies the allegations contained in Paragraph 47 and its

subparts.

48.  On September 30, R. was examined and treated by Dr. Christopher Sullivan, Chief of Pediatric Orthopedics, University of Chicago Comer Children's Hospital. On September 30, Dr. Sullivan reported to the Timmels his expert opinion that R.'s fracture was *unlikely* to be due to abuse.

ANSWER:     Defendant Griffin admits the first sentence of Paragraph 48.  Defendant

Griffin lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations contained in Paragraph 48. To the extent an answer is required, Defendant Griffin

denies the remaining allegations contained in Paragraph 48.

49. On the afternoon of October 1, 2009, Defendant Griffin contacted Brian Timmel and requested that he come to the DCFS offices the next day with Laura and their children.  That morning, Defendant Griffin had received a written report from Dr. Estes documenting her opinion. Though Defendant Griffin concealed her true motives from Brian Timmel, her intention was to take protective custody of the Timmels' children during the next day's meeting.

ANSWER:     Defendant Griffin admits the allegations contained in the first two

sentences of Paragraph 49.  Defendant Griffin denies the remaining allegations contained in the

last sentence of Paragraph 49.

50. On the afternoon of October 1, 2009,  upon learning of the request that Brian Timmel bring the children to the DCFS offices the next day, the Timmels' counsel called Defendant Griffin at approximately 4:30 p.m. and spoke to her and her supervisor, Defendant Leggin. The counsel (Diane L. Redleaf and Melissa L. Staas, both attorneys with the Family Defense Center) confirmed  to Defendants Griffin and Leggin the availability of Dr. Sullivan's opinion that the injury was more than likely *not* caused by abuse and urged Defendants to contact him immediately. While the Timmels' counsel offered a phone number for Dr. Sullivan's office so that the DCFS investigative staff could speak to him immediately about his opinion, Defendants Griffin and Leggin deliberately ignored this information.

ANSWER:     Defendant Griffin admits that on the afternoon of October 1, 2009, the

Timmels' counsel called Defendant Griffin at approximately 4:30 p.m. and spoke to her and her

supervisor, Defendant Leggin. Defendant Griffin is without knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in the first sentence of Paragraph 50.

Defendant Griffin admits that the Timmels' counsel stated to Defendants Griffin and Leggin the

availability of a second opinion from Dr. Sullivan at University of Chicago. Defendant Griffin

avers that Plaintiff's counsel stated that the opinion would be ready the following week and

further avers that Plaintiff's counsel stated to Defendants Griffin and Leggin that Dr. Sullivan's

opinion was that the injury could have been caused by other means than abuse. Defendant

Griffin denies each and every remaining allegation contained in Paragraph 50.

51. Instead of calling Dr. Sullivan or reviewing his opinion or seeking out further opinion of the MPEEC doctors or other medical opinions, Defendants Griffin and Leggin, with the approval of Defendant Kimberly Smith-Foote, decided to "go with our MPEEC doctor" without so much as any serious efforts to notify Dr. Estes, their own MPEEC consultant, that a second opinion disagreed with hers.

ANSWER: Defendant Griffin admits that she and Leggin, with the approval of

Defendant Smith-Foote, followed the opinion of the MPEEC doctor. Defendant Griffin denies

each and every remaining allegation contained in Paragraph 51.

52. At 4:51 p.m. on October 1, Defendants Griffin, Leggin, and Smith-Foote consulted with each other and with their superiors and decided to take protective custody of the Timmel children that very night instead of waiting until the following day as had been originally planned, showing that the DCFS Defendants refused to wait even a few *hours* for the newly-available evidence that the Timmels had secured from the head of pediatric orthopedics at the University of Chicago. By contrast, the DCFS Defendants had by that point waited for Dr. Estes' report for *twenty* days after the date on which Dr. Estes examined R. Timmel (*i.e.*, from September 11 to October 1). Their refusal to wait even *one* hour to fulfill the requirement under DCFS policy that they consult with a pediatric orthopedic expert demonstrates their disregard for the truth and their rush to judgment against the Timmels as guilty of child abuse. Griffin and Leggin made these decisions in consultation with their superiors, Defendant Smith-Foote and Division of Child Protection Associate Deputy Director Meryl Paniak.

ANSWER: Defendant Griffin admits that at 4:51 p.m. on October 1, 2009, she

consulted with Leggin and with their superiors Defendant Smith-Foote and Division of Child

Protection Associate Deputy Director Meryl Paniak and decided to take protective custody of the

Timmel children. Defendant Griffin admits that she received Dr. Estes's MPEEC report on

October 1, 2009. Defendant Griffin denies each and every remaining allegation contained in

Paragraph 52.

53.  After deciding to take protective custody, Defendant Griffin arranged for police squad cars to assist her in removing the Timmels' three children from their home.  Griffin went to the home at approximately 6:30 p.m. Janice Timmel, who was at the home with Laura and the children, answered the door but would not allow Griffin to enter.  Griffin saw N. in the window and observed that N. looked healthy and happy.

ANSWER:     Defendant Griffin admits that she went to the Timmel home at

approximately 6:30 p.m. and admits that she arranged for police to assist her.  Defendant Griffin

admits that Janice Timmel was at home with Laura Timmel and that Defendant Griffin saw N. in

the window and observed her.  Defendant Griffin denies each and every remaining allegation

contained in Paragraph 53.

54. Brian Timmel, who had not yet arrived home from work, contacted his counsel. Based on the advice of counsel, Janice Timmel notified Defendant Griffin that she would not be allowed into the home without a warrant.  Lacking a warrant to remove the children from their home, the police and Griffin left.

ANSWER:     Defendant Griffin admits that she was notified that she would not be

allowed into the home without a warrant and that Defendant Griffin and the police left.

Defendant Griffin lacks knowledge sufficient to form a belief as to the truth of the first sentence

of Paragraph 54 and therefore denies the first sentence as well as the remaining allegations in

Paragraph 54.

55. Fearful that the children would be seized from them in the middle of the night, the family found shelter with a family friend for the evening and awaited word from their counsel in the morning as to DCFS's intended actions concerning their family. Throughout that night, DCFS personnel went to the family home in La Grange on at least two additional occasions—at approximately 10:45 p.m. on October 1, and again at 3:30 a.m. on October 2—in an attempt to seize the Timmel children without a warrant or court order.

ANSWER:     Defendant Griffin admits that DCFS personnel went to the family home in

LaGrange on at least two occasions at approximately 10:45 p.m. on October 1, 2009 and again at

3:30 a.m. on October 2, 2009.  Defendant Griffin denies each and every remaining allegation

contained in Paragraph 55.

56. On the morning of October 2, 2009, counsel for the Timmels sent a letter to Defendants Griffin, Leggin, and Smith-Foote documenting that Dr. Sullivan had determined that

22

the fracture was fully consistent with accidental causes and urging the Defendants to refrain from making critical decisions in the case until they had received and reviewed Dr. Sullivan's written medical opinion, which was at that time forthcoming.

ANSWER:     Defendant Griffin admits that on October 2, 2009, the Timmels' counsel

sent a letter to Defendants Griffin, Leggin and Smith-Foote documenting that Dr. Sullivan had an

opinion and urging them to refrain from making critical decisions in the case until they had

received and reviewed Dr. Sullivan's written medical opinion, which was at that time

forthcoming.  Defendant Griffin denies each and every remaining allegation contained in

Paragraph 56.

57. On October 2, 2009, Defendant Griffin sought, and the Cook County State's Attorney's Office approved, without any review or consideration of the orthopedic opinions of Drs. Sullivan and Sagan undermining the conclusion that R.'s fracture was likely to be due to child abuse, the filing of petitions for Adjudication of Warship and Temporary Custody as to all three Timmel children. These petitions cited only the opinion of Dr. Estes and omitted the contrary opinions of Drs. Sullivan and Sagan.  Furthermore, these petitions were filed upon the false representation of Defendant Griffin that she had made "reasonable efforts" to keep the family together though no such efforts were documented and none had been made.

ANSWER:     Defendant Griffin admits that Petitions for Adjudication of Wardship and

Temporary Custody were filed.  Defendant Griffin denies each and every remaining allegation

contained in Paragraph 57.

58.  In the afternoon of October 2, based solely on the representations the State and DCFS had made in the petitions, an order taking the children into DCFS temporary custody was entered "without prejudice," albeit with the agreement that the children would remain in their home with their grandparents, either Tim and Janice Timmel (Brian's parents) or Hon. Nancy Dreher and Roger Dreher (Laura's parents), as their caregivers while the parents, Laura and Brian Timmel, were required to reside elsewhere.  As of that date, no DCFS employee, including Defendants, and no person employed by the State's Attorney's office had spoken to any orthopedist or radiologist regarding the likelihood of the fracture being caused by child abuse.

ANSWER:     Plaintiff is attempting to paraphrase and quote a court order and Defendant

Griffin avers that the court order speaks for itself.  Defendant Griffin admits that on October 2,

2009, the juvenile court entered an order for DCFS to take temporary custody of the children and

that order speaks for itself.  Defendant Griffin admits that as of October 2, 2009, she had not

spoken to any orthopedist or radiologist regarding the likelihood of the fracture being caused by

abuse. The last sentence of Paragraph 58 of the Complaint improperly collectivizes the actions

of the Defendants and as such does not apprise Defendant Griffin of what she is charged with.

Defendant Griffin lacks knowledge sufficient to form a belief as to the truth of the allegations

contained in the last sentence of Paragraph 58 and therefore denies those allegations.

59. On October 2, the court scheduled the preliminary temporary custody hearing to commence on October 14, 2009. Pursuant to 705 ILCS 405/2-10, this hearing was held to determine: (a) whether there was any probable cause to believe that the Timmel children had been abused or neglected and, if so; (b) whether it was a matter of immediate and urgent necessity that the Timmel children be placed in the temporary custody of DCFS and, if so; (c) whether DCFS made reasonable efforts to prevent or eliminate the necessity of removing the Timmel children from the custody of their parents. *See* ¶ 21 *supra*. As is discussed below, *see* ¶ 69 *infra*, at the conclusion of the temporary custody hearing regarding the Timmel family, the juvenile court found no probable cause to believe that any of the Timmel children had been abused or neglect.

ANSWER: Defendant Griffin admits the first sentence in Paragraph 59. Plaintiff is

attempting to paraphrase Illinois law and Defendant Griffin avers that the cited law speaks for

itself. Defendant Griffin admits that at the conclusion of the temporary custody hearing

regarding the Timmel family, the juvenile court found no probable cause. Defendant Griffin

further avers that Plaintiff is attempting to paraphrase the November 20, 2009 juvenile court

order dismissing the petition for temporary custody which speaks for itself. Defendant Griffin

denies each and every remaining allegation contained in Paragraph 59.

60. On October 7, 2009, counsel for the Timmels sent to Defendants Griffin and Leggin the written report of Dr. Sullivan in which he concluded that the probability that the fracture to R.'s left femur was caused by abuse was extremely low.

ANSWER: Defendant Griffin admits that on October 7, 2009, counsel for the

Timmels sent to Defendants Griffin, Leggin and Smith-Foote the written report of Dr. Sullivan.

Defendant Griffin avers that Dr. Sullivan concluded as to the fracture to R.'s left femur that "the

probability that this is due to non-accidental trauma is extremely low and the child is at low risk

of further injury." Defendant Griffin denies the remaining allegations contained in Paragraph 60.

61.  Among the opinions and references Defendants ignored was that of Dr. Brian Foley, Laura Timmel's obstetrician.  In a letter to DCFS dated October 8, 2009, he stated:

> I was shocked to hear that DCFS was investigating this couple for abuse. I understand the situation warrants attention, and I can understand the unknown cause of the injury could raise suspicion on your department's behalf. However, being a caregiver for this couple for the last four plus years and seeing their interpersonal interactions with each other and their children I found it unfathomable that either is capable of inflicting that type of injury on any child. I would expect your department to do a more thorough investigation and follow up with myself and the Timmel's [sic] pediatrician as to their personalities and parenting skills.

During the DCFS investigation, DCFS Defendants made no attempt to speak with Dr. Foley.

ANSWER:     The allegations contained in Paragraph 61 of the Complaint improperly collectivize the actions of the Defendants and as such do not apprise Defendant Griffin of what she is charged with.  Defendant Griffin admits that during the DCFS investigation she made no attempt to speak to Dr. Foley.  Defendant Griffin denies that she ignored Dr. Foley's October 8, 2009 letter which speaks for itself and denies each and every remaining allegation contained in Paragraph 61.

62.  During the DCFS investigation, nobody from DCFS, including the Defendants, spoke with Dr. Danielle Cherian, the primary care pediatrician for R. and the other two Timmel children.

ANSWER:     Defendant Griffin admits that Dr. Danielle Cherian was the primary care physician for R. and the other Timmel children.  Defendant Griffin admits that she did not speak to Dr. Cherian during the DCFS investigation.  The remaining allegations contained in Paragraph 62 of the Complaint improperly collectivize the actions of the Defendants and as such do not apprise Defendant Griffin of what she is charged with, and therefore Defendant Griffin denies the remaining allegations contained in Paragraph 62.

63.  Throughout the ensuing juvenile court hearing as to whether there was probable cause to believe R. was abused by either Brian or Laura Timmel (or both), Defendants Griffin and Leggin pointed exclusively to Estes' MPEEC report and opinions as the exclusive source of the factual allegations throughout this case.  On October 14, 2009, Defendant Griffin testified that DCFS did not need to consider the opinions of orthopedists because "we had our MPEEC report" and "we decided to go with our MPEEC report." This exclusive reliance on Dr. Estes'

opinion, and refusal to consider the opinions and testimony of others, was unreasonable on its own terms for Dr. Estes herself acknowledged, in testimony given on October 16, that an MPEEC report is *not* by itself a complete child abuse investigation. It was the responsibility of DCFS, assigned to Defendants Griffin and Leggin, and not of the MPEEC team, to make investigative contacts confirming or rebutting a parents' account of the facts.

ANSWER: Defendant Griffin admits that in the juvenile court hearing as to whether there was probable cause to believe R. was abused by either Brian or Laura Timmel, Defendant Griffin and Dr. Estes testified and that their testimony speaks for itself in the context in which it was given. Defendant Griffin admits that she relied on Dr. Estes's MPEEC report and admits that it was the responsibility of DCFS, assigned to Defendants Griffin and Leggin to make investigative contacts and not the responsibility of the MPEEC team. Defendant Griffin denies that Defendant Leggin testified in the juvenile court proceeding and denies each and every remaining allegation contained in Paragraph 63.

64. In addition to failing to investigate medical evidence and eyewitness accounts, the DCFS Defendants failed to investigate any facts that would either confirm or refute the credibility and good character of the Timmels, as persons and as parents. Indeed, they held it as a mark against them that they had personal relationships with federal judges, lawyers, and doctors and refused to speak to any of these individuals prior to taking protective custody, and for days after initiating the juvenile court action. At the same time, Defendant Griffin claimed she had "no opinion" as to Laura's denial of abuse and acknowledged that the parents acted appropriately with their children and that she had no reports that they had ever behaved other than as model parents. In addition, the DCFS Defendants also refused to consider at all relevant the fact that Laura Timmel had a career working extensively with children as a school social worker and as a social worker in the Division of Specialized Services for Children.

ANSWER: Defendant Griffin admits that she testified in the juvenile court hearing as to Laura's denial of abuse and that testimony speaks for itself in the context in which it was given. The remaining allegations contained in Paragraph 64 of the Complaint improperly collectivize the actions of the Defendants and as such do not apprise Defendant Griffin of what she is charged with, and Defendant Griffin denies the remaining allegations contained in Paragraph 64.

65. Even though Dr. Este's opinion was the sole opinion upon which the DCFS Defendants relied, Dr. Estes' opinion was not as strongly inculpatory as the Defendants Griffin

and Leggin assumed: she had no opinion as to *who* had abused R., nor as to whether custody of the children should have been taken, nor as to whether either parent posed any danger to the children, nor as to whether the parents should be allowed to be alone with their children and she acknowledged that siblings can cause a fracture in a newborn baby and that infants being removed from car seats or baby carriers can experience a leg fracture.

ANSWER: Defendant Griffin avers that Dr. Estes' testimony at the juvenile court hearing speaks for itself in the context in which it was given. Defendant Griffin denies Plaintiff's characterization of Dr. Estes' testimony and denies each and every remaining allegation contained in Paragraph 65.

66. On October 16, 2009, though the juvenile court "probable cause" hearing had not yet concluded, the juvenile court directed that the Timmels should be allowed to return to their home under supervision, over the objection of DCFS counsel, representing Defendants Leggin, Griffin, and Smith-Foote. On November 4, 2009, the juvenile court allowed the Timmels unsupervised visits with their children, again over the objection of DCFS counsel. Throughout the proceedings in the juvenile court, Defendants Griffin and Leggin continued to press for a finding of abuse against both of the Timmels, even though they had failed to consider all the exculpatory evidence set forth above.

ANSWER: Defendant Griffin admits that the juvenile court held a "probable cause" hearing on October 16, 2009 which did not conclude on that date and admits that the juvenile court entered an order on that date which speaks for itself. Defendant Griffin admits that on November 4, 2009, the juvenile court entered an order and that order speaks for itself. Defendant Griffin denies that DCFS counsel represented Defendants Griffin, Leggin and Smith-Foote in the juvenile court proceedings and avers that the Cook County State's Attorney represented the People of the State of Illinois in the Petitions for Adjudication of Wardship of the Timmel children and that Defendant Griffin testified as a witness in those proceedings. Defendant Griffin denies each and every remaining allegation contained in Paragraph 66.

67. In the course of the juvenile court proceedings, while claiming to follow the law governing her investigation, *see* ¶ 43 *supra*, Defendant Griffin testified she was not aware of the DCFS requirement that she obtain the opinion of an orthopedist. DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, at subsections (C)(2)(F) and (C)(4)(E).

ANSWER: Plaintiff is attempting to paraphrase DCFS Procedure and Defendant

Griffin avers that the cited DCFS Procedure speaks for itself. Defendant Griffin admits that she

testified in the juvenile court proceedings to following the law governing her investigation and

that her testimony speaks for itself in the context in which it was given. Defendant Griffin

denies each and every remaining allegation contained in Paragraph 67.

68. On November 4, R.'s treating orthopedist at CMH, Dr. Sagan, testified in the juvenile
court proceedings that she could not conclude R. was more likely than not to have been abused
based on available evidence. Dr. Sagan also disagreed with the "inconsolable cry" theory put
forth by Dr. Estes as the linchpin of her contention that R. was abused.

ANSWER:     Defendant Griffin admits that on November 4, 2009, Dr. Sagan testified in

the juvenile court proceedings and her testimony speaks for itself in the context in which it was

given. Defendant Griffin denies Plaintiff's characterization of Dr. Sagan's testimony and Dr.

Estes's testimony in juvenile court proceedings and avers that their testimony speaks for itself in

the context in which it was given. Defendant Griffin denies Plaintiff's characterization of Dr.

Estes' theory. Defendant Griffin denies each and every remaining allegation contained in

Paragraph 68.

69. On November 20, 2009, after five separate days of hearing and closing arguments,
the juvenile court ruled that there was no probable cause to believe R. Timmel had been abused.
The court found the testimony of Brian and Laura Timmel "clear and compelling." The court
also found Dr. Sullivan's testimony to be "convincing." Upon finding no probable cause, the
court dismissed the Petition for Adjudication of Wardship as to the Timmel children.

ANSWER:     Defendant Griffin admits that on November 20, 2009 after five separate

days of hearing and closing argument, the juvenile court ruled that there was no probable cause

and dismissed the Petition for Adjudication of Wardship as to the Timmel children. Defendant

Griffin denies that Plaintiff's quotation is accurate as to the court's finding regarding the

testimony of Brian and Laura Timmel and the testimony of Dr. Sullivan and therefore denies

each and every remaining allegation contained in Paragraph 69.

70. Despite the judicial finding that R. was not abused and that there was not even
probable cause to believe that he had been abused, DCFS Defendants Griffin, Leggin, and
Smith-Foote continued to pursue the investigation they had started on September 10 rather than

close it out immediately, as the finding of no probable cause required. The sole change in the focus of the ongoing investigation they started on September 10 was that they narrowed their focus to only Plaintiff Laura Timmel, not Brian Timmel.

ANSWER: Defendant Griffin denies the allegations contained in Paragraph 70.

71. On December 3, 2009, Defendant Griffin issued a recommended decision, approved by Defendants Leggin and Smith-Foote, that the report of abuse be "indicated" as to Laura Timmel only. The Defendants issued a notice of their intent to indicate the report against her and sent her an Investigation Summary. This Summary recites their continuing reliance on the opinion of Dr. Estes and omits mention of Dr. Sagan altogether.

ANSWER: Defendant Griffin admits that she recommended that the report of abuse against Laura Timmel be indicated and that Defendant Smith-Foote and Defendant Leggin approved the recommendation. Defendant Griffin admits that on December 3, 2009, DCFS issued Laura Timmel a notice of intent to indicate a childcare worker and sent Laura Timmel an Investigation Summary. Defendant Griffin avers that the summary speaks for itself and denies Plaintiff's characterization of the summary is accurate. The remaining allegations contained in Paragraph 71 of the Complaint improperly collectivize the actions of the Defendants and as such do not apprise Defendant Griffin of what she is charged with, and therefore Defendant Griffin denies the remaining allegations contained in Paragraph 71.

72. As was her right pursuant to the *Dupuy* decisions, Plaintiff Laura Timmel invoked her right to an Administrator's Conference and retained counsel, at significant continued expense, in order to present to the DCFS administrator the mountain of exculpatory evidence she had by now collected. On December 15, 2009, Defendant Miller convened an Administrator's Conference in which Defendants Griffin and Leggin participated.

ANSWER: Defendant Griffin admits that Laura Timmel invoked her right to an Administrator's Conference and retained counsel; and admits that Defendant Miller convened the Administrator's Conference, and Defendants Griffin and Leggin participated. Defendant Griffin denies each and every remaining allegation contained in Paragraph 72.

73. During the December 15 conference, Defendants Griffin and Leggin stated they still had not interviewed Dr. Sagan, they were not aware of Dr. Sagan's involvement in this case, and they "[didn't] know who she [was]" even though the juvenile court's November 20 ruling specifically cites Dr. Sagan's opinion and her testimony.

ANSWER:     Defendant Griffin admits that she and Defendant Leggin participated in

the December 15, 2009 Administrator's Conference.  Defendant Griffin is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

Paragraph 73 and therefore denies the remaining allegations contained in Paragraph 73.

74.  Defendant Griffin and Defendant Leggin asserted that they had read the juvenile
court's final order in the case, but it was clear from their statements during the December 15
Administrator's Conference that they did not consider it, apply it, or obey it, and nor did
Defendant Smith-Foote, who on November 24, 2009, had personally approved the indicated
finding recommendation.

ANSWER:  Defendant Griffin denies the allegations contained in Paragraph 74.

75.  Despite the overwhelming and legally binding exculpatory evidence that had already
been determined to preclude a finding of abuse as to Laura Timmel, including a binding and final
court order, on or about January 8, 2010, Defendant Maria Miller affirmed the recommendation
to indicate Laura Timmel as guilty of child abuse in causing the fracture of her son R.'s leg and
as guilty of child neglect in creating a substantial risk of physical injury as to N. and B..  No
rationale for overriding the juvenile court's final order was provided in Defendant Miller's
decision to indicate Laura, nor have any of the Defendants provided any explanation for their
decision to override and ignore the juvenile court's order (such as a claim of newly-discovered
evidence, as there was none).

ANSWER:     Defendant Griffin admits that Defendant Miller affirmed the

recommendation to indicate Laura Timmel as guilty of child abuse in causing the fracture of her

son R.'s leg and as guilty of child neglect in creating a substantial risk of physical injury as to N.

and B.  Defendant Griffin denies Plaintiff's characterization of Defendant Miller's

recommended opinion and avers that Defendant Miller's recommended opinion speaks for itself.

Defendant Griffin denies each and every remaining allegation contained in Paragraph 75.

76.     Based upon Defendant Miller's decision to affirm the recommended indicated
finding, Laura Timmel's name was entered into the State Central Register as a perpetrator of
child abuse and neglect.  Absent a successful appeal, by operation of law the Registry would
continue for 20 years and would bar Laura from working in any social work position during that
time.  It would also prevent her from volunteering at her children's school, becoming a scout
leader and had a chilling effect on Laura's ability to pursue activities with her children while the
finding remained on the register.

ANSWER:     Defendant Griffin admits that there was an indicated finding and that

Laura Timmel's name was placed on the State Central Register as a perpetrator of child abuse.

Defendant Griffin also admits that Defendant Miller affirmed the recommendation to indicate

Laura Timmel for child abuse.  The remaining allegations in Paragraph 76 are hypothetical and

Defendant Griffin denies the remaining allegations in Paragraph 76.

77.     Plaintiff Timmel appealed the indicated finding that had been registered against her and requested an expedited hearing as was her right as a *Dupuy* class member.  She retained counsel at considerable expense to present her case for expungement to the assigned DCFS administrative law judge on her behalf.

ANSWER:     Defendant Griffin admits that Plaintiff appealed the indicated finding,

requested an expedited hearing and retained counsel to present her case for expungement to the

assigned DCFS administrative law judge on her behalf.  Defendant Griffin denies each and every

remaining allegation contained in Paragraph 77.

78.     On or about February 19, 2010, DCFS Director Erwin McEwen approved the administrative law judge's recommended order granting Plaintiff Timmel's request for expungement of the indicated findings on the basis of the November 20, 2009, juvenile court order that exonerated Plaintiff Timmel of any alleged wrongdoing.

ANSWER:     Defendant Griffin admits that on or about February 19, 2010, DCFS

Director Erwin McEwen approved the administrative law judge's recommended order granting

Plaintiff Timmel's request for expungement of the indicated findings on the basis of the

November 20, 2009 juvenile court order.  Defendant Griffin denies the remaining allegations

contained in Paragraph 78.

79. On information and belief, Defendants Griffin, Leggin, and Smith-Foote recommended indicating Laura Timmel in retaliation for her assertion of her rights, for her refusal to turn her children over to DCFS on the evening of October 1, for her prevailing before the juvenile court, and/or in order to exercise arbitrary power against her, all in violation of her substantive due process rights.

ANSWER:     Defendant Griffin denies the allegations contained in Paragraph 79.

80.  In addition to causing her to expend money on legal fees in order to clear her name, the decision to indicate Plaintiff Laura Timmel caused her extreme emotional distress, including fear for her future ability to work in her chosen career (given an indicated finding of bone fractures is registered for 20 years), concern as to her ability to be involved in her children's

schooling and after-school activities, intense fear about any future accidents that might occur to her children, and a reasonably-based belief that she was being persecuted and harassed by governmental officials who might again seize her children or undertake other unwarranted actions against her.

ANSWER: Defendant Griffin denies the allegations contained in Paragraph 80.

81. At all relevant times, Defendants Griffin, Leggin, Smith-Foote, and Miller acted with respect to Plaintiff Timmel under color of state law.

ANSWER: Defendant Griffin admits that she acted under color of state law. Defendant

Griffin denies each and every remaining allegation contained in Paragraph 81.

82. After the case with DCFS and Laura Timmel was completely closed, the Timmels continued to receive medical care and treatment for R. In early January, 2011, R. was diagnosed with a condition that is consistent with higher-than-normal pain tolerance, a symptom that the Timmels have consistently reported was the case for R. since he was a baby.

ANSWER: Defendant Griffin is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 82. To the extent an answer is

required, Defendant Griffin denies the allegations contained in Paragraph 82.

83. Defendants Griffin, Leggin, Smith-Foote, and Miller violated Plaintiff Laura Timmel's clearly established rights, about which a reasonable person in their position should have known.

ANSWER: Defendant Griffin denies the allegations contained in Paragraph 83.

84. In recommending and in issuing an indicated finding against Laura Timmel, Defendants Griffin, Leggin, Smith-Foote, and Miller each acted intentionally or recklessly or with deliberate indifference to the consequences of their actions.

ANSWER: Defendant Griffin denies the allegations contained in Paragraph 84.

85. Defendants' actions complained of herein have caused severe and long-lasting harm and long-lasting injury to Plaintiff. Plaintiff Timmel's right to pursue her career was seriously threatened without basis and without constitutionally required process. Defendants' actions complained of herein proximately caused her emotional and financial harm. Plaintiff is entitled to compensatory damages in an amount not less than $50,000 from each Defendant, jointly and severally.

ANSWER: Defendant Griffin denies the allegations contained in Paragraph 85.

86. Defendants Griffin and Leggin acted with callous disregard for the rights of Plaintiff. Plaintiff seeks punitive damages against defendants Griffin and Leggin.

ANSWER:     Defendant Griffin denies the allegations contained in Paragraph 86.

87.  Plaintiff also seeks a declaratory judgment in her favor as to the claims set forth in this Count, an award of civil rights attorneys' fees pursuant to 42 U.S.C. § 1988 and costs against all Defendants, jointly and severally, and such other relief as this Court deems just and equitable.

ANSWER:     Defendant Griffin denies the allegations contained in Paragraph 87.

## AFFIRMATIVE DEFENSES

For her affirmative defenses, Defendant Griffin states as follows:

### FIRST AFFIRMATIVE DEFENSE

The allegations in Plaintiffs' Amended Complaint against Defendant Griffin fail to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Defendant Griffin affirmatively states that actions taken relating to the underlying allegations in this Amended Complaint were in conformance with all applicable constitutional, statutory, and regulatory rules of law.

### THIRD AFFIRMATIVE DEFENSE

This Court lacks jurisdiction to award the relief requested in the Complaint.

### FOURTH AFFIRMATIVE DEFENSE

Defendant Griffin affirmatively states that her alleged conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known, and she is therefore entitled to qualified immunity from civil damages.

### FIFTH AFFIRMATIVE DEFENSE

Defendant affirmative states that she is entitled to absolute prosecutorial immunity for actions taken in this matter related to the juvenile court matter.

### SIXTH AFFIRMATIVE DEFENSE

Defendant affirmative states that she is entitled to absolute quasi-judicial immunity for actions taken in this matter pursuant to a court order.

JURY DEMAND

Defendant Griffin requests trial by jury.

Respectfully submitted,

LISA MADIGAN
Illinois Attorney General

By:   s/Barbara L. Greenspan
Barbara L. Greenspan
Teresa M. Cullen
Assistant Attorneys General
100 W. Randolph St., 11-200
Chicago, Illinois  60601
(312) 814-7087
(312) 814-6833

Erin R. Gard, Senior Law Clerk,
Assisted in the preparation of this Answer.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LAURA TIMMEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 11 C 6034 |
| JANICE GRIFFIN, DCFS Investigator, in her individual | ) | James B. Zagel |
| capacity, KENNETH LEGGIN, DCFS Supervisor, | ) | Judge Presiding |
| in his individual capacity, KIMBERLY SMITH-FOOTE, | ) | |
| Child Protection Manager, in her individual capacity, | ) | |
| and MARIA MILLER, DCFS Administrator, in her | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT KENNETH LEGGIN'S AMENDED ANSWER

1.     This civil rights complaint, brought pursuant to 42 U.S.C. § 1983, seeks redress for the actions of four employees of the Division of Child Protection of the Illinois Department of Children and Family Services ("DCFS") that deprived Plaintiff Laura Timmel of her rights to due process under the Fourteenth Amendment to the United States Constitution. Defendants refused to consider plainly exculpatory evidence that any responsible child protection investigator or administrator in their position would consider and, in flagrant disregard of this evidence, unconstitutionally caused the impairment of Plaintiff Laura Timmel's constitutionally protected liberty interest in her career as a social worker.

     ANSWER:     Defendant Leggin admits that Plaintiff purports to bring this action

pursuant to 42 U.S.C. § 1983. Defendant Leggin denies each and every remaining allegation

contained in Paragraph 1.

2.     Laura Timmel sues all four Defendants for violation of their clearly-established constitutional duty to fully consider all available exculpatory evidence before they issue and register a so-called "indicated" finding of abuse or neglect against any professional pursuing a career working with children, such as a social worker. The Defendants also violated a basic principle of law by disregarding the state circuit court order finding "no probable cause" that had already exonerated Plaintiff Laura Timmel and, oblivious to the requirement that they respect final legal rulings, they proceeded to indicate Laura as guilty of child abuse, placing her name in the State Central Register ("Register") despite the state circuit court's order that had exonerated her of any wrongdoing as to her children.

     ANSWER:     Defendant Leggin admits that Laura Timmel sues all four Defendants.

Defendant Leggin admits that he approved the recommendation to indicate the report of abuse

against Laura Timmel and that Laura Timmel was indicated for child abuse, and that her name

was placed on the State Central Register. Paragraph 2 of the Complaint improperly collectivizes

the actions of the Defendants and as such does not apprise Defendant Leggin of what he is

charged with and he therefore denies each and every remaining allegation contained in Paragraph

2.

      3. The DCFS Defendants' decision to "indicate" Plaintiff for child abuse in derogation of
the juvenile court's order impaired her ability to function as a mother, threatened permanently to
ruin her career and her ability to support herself and her children, and caused her great emotional
distress. Plaintiff Timmel was compelled to expend thousands of dollars to exculpate herself
from this utterly baseless indicated finding, issued against her without due process of law. As
relief from these injuries in violation of Plaintiff's constitutional rights, she seeks compensatory
damages, an award of punitive damages, and an award of attorneys' fees under 42 U.S.C. § 1988
and costs.

      ANSWER:    Defendant Leggin denies the allegations contained in Paragraph 3.

      4. This Court has jurisdiction over Plaintiff's claims below pursuant to 42 U.S.C. § 1983
and 28 U.S.C. §§ 1331 and 1343.

      ANSWER:    Defendant Leggin admits that if this action were proper, this Court would

have jurisdiction under 28 U.S.C. §§ 1331 and 1343(3). Defendant Leggin denies each and

every remaining allegation contained in Paragraph 4.

      5. Venue is proper in this district under 28 U.S.C. § 1391 because:

      (a) the Northern District of Illinois is the judicial district in which substantially all of the
events or omissions giving rise to Plaintiff's claims occurred; and

      (b) the Defendants Griffin, Leggin, and Smith-Foote are found or are employed in the
Northern District of Illinois.

      ANSWER:  Defendant Leggin admits the allegations contained in Paragraph 5 and its

subparts.

      6. Plaintiff Laura Timmel, a licensed clinical social worker who holds a degree with
honors from Jane Addams School of Social Work at the University of Illinois, resides in Western
Springs, Illinois, with her husband Brian Timmel and her three children, N. and B., twins whose
birth date is in the summer of 2007, and R., whose birth date is in the late summer of 2009.

2

ANSWER: Defendant Leggin admits that Plaintiff Laura Timmel is a licensed clinical

social worker and that she resides with her husband and her three children, N. and B., twins

whose birth date is in the summer of 2007, and R., whose birth date is in the late summer of

2009. Defendant Leggin is without knowledge or information sufficient to form a belief as to the

truth of the allegations contained in Paragraph 6 and therefore denies the remaining allegations in

Paragraph 6.

7. Defendant Janice Griffin is the DCFS investigator who had primary responsibility for
the investigation as to R. Timmel and for making the determination that Laura Timmel should be
"indicated" for child abuse even after Plaintiff had been cleared of liability by the juvenile court.
She is sued in her individual capacity

ANSWER: Defendant Leggin admits that Defendant Griffin is a DCFS investigator

and that she was assigned to the investigation concerning R. Timmel. Defendant Leggin admits

that Plaintiff purports to sue Defendant Griffin in her individual capacity. Defendant Leggin

denies each and every remaining allegation contained in Paragraph 7.

8. At all times relevant to this complaint, Defendant Kenneth Leggin was Defendant
Griffin's supervisor, and in that capacity he had responsibility for directing the investigation as
to R. Timmel and overseeing and approving the recommendations of Defendant Griffin. He is
sued in his individual capacity.

ANSWER: Defendant Leggin admits that he was Defendant Griffin's supervisor, and

in that capacity he had responsibility for directing the investigation as to R. Timmel and

overseeing and approving the recommendations of Defendant Griffin. Defendant Leggin admits

that Plaintiff purports to sue him in his individual capacity.

9. Defendant Kimberly Smith-Foote is a Child Protection Manager, and at all times
relevant to this complaint, she was the direct supervisor of Defendant Leggin. She approved the
decision to recommend indicating Laura Timmel for child abuse on November 24, four days
after the juvenile court exonerated Plaintiff. Defendant Smith-Foote is sued in her individual
capacity.

ANSWER: Defendant Leggin admits that Defendant Smith-Foote is a Child

Protection Manager and was the direct supervisor of Defendant Leggin. Defendant Leggin

3

admits that Defendant Smith-Foote approved the recommendation to indicate Laura Timmel for

child abuse on November 24.  Defendant Leggin admits that Plaintiff purports to sue Defendant

Smith-Foote in her individual capacity and denies each and every remaining allegation in

Paragraph 9.

10.  At all times relevant to this complaint, Defendant Maria Miller was a DCFS administrator for the Central Region of DCFS.  Defendant Miller was the assigned administrator who made the final review of the recommendation to indicate Plaintiff Timmel and, as such, Defendant Miller made the ultimate decision to register Plaintiff Timmel as a perpetrator of child abuse.

ANSWER:     Defendant Leggin admits that Defendant Maria Miller was a DCFS

administrator for the Central Region of DCFS, that Defendant Miller was the assigned

administrator who made the final review of the recommendation to indicate Plaintiff Timmel.

Defendant Leggin avers that Defendant Miller concurred with the field recommendation to

indicate Plaintiff as a perpetrator of child abuse and denies each and every remaining allegation

in Paragraph 10.

11.  Pursuant to the Illinois Abused and Neglected Child Reporting Act ("ANCRA"), 325 ILCS 5/1 *et seq*, DCFS receives Hotline calls when any person makes a call based upon "reasonable cause to believe a child may be an abused child or a neglected child."  325 ILCS 5/4, 5/7, 5/7.6.

ANSWER:  Paragraph 11 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Leggin avers that the cited

law speaks for itself.  Defendant Leggin denies each and every remaining allegation contained in

Paragraph 11 inconsistent with the law.  To the extent an answer is required, Defendant Leggin

denies the allegations contained in Paragraph 11.

12.  Under ANCRA, and consistent with a federal law known as the Child Abuse Prevention and Treatment Act (alternatively called "the Mondale Act,"), 42 U.S.C. 5101 *et seq.*, 42 U.S.C. 5116 *et seq.*, certain persons are "mandated reporters" of child abuse if a child known to them in their professional capacity is reasonably suspected of being an abused or neglected child.  Persons other than mandated reporters are permitted to make such reports, though they are not penalized by law for failure to report; however, mandated reporters may be subject to criminal and civil penalties if they fail to report reasonably suspected child abuse. 325 ILCS 5/4,

5/4.02.

ANSWER:  Paragraph 12 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Leggin avers that the cited

law speaks for itself.  Defendant Leggin denies each and every remaining allegation contained in

Paragraph 12 inconsistent with the law.  To the extent an answer is required, Defendant Leggin

denies the allegations contained in Paragraph 12.

13. ANCRA requires that DCFS promptly initiate an investigation of the merits of calls it
accepts, sometimes working jointly with law enforcement authorities if the allegations in the call
give rise to a potential criminal complaint.  *Id*. at 5/7, 5/7.3, 5/7.4.

ANSWER:  Paragraph 13 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Leggin avers that the cited

law speaks for itself.  Defendant Leggin denies each and every remaining allegation contained in

Paragraph 13 inconsistent with the law.  To the extent an answer is required, Defendant Leggin

denies the allegations contained in Paragraph 13.

14.  To be accepted as a Hotline call and subject to an investigation, the specific incident
of harm alleged in the report must meet an allegation definition in the DCFS allegation system.
Each of these allegations is defined in DCFS Manual of Rules and Procedures 300, Appendix B.
*See* 89 Ill. Admin. Code § 300, App'x B.  Physical abuse allegations, which are coded with a
one- or two-digit number under 50 in the DCFS allegation coding system, include specific
allegations of harm alleged to have been caused by the direct action of an alleged perpetrator,
including "#2 Head Injuries"; "#5 Burns"; "#7 Wounds"; "#9 Bone Fractures"; "#10 Substantial
Risk of Physical Injury"; "#11 Cuts, Bruises, Welts, Abrasions and Oral Injuries"; "#12 Human
Bites"; and "#16 Torture." Neglect allegations of harm, which are coded with a two-digit number
greater than 50, include injuries that are alleged to have been caused by the blatant disregard of
the alleged perpetrator (such as "#52 Head Injuries," "#57 Bone Fractures," and "#62 Human
Bites") as well as additional defined areas of harm to children, such as "#74 Inadequate
Supervision" and "#79 Medical Neglect."

ANSWER:  Paragraph 14 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Leggin avers that the cited

law speaks for itself.  Defendant Leggin denies each and every remaining allegation contained in

Paragraph 14 inconsistent with the law.  To the extent an answer is required, Defendant Leggin

denies the allegations contained in Paragraph 14.

15. The specific allegations relevant to the investigation and indicated findings involving the Timmel children are allegation of harm "#9 Bone Fractures by Abuse" (alleged as to R. Timmel due to a fracture he sustained to his left femur in September 2009) and allegation of harm "#60 Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect" (alleged as to N. and B. Timmel insofar as they were assumed to be at risk of harm as a result of the injury to R.).

ANSWER: Defendant Leggin admits the allegations in Paragraph 15 and avers that

Paragraph 15 calls for a legal conclusion to which no answer is required. Also, Plaintiff is

attempting to paraphrase Illinois law and Defendant Leggin avers that the cited law speaks for

itself.

16. DCFS regulations require DCFS to complete investigations of Hotline calls within 60 days, except where this time may be extended for good cause. 325 ILCS 5/7.12. At the conclusion of the investigation, DCFS investigators determine if the allegations under investigation are "indicated"—meaning that some credible evidence of abuse or neglect was found—or "unfounded"—meaning that DCFS did not find credible evidence of abuse or neglect. *Id*.

ANSWER: Paragraph 16 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Leggin avers that the cited

law speaks for itself. Defendant Leggin denies each and every remaining allegation contained in

Paragraph 16 inconsistent with the law. To the extent an answer is required, Defendant Leggin

denies the allegations contained in Paragraph 16.

17. The final determination of "indicated" or "unfounded" must be reported forthwith to the Register. *Id* at 7/7, 7/12. However, if an individual is licensed to work with children or otherwise is engaged in employment involving the care of children, DCFS is not permitted to issue an indicated finding without first allowing the child care professional an opportunity to have the recommendation to "indicate" her reviewed by an administrator by way of an Administrator's Conference. The pre-deprivation Administrator's Conference is one of the procedural due process protections that the federal court, in *Dupuy v. McDonald*, directed DCFS to adopt in order to remedy the then-constitutionally inadequate indicated report decision-making policies as applied to child care professionals. *Dupuy v. McDonald*, 141 F. Supp. 2d 1090 (N.D. Ill. 2001); Preliminary Injunction Memorandum Opinion and Order at *Dupuy v. McDonald*, 2003 U.S. Dist. LEXIS 12019, at *21-26 (N.D. Ill. July 10, 2003), *aff'd in relevant part sub nom Dupuy v. Samuels*, 397 F. 3d 493, 512 (7th Cir. 2005). The requirements for Administrator's Conferences are now codified in DCFS rules and procedures. *See* 89 Ill. Admin. Code § 300.160.

ANSWER: Paragraph 17 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Leggin avers that the cited

law speaks for itself.  Defendant Leggin denies each and every remaining allegation contained in

Paragraph 17 inconsistent with the law.  To the extent an answer is required, Defendant Leggin

denies the allegations contained in Paragraph 17.

18.  Only if the Administrator, after reviewing the basis for the recommended finding as well as any information or evidence the child care professional presents at the conference, determines that there is sufficient evidence of abuse or neglect, upon consideration of all of the inculpatory as well as the exculpatory evidence,  is DCFS authorized to issue an indicated report and register an individual's name identifying him or her as a perpetrator of child abuse or neglect in the State Central Register. *Dupuy*, U.S. LEXIS 12019, at *25; 89 Ill. Admin. Code § 300.160(c)(4).

ANSWER:  Paragraph 18 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Leggin avers that the cited

law speaks for itself.  Defendant Leggin denies each and every remaining allegation contained in

Paragraph 18 inconsistent with the law.  To the extent an answer is required, Defendant Leggin

denies the allegations contained in Paragraph 18.

19.  Once registered, indicated findings for physical abuse such as bone fractures are registered for a period of 20 years, and indicated findings for most forms of neglect are registered for a period of 5 years.  325 ILCS 5/7.14; DCFS Procedures 300.100(c). These findings are registered and maintained unless the person named as a perpetrator appeals the finding and, at the subsequent administrative hearing, DCFS fails to meet is burden of proof (by a preponderance of the evidence) that the finding should be maintained. 325 ILCS 5/7.16.

ANSWER:  Paragraph 19 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Leggin avers that the cited

law speaks for itself.  Defendant Leggin avers each and every remaining allegation contained in

Paragraph 19 inconsistent with the law.  To the extent an answer is required, Defendant Leggin

denies the allegations contained in Paragraph 19.

20.  At the same time as DCFS investigators are expected to make determinations as to whether allegations of abuse or neglect are "indicated" or "unfounded," they are also authorized by state law to take emergency protective custody of children whom they reasonably believe cannot be cared for at home without endangering their health or safety, but only if there is not time to apply for a court order requesting temporary custody. 325 ILCS 5/5. (Doctors and law

enforcement authorities also are given such authority by state law but it is DCFS that has the exclusive responsibility to hold a child in its custody after emergency protective custody has been taken. *Id.*)

ANSWER: Paragraph 20 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Leggin avers that the cited

law speaks for itself. Defendant Leggin denies each and every remaining allegation contained in

Paragraph 20 inconsistent with the law. To the extent an answer is required, Defendant Leggin

denies the allegations contained in Paragraph 20.

21. If DCFS intends to maintain temporary custody after taking emergency protective custody of a child without a court order, however, the Juvenile Court Act requires: (a) that a Petition for Adjudication of Wardship as to the child be filed within 48 hours of the taking of custody, otherwise the child is to be released back to their parents' care, 705 ILCS 405/2-9; and (b) upon such petition, the court must find that there is "probable cause" to believe the child is abused or neglected, that there is "immediate and urgent necessity" for the safety of the child that he or she be placed outside the custody of his or her parents, and that "reasonable efforts" were made to avoid removing the child from his or her parent, 705 ILCS 405/2-10.

ANSWER: Paragraph 21 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Leggin avers that the cited

law speaks for itself. Defendant Leggin denies each and every remaining allegation contained in

Paragraph 21 inconsistent with the law. To the extent an answer is required, Defendant Leggin

denies the allegations contained in Paragraph 21.

22. DCFS rules and regulations set forth detailed requirements as to the types of evidence to be considered in each type of investigation. For example, in an investigation of an allegation of "Bone Fractures," DCFS Procedures 300, Appendix B, provide that DCFS investigators must consider the opinion of radiologists or orthopedists and the procedures direct investigators to weight the opinion of doctors with higher degrees of relevant specialization more highly than the opinions of less specialized doctors.

ANSWER: Paragraph 22 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Leggin avers that the cited

law speaks for itself. Defendant Leggin denies each and every remaining allegation contained in

Paragraph 22 inconsistent with the law. To the extent an answer is required, Defendant Leggin

denies the allegations contained in Paragraph 22.

23. Any person who is indicated for child abuse or neglect has the right to appeal the finding to a neutral decision-maker—a DCFS administrative law judge. 325 ILCS 5/7.16, 89 Ill. Admin. Code § 336, "Appeal of Child Abuse and Neglect Investigation Findings." Ordinarily, such appeals must be decided within 90 days, *Lyon v. Dep't of Children & Family Servs.*, 209 Ill. 2d 264, 807 N.E.2d 423 (Ill. 2004); 89 Ill. Admin. Code § 336.220, but for persons who work with children (i.e., *Dupuy* class members, *see* ¶ 17 *supra*), DCFS is required to issue a final administrative hearing decision within 35 days of the filing of an administrative appeal request if the child care professional has requested an expedited appeal, *Dupuy*, LEXIS 12019, at *26-29; 89 Ill. Admin. Code § 336.85.

ANSWER: Paragraph 23 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Leggin avers that the cited

law speaks for itself. Defendant Leggin denies each and every remaining allegation contained in

Paragraph 23 inconsistent with the law. To the extent an answer is required, Defendant Leggin

denies the allegations contained in Paragraph 23.

24. Prior to the Hotline call in this case, which occurred in the late evening on Thursday, September 10, 2009, Laura Timmel's sole contact with DCFS had been as a Licensed Clinical Social Worker herself: she had been employed as a social worker by the Division of Specialized Care for Children and, before that, as a school-based social worker. In these capacities, Laura Timmel herself had several occasions to contact the Hotline as a mandated child abuse reporter seeking help for children she reasonably believed were seriously abused or neglected and required DCFS's intervention.

ANSWER: Defendant Leggin admits that a hotline call was placed and avers that it

occurred on September 11, 2009 at 12:18 a.m. Defendant Leggin is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

Paragraph 24. To the extent an answer is required, Defendant Leggin denies the remaining

allegations contained in Paragraph 24.

25. Neither Plaintiff Laura Timmel nor her husband Brian ever had any prior interaction with law enforcement either, except for traffic stops.

ANSWER: Defendant Leggin is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 25. To the extent an answer is

required, Defendant Leggin denies the allegations contained in Paragraph 25.

26.  During the week leading up to the Hotline call that gave rise to this action, Laura Timmel had been the primary caregiver for her three children, except during a few hours when her husband Brian Timmel watched the children.

ANSWER:    Defendant Leggin is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26.  To the extent an answer is required, Defendant Leggin denies the allegations contained in Paragraph 26.

27. On the morning of Thursday, September 10, 2009, Laura took R., who was then four weeks old, to a medical appointment with an audiologist at Children's Memorial Hospital and left the twins, who were then two years old, at home with her husband for the day.  After the medical appointment, Laura visited friend and former neighbor John Matthew Peluse and changed R.'s diaper and nursed R. while there, then went for lunch at a Panera Bread restaurant before going to a hair salon appointment in the afternoon.  She returned home with R. in the late afternoon.

ANSWER:    Defendant Leggin is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27. To the extent an answer is required, Defendant Leggin denies the allegations contained in Paragraph 27.

28. While at the hair salon, Laura nursed R. and changed R.'s diaper.  As she placed R. in his car seat to leave, Laura noticed that R.'s leg seemed slightly swollen and asked the stylist, Sasha Staerkel, who had recently held R. for several minutes, if it appeared swollen to her. The stylist said that it did perhaps look a little different from the other leg. The stylist later testified that she did not think that R.'s leg looked injured.

ANSWER:    Defendant Leggin is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28. To the extent an answer is required, Defendant Leggin denies the allegations contained in Paragraph 28.

29. During the entire time Laura and R. were at the salon, R. appeared content and comfortable with no unusual crying or behaviors suggesting that he had been injured in any way. Indeed, despite Laura having been in public with R. all day on September 10, no one—including medical staff with whom Laura and R. had contact on September 10—had any concern about R.'s condition.

ANSWER:    Defendant Leggin is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29. To the extent an answer is required, Defendant Leggin denies the allegations contained in Paragraph 29.

30.  Laura and R. returned home in the late afternoon shortly before Brian and the twins came home. When Brian arrived home, he held R. because he hadn't seen him all day, and he did not notice anything unusual about R.

ANSWER:     Defendant Leggin is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 30. To the extent an answer is

required, Defendant Leggin denies the allegations contained in Paragraph 30.

31. At approximately 5:00 p.m., Laura fed R. and then changed R.'s diaper and clothes, taking note that his left leg still appeared as though it might be a little swollen. R. was not exhibiting any signs of distress or pain.

ANSWER:     Defendant Leggin is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 31. To the extent an answer is

required, Defendant Leggin denies the allegations contained in Paragraph 31.

32. That evening, Laura prepared dinner for the family and R. was placed in his swing while the family ate. At about 7:00 p.m., after dinner, Laura went to change R.'s diaper and noticed that his left leg had become extremely swollen and that his leg seemed slightly out of alignment.  When Laura moved his leg to change his diaper, he cried out in pain but he did not cry inconsolably.  She called to Brian to take a look at R.'s leg, whereupon both Laura and Brian agreed that it looked like R. might have been bitten by a spider or insect.

ANSWER:     Defendant Leggin is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 32. To the extent an answer is

required, Defendant Leggin denies the allegations contained in Paragraph 32.

33. Because the Timmels had just moved to the western suburbs from Chicago, they called one of their new neighbors for a recommendation as to where to take R. to be examined by a doctor.  Upon receiving the recommendation to take R. to Hinsdale Hospital, Brian Timmel took R. there while Laura remained home with the twins.

ANSWER:     Defendant Leggin is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 33.  To the extent an answer is

required, Defendant Leggin denies the allegations contained in Paragraph 33.

34.  While at Hinsdale Hospital, R. was examined by several medical personnel, including Nurse Robert Ditto and an emergency room doctor.  At approximately 11:00 p.m., the ER doctor informed Brian Timmel that an x-ray had identified a fracture to R.'s left femur and that DCFS would be called based on a suspicion that the fracture may have been caused by child

abuse.

ANSWER:     Defendant Leggin is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 34.  To the extent an answer is

required, Defendant Leggin denies the allegations contained in Paragraph 34.

35.  After Brian notified Laura that R. had a fracture to his leg, Laura arranged for a neighbor to sit with the twins and she met Brian at Hinsdale Hospital. Medical personnel at Hinsdale recommended transferring R. to Children's Memorial Hospital ("CMH") and Brian and Laura acted in accordance with this recommendation.  Laura travelled by ambulance to CMH with R. while Brian returned home to care for the twins.

ANSWER:     Defendant Leggin is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 35. To the extent an answer is

required, Defendant Leggin denies the allegations contained in Paragraph 35.

36. Upon arriving at CMH at approximately 1:00 a.m. on Friday, September 11, Laura was interviewed by the DCFS on-call investigator Moises Cruz, who was considered the "mandate worker"—i.e., the DCFS investigator who was assigned to see R. within 24 hours of the Hotline Call.  Mr. Cruz directed Laura to immediately arrange for someone to supervise Brian's and her own contact with their children at all times. Mr. Cruz threatened Laura that if she did not immediately make such an arrangement, he would take protective custody of all of her children.

ANSWER:     Defendant Leggin admits the first sentence of Paragraph 36.  Defendant

Leggin denies the remaining allegations contained in Paragraph 36.

37. During the early morning hours of September 11, Mr. Cruz also visited the family home and spoke with Brian. Brian and Laura made immediate arrangements for Brian's mother, Janice Timmel, to travel to Chicago from Cincinnati, Ohio, in order to supervise Brian and Laura, and also arranged for a neighbor to supervise their contact until Janice Timmel could arrive.

ANSWER:     Defendant Leggin admits the allegations contained in Paragraph 37.

38. While at the hospital on September 11, Laura was also interviewed by Dr. Sarah Monahan-Estes ("Estes"), a non-board-certified fellow with CMH's Child Protective Unit. This unit is part of MPEEC (Multidisciplinary Pediatric Education and Evaluation Consortium), a consortium of child abuse divisions at area hospitals that provide evaluations to DCFS. Unbeknownst to Laura at the time, pursuant to a pre-existing contract between CMH and DCFS, Dr. Estes would be reporting her conclusions directly to DCFS, and specifically to Defendant Griffin, and not to them as parents.

ANSWER: Defendant Leggin admits that on September 11, Laura Timmel was interviewed by Dr. Sarah Monahan-Estes with CMH's child protective unit and that this unit is part of MPEEC (Multidisciplinary Pediatric Education and Evaluation Consortium), a consortium of child abuse divisions at area hospitals that provide evaluations to DCFS and avers that Dr. Estes is a Fellow with the protective services team at CMH. Defendant Leggin is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 38. To the extent an answer is required, Defendant Leggin denies the remaining allegations.

39. Dr. Michelle Sagan was the treating pediatric orthopedist for R. while he was admitted at CMH. At no point during the ensuing DCFS investigation did any person with DCFS, including the Defendants to this action, make any attempt to speak with Dr. Sagan despite the DCFS requirement that in a bone fracture investigation, DCFS must contact all treating physicians and must obtain "[v]erification of the injury . . . from a physician, preferably an orthopedist or radiologist." 89 Ill. Admin. Code, § 300, App'x B, "# 9/59 Bone Fractures." Further, DCFS procedures require that DCFS investigators give the greatest weight to the specialist with the greatest expertise in the relevant area of medicine, which Defendant Griffin acknowledged would be the area of orthopedics in the present case, but none of the DCFS Defendants sought or considered Dr. Sagan's opinion at any relevant time.

ANSWER: Defendant Leggin admits the first sentence of Paragraph 39. Defendant Leggin avers that Defendant Griffin's testimony in the juvenile court proceedings on October 14, 2009 speaks for itself. The remaining allegations of Paragraph 39 of the Complaint improperly collectivize the actions of the Defendants and as such do not apprise Defendant Leggin of what he is charged with. Plaintiff is attempting to paraphrase Illinois law and Defendant Leggin avers that the cited law speaks for itself. Defendant Leggin denies the remaining allegations contained in Paragraph 39.

40. R. was discharged from CMH on the evening of Friday, September 11.

ANSWER: Defendant Leggin admits that R. was discharged from CMH on September 11 and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore denies the remaining allegations contained in Paragraph 40.

41. Officer Craig Balon with the LaGrange Police Department interviewed both Brian and Laura at the family home, on September 11 and September 12, respectively. On September 15, Officer Wardlaw with the LaGrange Police reported to Defendant Griffin that after speaking with the family, the police department "did not have a sense of abuse."

ANSWER: Defendant Leggin admits the first sentence of Paragraph 41 and admits

that on September 15, Officer Wardlaw with the LaGrange Police reported to Defendant Griffin

and avers that the initial police "investigator did not have a sense of abuse." Defendant Leggin

denies the remaining allegations contained in Paragraph 41.

42. On September 11, 2009, DCFS Supervisor Lucia Greer directed that the ensuing investigation in this case should include "an exact description of the fracture," interviews with "all physicians directly involved with the treatment of the reported injury (e.g., attending physician, radiologist or orthopedist)," and "a TIME LINE starting with when they noticed the injury; activity throughout the past week [] with both parents." [emphasis in original]. In addition, she directed that "any other person with knowledge" should be interviewed.

ANSWER: Defendant Leggin admits the allegations contained in Paragraph 42.

43. On Friday, September 11, 2009, DCFS assigned Janice Griffin as the primary investigator of the allegations against Brian and Laura Timmel. Griffin was obligated to conduct the investigation in accordance with DCFS Rules and Procedures and in accordance with the *Dupuy* orders, cited at ¶¶17 and 18, above and she later testified in the juvenile court action that ensued on October 2 that she handled the investigation in accordance with her understanding of the applicable policies and procedures. However, her understanding of these requirements was lacking, as described below.

ANSWER: Defendant Leggin admits the first sentence of Paragraph 43. Defendant

Leggin admits that Defendant Griffin was obligated to conduct the investigation in accordance

with DCFS rules, procedures, the law and any applicable court orders and that Defendant Griffin

later testified in the juvenile court action that ensued on October 2, 2009 and that her testimony

speaks for itself. Defendant Leggin avers that the cited law speaks for itself and denies the

remaining allegations contained in Paragraph 43.

44. Between September 11, 2009, the day Griffin was assigned as the primary investigator, and October 1, 2009, which was the day that Griffin decided (with Defendant Leggin, Defendant Smith-Foote, and Division of Child Protection Associate Deputy Director Meryl Paniak) to take protective custody of the Timmels' children, she had conducted very little investigation of the facts either supporting or refuting the allegations that Brian or Laura Timmel had abused or neglected their children. Indeed, not *one* of Supervisor Greer's September 11

14

directives had been satisfied, nor had the directive of Defendant Leggin, dated September 23, 2009, to secure additional information including "how old is the fracture" been satisfied.

ANSWER:    Defendant Leggin admits that on September 11, 2009 Defendant Griffin

was assigned as the primary investigator and avers that he approved the decision to take

protective custody along with Defendant Smith-Foote in consultation with Associate Deputy

Director Meryl Paniak.  Defendant Leggin denies each and every remaining allegation contained

in Paragraph 44.

45.  Between September 11 and October 1, only the following minimal investigative steps had occurred:

(i) On September 11, Griffin spoke briefly with two CMH social workers merely to learn that the case had been assigned to Dr. Estes for MPEEC review and confirm that R. was ready for discharge and that, pursuant to Griffin's direction, he would be discharged to the care of Janice Timmel and not to Brian or Laura;

(ii) On September 11, Griffin spoke briefly with Janice Timmel, Brian's mother, merely to confirm that she would supervise any contact Laura and Brian had with their own children per DCFS directive that during the investigation they could no longer have unsupervised contact with their own children;

(iii) On September 15, Griffin spoke with Office Wardlaw from the LaGrange Police Department, who informed Griffin that after speaking with the family, the police "did not have a sense of abuse;"

(iv) On September 15, Griffin visited the home where she interviewed Brian Timmel and Laura Timmel, though the interview of Laura Timmel did not comport with a number of DCFS requirements, including the requirement that DCFS ask her for collateral contacts and conduct a domestic violence and substance abuse screen;

(v) On September 15 and September 22, Griffin observed the children in their home (where they were found to be healthy except for R.'s fracture);

(vi) On September 16, Griffin spoke with Nurse Ditto, who reported that while at Hinsdale Hospital, R. did not cry inconsolably but, rather, would cry while he was repositioned but would not cry while at rest; and

(vii) During this time period of September 11 through October 1, Griffin spoke to only a single doctor: Dr. Estes, a non-board-certified child abuse fellow who offered her opinion that based merely on the absence of an explanation for the fracture, she concluded that the injury was more than likely caused by abuse. Dr. Estes' opinion was based upon the theory that the fracture would have been so painful that R. would have cried inconsolably.

ANSWER: The allegations contained in Paragraph 45 of the Complaint improperly

collectivize the actions of the Defendants and as such do not apprise Defendant Leggin of what

he is charged with.  Defendant Leggin answers the subparts of Paragraph 45 as follows:

(i) Defendant Leggin admits that on September 11, Defendant Griffin spoke with two CMH social workers and avers that CMH social worker Hickey told her that the case was assigned to Estes for MPEEC review at 11:30 a.m. and further avers that at 3:30 p.m. CMH social worker Gronin told Defendant Griffin that R. was ready for discharge "pending the results of the background check, R. would be discharged in the care of paternal grandmother, Janice Timmel." Defendant Leggin denies the remaining allegations contained in subpart (i) of Paragraph 45.

(ii) Defendant Leggin admits that Defendant Griffin spoke with Janice Timmel, admits that Defendant Griffin confirmed that Janice Timmel would supervise contact between Laura and Brian and their three children. Defendant Leggin denies the remaining allegations contained in subpart (ii) of Paragraph 45.

(iii) Defendant Leggin admits that Defendant Griffin spoke to Office [sic] Wardlaw from the LaGrange Police Department and avers that he informed Defendant Griffin that after speaking with the family, "the initial investigator did not have a sense of abuse." Defendant Leggin denies the remaining allegations contained in subpart (iii) of Paragraph 46.

(iv) Defendant Leggin admits that on September 15 Defendant Griffin visited the home where she interviewed Brian Timmel and Laura Timmel and admits that Defendant Griffin did not conduct a domestic violence and substance abuse screen on that date. Defendant Leggin denies that the interview of Laura Timmel did not comport with a number of DCFS requirements and denies the remaining allegations contained in subpart (iv) of Paragraph 45.

(v) Defendant Leggin denies the allegations contained in subpart (v) of Paragraph 45 and avers that on September 15, 2009, Defendant Griffin observed N. in her home and saw no signs of abuse or neglect and further avers that on September 22, 2009, Defendant Griffin observed R. and B. in their home and saw no signs of abuse or neglect.

16

(vi) Defendant Leggin admits that Defendant Griffin spoke with Ditto who reported that R. would cry when he was repositioned but not while he was at rest. Defendant Leggin denies the remaining allegations contained in subpart (vi) of Paragraph 45.

(vii) Defendant Leggin admits that Defendant Griffin spoke to Dr. Estes who offered her opinion that the injury was more than likely caused by abuse. Defendant Leggin denies the remaining allegations contained in subpart (vii) of Paragraph 45 and avers that Dr. Estes is a Fellow with the Protective Services Team at CMH.

46. The following investigative steps were not taken between September 11 and October 1, 2009, despite the clear requirements of DCFS rules and procedures and the due process requirement, as directed by the *Dupuy* orders, that DCFS investigators are to gather and consider all available exculpatory evidence:

(i) Identification of and contact with two eyewitnesses who saw R. on the date his fracture was discovered (i.e., John Matthew Peluse, who saw R. at approximately 11:00 a.m. on September 10, and Sasha Staerkel, the hairstylist who observed R. from approximately 1:00 p.m. to 3:30 p.m. on September 10 and held him briefly herself). Eye witness contacts are required by DCFS Procedures 300, Appendix B (defining direct evidence as "a statement taken from an eyewitness . . . **It is imperative that the CPSW seeks objective corroboration of . . . self-reports**" and "consider information developed through personal observation . . . or required interviews that will establish the accuracy of [parents'] reports. . . . **There is no substitute for independent verification of this sort of information.**") (bold in original). *See also* DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, (subsection (C)(4)(F), requiring the investigator to "[i]nterview all identified witnesses who are reported to have knowledge of the incident that resulted in a bone fracture");

(ii) contact with *all* pediatric orthopedists, radiologists, or attending physicians who treated the injury as required by DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, at subsections (C)(2)(F) and (C)(4)(E). Such doctors were Dr. Michelle Sagan, the pediatric orthopedist who had treated R.'s fracture at CMH, and Dr. Christopher Sullivan, the Chief of Pediatric Orthopedics at University of Chicago's Comer Children's Hospital, who provided further treatment for R.'s fracture on September 30, 2009. Griffin later denied knowing that Dr. Sullivan was a treating physician, but acknowledged she knew he had put a new splint on R.'s leg;

(iii) contact with R.'s primary care pediatrician, Dr. Danielle Cherian, required by DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, subsection (C)(4)(L);

(iv) contact with Laura Timmel's obstetrician, Dr. Brian Foley, as required by *id.* (insofar as he was a physician who had seen the child in past six months). Griffin did not even request consents from Ms. Timmel to speak to any of her own doctors or secure her own medical records, including her obstetrical records;

(v) assessment of the credentials of the doctors upon whom DCFS was relying for its opinion as required by DCFS Procedures 300 (specifying that a professional's expertise is to be assessed according to their amount of training, experience, and specialization, specifically stating that the opinion of a pediatric radiologist is more credible than that of a radiologist, and the

opinion of a radiologist as to a bone fracture is more credible than that of a pediatrician; also stating that the opinion of a doctor on "hospital staff is more credible than a pediatric resident.") Griffin later testified that she N.r took steps to identify any doctors Dr. Estes may have consulted, while wrongly assuming that Dr. Estes had "consulted with an orthopedic doctor" and "other doctors who have training in [radiology];"

(vi) determination as to the relative weight to be given to the opposing opinions of doctors when their opinions were in conflict, based on the specific expertise and level of experience of the opposing doctors. Griffin later acknowledged that the "relevant specialization" in a case involving bone fractures would be orthopedics;

(vii) consideration of whether a *third* opinion is needed to reconcile divergent medical views and render a sound determination as to the likelihood of abuse versus accidental trauma where experts disagree, as required by Procedures 300, Appendix B, #9/59, Bone Fractures, (subsection (C)(5)(F)).

ANSWER: The allegations contained in Paragraph 46 of the Complaint improperly collectivize the actions of the Defendants and as such do not apprise Defendant Leggin of what he is charged with. Defendant Leggin avers that the cited law in each subpart speaks for itself and that the Department's rules and procedures set forth the applicable time frames for all aspects of the child abuse investigation. Defendant Leggin answers the subparts of Paragraph 46 as follows:

(i) Defendant Leggin admits that Defendant Griffin did not have contact with John Peluse or Sasha Staerkel between September 11 and October 1, 2009. Defendant Leggin denies the remaining allegations and avers that the cited law speaks for itself.

(ii) Defendant Leggin admits that between September 11 and October 1, 2009, Defendant Griffin did not contact Dr. Michelle Sagan who was the pediatric orthopedist who treated R.'s fracture at CMH or Dr. Christopher Sullivan, the chief of Pediatric Orthopedics at University of Chicago's Comer Children's Hospital, who provided further treatment for R.'s fracture on September 30, 2009. Defendant Leggin avers that Defendant Griffin's testimony in the juvenile court proceedings concerning her understanding of Dr. Sullivan's treatment of R. speaks for itself in the context in which it was given and he therefore denies each and every remaining allegation contained in subpart (ii) of Paragraph 46.

(iii) Defendant Leggin admits that Defendant Griffin did not contact R.'s primary care pediatrician, Dr. Danielle Cherian between September 11 and October 1, 2009. Defendant Leggin avers that the cited law speaks for itself and denies the remaining allegations contained in subpart (iii) of Paragraph 46.

(iv) Defendant Leggin admits that he did not contact Dr. Brian Foley between September 11 and October 1, 2009. Defendant Leggin admits that between September 11 and October 1, 2009 Defendant Griffin did not request consents from Ms. Timmel to speak to any of her own doctors or secure her own medical records, including her obstetrical records. Defendant Leggin denies the remaining allegations contained in subpart (iv) of Paragraph 46.

(v) Defendant Leggin avers that the cited law speaks for itself and Defendant Griffin's testimony at the juvenile court proceeding speaks for itself in the context in which it was given. Defendant Leggin denies the remaining allegations contained in subpart (v) of Paragraph 46.

(vi) Defendant Leggin avers that Defendant Griffin's testimony at the juvenile court proceedings speaks for itself in the context in which it was given as to the allegations set forth in the second sentence of subpart (vi) of Paragraph 46. Defendant Leggin denies the remaining allegations contained in subpart (vi) of Paragraph 46.

(vii) Defendant Leggin denies each and every allegation contained in subpart (vii) of Paragraph 46. Defendant Leggin avers that the cited law speaks for itself.

47. Defendant Griffin made only *pro forma* contact with the police officers who were also investigating the case and the initial child abuse reporter, Nurse Robert Ditto. Neither she nor Defendants Leggin or Smith-Foote, nor Defendant Miller at the later Administrator's Conference, considered the information these persons had to provide that was exculpatory. Specifically:

(i) On September 15, Officer Wardlaw informed Griffin that after speaking with the family, the police department officials did not have a "sense of abuse."

(ii) Nurse Ditto at Hinsdale Hospital made observations of R. that *supported* the Timmels' contentions that R. was not inconsolable (Nurse Ditto ultimately testified that when R.'s leg was manipulated, he would cry for only 10-20 seconds) and discounted the claim of Dr. Estes (which was that the fracture would have been so painful and so obvious thereafter that R. would have cried inconsolably and, therefore, the lack of an explanation for the fracture by the

parents was not credible).

ANSWER: Defendant Leggin denies the allegations contained in Paragraph 47 and its

subparts.

48. On September 30, R. was examined and treated by Dr. Christopher Sullivan, Chief of Pediatric Orthopedics, University of Chicago Comer Children's Hospital. On September 30, Dr. Sullivan reported to the Timmels his expert opinion that R.'s fracture was *unlikely* to be due to abuse.

ANSWER: Defendant Leggin admits the first sentence of Paragraph 48. Defendant

Leggin lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations contained in Paragraph 48. To the extent an answer is required, Defendant Leggin

denies the remaining allegations contained in Paragraph 48.

49. On the afternoon of October 1, 2009, Defendant Griffin contacted Brian Timmel and requested that he come to the DCFS offices the next day with Laura and their children. That morning, Defendant Griffin had received a written report from Dr. Estes documenting her opinion. Though Defendant Griffin concealed her true motives from Brian Timmel, her intention was to take protective custody of the Timmels' children during the next day's meeting.

ANSWER: Defendant Leggin admits the allegations contained in the first two

sentences of Paragraph 49. Defendant Leggin lacks knowledge sufficient to form a belief as to

the truth of the allegations in the last sentence of Paragraph 49 and therefore denies the

allegations set forth in the last sentence of Paragraph 49.

50. On the afternoon of October 1, 2009, upon learning of the request that Brian Timmel bring the children to the DCFS offices the next day, the Timmels' counsel called Defendant Griffin at approximately 4:30 p.m. and spoke to her and her supervisor, Defendant Leggin. The counsel (Diane L. Redleaf and Melissa L. Staas, both attorneys with the Family Defense Center) confirmed to Defendants Griffin and Leggin the availability of Dr. Sullivan's opinion that the injury was more than likely *not* caused by abuse and urged Defendants to contact him immediately. While the Timmels' counsel offered a phone number for Dr. Sullivan's office so that the DCFS investigative staff could speak to him immediately about his opinion, Defendants Griffin and Leggin deliberately ignored this information.

ANSWER: Defendant Leggin admits that on the afternoon of October 1, 2009, the

Timmels' counsel called Defendant Griffin at approximately 4:30 p.m. and spoke to Defendants

Griffin and Leggin. Defendant Leggin is without knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in the first sentence of Paragraph 50.

Defendant Leggin admits that the Timmels' counsel stated to Defendants Griffin and Leggin the

availability of a second opinion from Dr. Sullivan at University of Chicago. Defendant Leggin

avers that Plaintiff's counsel stated that the opinion would be ready the following week and

further avers that Plaintiff's counsel stated to Defendants Griffin and Leggin that Dr. Sullivan's

opinion was that the injury could have been caused by other means than abuse. Defendant

Leggin denies each and every remaining allegation contained in Paragraph 50.

51. Instead of calling Dr. Sullivan or reviewing his opinion or seeking out further opinion of the MPEEC doctors or other medical opinions, Defendants Griffin and Leggin, with the approval of Defendant Kimberly Smith-Foote, decided to "go with our MPEEC doctor" without so much as any serious efforts to notify Dr. Estes, their own MPEEC consultant, that a second opinion disagreed with hers.

ANSWER: Defendant Leggin admits that he and Defendant Griffin, with the approval

of Defendant Smith-Foote, followed the opinion of the MPEEC doctor. Defendant Leggin

denies each and every remaining allegation contained in Paragraph 51.

52. At 4:51 p.m. on October 1, Defendants Griffin, Leggin, and Smith-Foote consulted with each other and with their superiors and decided to take protective custody of the Timmel children that very night instead of waiting until the following day as had been originally planned, showing that the DCFS Defendants refused to wait even a few *hours* for the newly-available evidence that the Timmels had secured from the head of pediatric orthopedics at the University of Chicago. By contrast, the DCFS Defendants had by that point waited for Dr. Estes' report for *twenty* days after the date on which Dr. Estes examined R. Timmel (*i.e.*, from September 11 to October 1). Their refusal to wait even *one* hour to fulfill the requirement under DCFS policy that they consult with a pediatric orthopedic expert demonstrates their disregard for the truth and their rush to judgment against the Timmels as guilty of child abuse. Griffin and Leggin made these decisions in consultation with their superiors, Defendant Smith-Foote and Division of Child Protection Associate Deputy Director Meryl Paniak.

ANSWER: Defendant Leggin admits that at 4:51 p.m. on October 1, 2009, he

consulted with Defendant Griffin and with their superiors Defendant Smith-Foote and Division

of Child Protection Associate Deputy Director Meryl Paniak and decided to take protective

custody of the Timmel children. Defendant Leggin admits that he received Dr. Estes's MPEEC

report on October 1, 2009. Defendant Leggin denies each and every remaining allegation

contained in Paragraph 52.

53. After deciding to take protective custody, Defendant Griffin arranged for police squad cars to assist her in removing the Timmels' three children from their home. Griffin went to the home at approximately 6:30 p.m. Janice Timmel, who was at the home with Laura and the children, answered the door but would not allow Griffin to enter. Griffin saw N. in the window and observed that N. looked healthy and happy.

ANSWER: Defendant Leggin admits that Defendant Griffin went to the Timmel home

at approximately 6:30 p.m. and admits that Defendant Griffin arranged for police to assist her.

Defendant Leggin admits that Janice Timmel was at home with Laura Timmel and that

Defendant Griffin saw N. in the window and observed her. Defendant Leggin denies each and

every remaining allegation contained in Paragraph 53.

54. Brian Timmel, who had not yet arrived home from work, contacted his counsel. Based on the advice of counsel, Janice Timmel notified Defendant Griffin that she would not be allowed into the home without a warrant. Lacking a warrant to remove the children from their home, the police and Griffin left.

ANSWER: Defendant Leggin admits that Defendant Griffin was notified that she

would not be allowed into the home without a warrant and that Defendant Griffin and the police

left. Defendant Leggin lacks knowledge sufficient to form a belief as to the truth of the first

sentence of Paragraph 54 and therefore denies the first sentence as well as the remaining

allegations in Paragraph 54.

55. Fearful that the children would be seized from them in the middle of the night, the family found shelter with a family friend for the evening and awaited word from their counsel in the morning as to DCFS's intended actions concerning their family. Throughout that night, DCFS personnel went to the family home in La Grange on at least two additional occasions—at approximately 10:45 p.m. on October 1, and again at 3:30 a.m. on October 2—in an attempt to seize the Timmel children without a warrant or court order.

ANSWER: Defendant Leggin admits that DCFS personnel went to the family home in

LaGrange on at least two occasions at approximately 10:45 p.m. on October 1, 2009 and again at

3:30 a.m. on October 2, 2009. Defendant Leggin denies each and every remaining allegation

contained in Paragraph 55.

56. On the morning of October 2, 2009, counsel for the Timmels sent a letter to Defendants Griffin, Leggin, and Smith-Foote documenting that Dr. Sullivan had determined that the fracture was fully consistent with accidental causes and urging the Defendants to refrain from making critical decisions in the case until they had received and reviewed Dr. Sullivan's written medical opinion, which was at that time forthcoming.

ANSWER:    Defendant Leggin admits that on the morning of October 2, 2009, the

Timmels' counsel sent a letter to Defendants Griffin, Leggin, and Smith-Foote documenting that

Dr. Sullivan had an opinion and urging them to refrain from making critical decisions in the case

until they had received and reviewed Dr. Sullivan's written medical opinion, which was at that

time forthcoming.  Defendant Leggin denies each and every remaining allegation contained in

Paragraph 56.

57. On October 2, 2009, Defendant Griffin sought, and the Cook County State's Attorney's Office approved, without any review or consideration of the orthopedic opinions of Drs. Sullivan and Sagan undermining the conclusion that R.'s fracture was likely to be due to child abuse, the filing of petitions for Adjudication of Warship and Temporary Custody as to all three Timmel children. These petitions cited only the opinion of Dr. Estes and omitted the contrary opinions of Drs. Sullivan and Sagan.  Furthermore, these petitions were filed upon the false representation of Defendant Griffin that she had made "reasonable efforts" to keep the family together though no such efforts were documented and none had been made.

ANSWER:    Defendant Leggin admits that Petitions for Adjudication of Wardship and

Temporary Custody were filed.  Defendant Leggin denies each and every remaining allegation

contained in Paragraph 57.

58.  In the afternoon of October 2, based solely on the representations the State and DCFS had made in the petitions, an order taking the children into DCFS temporary custody was entered "without prejudice," albeit with the agreement that the children would remain in their home with their grandparents, either Tim and Janice Timmel (Brian's parents) or Hon. Nancy Dreher and Roger Dreher (Laura's parents), as their caregivers while the parents, Laura and Brian Timmel, were required to reside elsewhere.  As of that date, no DCFS employee, including Defendants, and no person employed by the State's Attorney's office had spoken to any orthopedist or radiologist regarding the likelihood of the fracture being caused by child abuse.

ANSWER:    Plaintiff is attempting to paraphrase and quote a court order and Defendant

Leggin avers that the court order speaks for itself.  Defendant Leggin admits that on October 2,

2009, the juvenile court entered an order for DCFS to take temporary custody of the children and

that order speaks for itself. Defendant Leggin admits that as of October 2, 2009, he had not

spoken to any orthopedist or radiologist regarding the likelihood of the fracture being caused by

abuse. The last sentence of Paragraph 58 of the Complaint improperly collectivizes the actions

of the Defendants and as such does not apprise Defendant Leggin of what he is charged with.

Defendant Leggin lacks knowledge sufficient to form a belief as to the truth of the allegations

contained in the last sentence of Paragraph 58 and therefore denies those allegations.

59. On October 2, the court scheduled the preliminary temporary custody hearing to
commence on October 14, 2009. Pursuant to 705 ILCS 405/2-10, this hearing was held to
determine: (a) whether there was any probable cause to believe that the Timmel children had
been abused or neglected and, if so; (b) whether it was a matter of immediate and urgent
necessity that the Timmel children be placed in the temporary custody of DCFS and, if so; (c)
whether DCFS made reasonable efforts to prevent or eliminate the necessity of removing the
Timmel children from the custody of their parents. *See* ¶ 21 *supra*. As is discussed below, *see* ¶
69 *infra*, at the conclusion of the temporary custody hearing regarding the Timmel family, the
juvenile court found no probable cause to believe that any of the Timmel children had been
abused or neglect.

ANSWER: Defendant Leggin admits the first sentence in Paragraph 59. Plaintiff is

attempting to paraphrase Illinois law and Defendant Leggin avers that the cited law speaks for

itself. Defendant Leggin admits that at the conclusion of the temporary custody hearing

regarding the Timmel family, the juvenile court found no probable cause. Defendant Leggin

further avers that Plaintiff is attempting to paraphrase the November 20, 2009 juvenile court

order dismissing the petition for temporary custody which speaks for itself. Defendant Leggin

denies each and every remaining allegation contained in Paragraph 59.

60. On October 7, 2009, counsel for the Timmels sent to Defendants Griffin and Leggin
the written report of Dr. Sullivan in which he concluded that the probability that the fracture to
R.'s left femur was caused by abuse was extremely low.

ANSWER: Defendant Leggin admits that on October 7, 2009, counsel for the

Timmels sent to Defendants Griffin, Leggin and Smith-Foote the written report of Dr. Sullivan.

Defendant Leggin avers that Dr. Sullivan concluded as to the fracture to R.'s left femur that "the

probability that this is due to non-accidental trauma is extremely low and the child is at low risk

of further injury." Defendant Leggin denies the remaining allegations contained in Paragraph

60.

61.  Among the opinions and references Defendants ignored was that of Dr. Brian Foley, Laura Timmel's obstetrician.  In a letter to DCFS dated October 8, 2009, he stated:

> I was shocked to hear that DCFS was investigating this couple for abuse. I understand the situation warrants attention, and I can understand the unknown cause of the injury could raise suspicion on your department's behalf. However, being a caregiver for this couple for the last four plus years and seeing their interpersonal interactions with each other and their children I found it unfathomable that either is capable of inflicting that type of injury on any child. I would expect your department to do a more thorough investigation and follow up with myself and the Timmel's [sic] pediatrician as to their personalities and parenting skills.

During the DCFS investigation, DCFS Defendants made no attempt to speak with Dr. Foley.

ANSWER:  The allegations contained in Paragraph 61 of the Complaint improperly

collectivize the actions of the Defendants and as such do not apprise Defendant Leggin of what

he is charged with.  Defendant Leggin admits that during the DCFS investigation he made no

attempt to speak to Dr. Foley.  Defendant Leggin denies that he ignored Dr. Foley's October 8,

2009 letter which speaks for itself and denies each and every remaining allegation contained in

Paragraph 61.

62.  During the DCFS investigation, nobody from DCFS, including the Defendants, spoke with Dr. Danielle Cherian, the primary care pediatrician for R. and the other two Timmel children.

ANSWER:  Defendant Leggin admits that Dr. Danielle Cherian was the primary care

physician for R. and the other Timmel children.  Defendant Leggin admits that he did not speak

to Dr. Cherian during the DCFS investigation. The remaining allegations contained in Paragraph

62 of the Complaint improperly collectivize the actions of the Defendants and as such do not

apprise Defendant Leggin of what he is charged with, and therefore Defendant Leggin denies the

remaining allegations contained in Paragraph 62.

63.  Throughout the ensuing juvenile court hearing as to whether there was probable cause to believe R. was abused by either Brian or Laura Timmel (or both), Defendants Griffin

and Leggin pointed exclusively to Estes' MPEEC report and opinions as the exclusive source of the factual allegations throughout this case. On October 14, 2009, Defendant Griffin testified that DCFS did not need to consider the opinions of orthopedists because "we had our MPEEC report" and "we decided to go with our MPEEC report." This exclusive reliance on Dr. Estes' opinion, and refusal to consider the opinions and testimony of others, was unreasonable on its own terms for Dr. Estes herself acknowledged, in testimony given on October 16, that an MPEEC report is *not* by itself a complete child abuse investigation. It was the responsibility of DCFS, assigned to Defendants Griffin and Leggin, and not of the MPEEC team, to make investigative contacts confirming or rebutting a parents' account of the facts.

ANSWER: Defendant Leggin admits that in the juvenile court hearing as to whether

there was probable cause to believe R. was abused by either Brian or Laura Timmel, Defendant

Griffin and Dr. Estes testified and that their testimony speaks for itself in the context in which it

was given. Defendant Leggin admits that he relied on Dr. Estes's MPEEC report and admits that

it was the responsibility of DCFS, assigned to Defendants Griffin and Leggin to make

investigative contacts and not the responsibility of the MPEEC team. Defendant Leggin denies

that he testified in the juvenile court proceeding and denies each and every remaining allegation

contained in Paragraph 63.

64. In addition to failing to investigate medical evidence and eyewitness accounts, the DCFS Defendants failed to investigate any facts that would either confirm or refute the credibility and good character of the Timmels, as persons and as parents. Indeed, they held it as a mark against them that they had personal relationships with federal judges, lawyers, and doctors and refused to speak to any of these individuals prior to taking protective custody, and for days after initiating the juvenile court action. At the same time, Defendant Griffin claimed she had "no opinion" as to Laura's denial of abuse and acknowledged that the parents acted appropriately with their children and that she had no reports that they had ever behaved other than as model parents. In addition, the DCFS Defendants also refused to consider at all relevant the fact that Laura Timmel had a career working extensively with children as a school social worker and as a social worker in the Division of Specialized Services for Children.

ANSWER: Defendant Leggin admits that Defendant Griffin testified in the juvenile

court hearing as to Laura's denial of abuse and that her testimony speaks for itself in the context

in which it was given. The remaining allegations contained in Paragraph 64 of the Complaint

improperly collectivize the actions of the Defendants and as such do not apprise Defendant

Leggin of what he is charged with, and Defendant Leggin denies the remaining allegations

contained in Paragraph 64.

65. Even though Dr. Este's opinion was the sole opinion upon which the DCFS Defendants relied, Dr. Estes' opinion was not as strongly inculpatory as the Defendants Griffin and Leggin assumed: she had no opinion as to *who* had abused R., nor as to whether custody of the children should have been taken, nor as to whether either parent posed any danger to the children, nor as to whether the parents should be allowed to be alone with their children and she acknowledged that siblings can cause a fracture in a newborn baby and that infants being removed from car seats or baby carriers can experience a leg fracture.

ANSWER: Defendant Leggin avers that Dr. Estes' testimony at the juvenile court

hearing speaks for itself in the context in which it was given. Defendant Leggin denies

Plaintiff's characterization of Dr. Estes' testimony and denies each and every remaining

allegation contained in Paragraph 65.

66. On October 16, 2009, though the juvenile court "probable cause" hearing had not yet concluded, the juvenile court directed that the Timmels should be allowed to return to their home under supervision, over the objection of DCFS counsel, representing Defendants Leggin, Griffin, and Smith-Foote. On November 4, 2009, the juvenile court allowed the Timmels unsupervised visits with their children, again over the objection of DCFS counsel. Throughout the proceedings in the juvenile court, Defendants Griffin and Leggin continued to press for a finding of abuse against both of the Timmels, even though they had failed to consider all the exculpatory evidence set forth above.

ANSWER: Defendant Leggin admits that the juvenile court held a "probable cause"

hearing on October 16, 2009 which did not conclude on that date and admits that the juvenile

court entered an order on that date which speaks for itself. Defendant Leggin admits that on

November 4, 2009, the juvenile court entered an order and that order speaks for itself.

Defendant Leggin denies that DCFS counsel represented Defendants Griffin, Leggin and Smith-

Foote in the juvenile court proceedings and avers that the Cook County State's Attorney

represented the People of the State of Illinois in the Petitions for Adjudication of Wardship of the

Timmel children and that Defendant Griffin testified as a witness in those proceedings.

Defendant Leggin denies each and every remaining allegation contained in Paragraph 66.

67. In the course of the juvenile court proceedings, while claiming to follow the law governing her investigation, *see* ¶ 43 *supra*, Defendant Griffin testified she was not aware of the DCFS requirement that she obtain the opinion of an orthopedist. DCFS Procedures 300,

Appendix B, #9/59 Bone Fractures, at subsections (C)(2)(F) and (C)(4)(E).

ANSWER:     Plaintiff is attempting to paraphrase DCFS Procedure and Defendant

Leggin avers that the cited DCFS Procedure speaks for itself.  Defendant Leggin admits that

Defendant Griffin testified in the juvenile court proceedings to following the law governing her

investigation and that her testimony speaks for itself in the context in which it was given.

Defendant Leggin denies each and every remaining allegation contained in Paragraph 67.

68. On November 4, R.'s treating orthopedist at CMH, Dr. Sagan, testified in the juvenile court proceedings that she could not conclude R. was more likely than not to have been abused based on available evidence. Dr. Sagan also disagreed with the "inconsolable cry" theory put forth by Dr. Estes as the linchpin of her contention that R. was abused.

ANSWER:     Defendant Leggin admits that on November 4, 2009, Dr. Sagan testified in

the juvenile court proceedings and her testimony speaks for itself in the context in which it was

given.  Defendant Leggin denies Plaintiff's characterization of Dr. Sagan's testimony and Dr.

Estes's testimony in juvenile court proceedings and avers that their testimony speaks for itself in

the context in which it was given.  Defendant Leggin denies the characterization of Dr. Estes'

theory and denies each and every remaining allegation contained in Paragraph 68.

69.  On November 20, 2009, after five separate days of hearing and closing arguments, the juvenile court ruled that there was no probable cause to believe R. Timmel had been abused. The court found the testimony of Brian and Laura Timmel "clear and compelling."  The court also found Dr. Sullivan's testimony to be "convincing."  Upon finding no probable cause, the court dismissed the Petition for Adjudication of Wardship as to the Timmel children.

ANSWER:     Defendant Leggin admits that on November 20, 2009 after five separate

days of hearing and closing argument, the juvenile court ruled that there was no probable cause

and dismissed the Petition for Adjudication of Wardship as to the Timmel children.  Defendant

Leggin denies that Plaintiff's quotation is accurate as to the court's finding regarding the

testimony of Brian and Laura Timmel and the testimony of Dr. Sullivan and therefore denies

each and every remaining allegation contained in Paragraph 69.

70. Despite the judicial finding that R. was not abused and that there was not even

probable cause to believe that he had been abused, DCFS Defendants Griffin, Leggin, and Smith-Foote continued to pursue the investigation they had started on September 10 rather than close it out immediately, as the finding of no probable cause required. The sole change in the focus of the ongoing investigation they started on September 10 was that they narrowed their focus to only Plaintiff Laura Timmel, not Brian Timmel.

ANSWER:     Defendant Leggin denies the allegations contained in Paragraph 70.

71. On December 3, 2009, Defendant Griffin issued a recommended decision, approved by Defendants Leggin and Smith-Foote, that the report of abuse be "indicated" as to Laura Timmel only. The Defendants issued a notice of their intent to indicate the report against her and sent her an Investigation Summary. This Summary recites their continuing reliance on the opinion of Dr. Estes and omits mention of Dr. Sagan altogether.

ANSWER:     Defendant Leggin admits that Defendant Griffin recommended that the

report of abuse against Laura Timmel be indicated and that he and Defendant Smith-Foote

approved the recommendation. Defendant Leggin admits that on December 3, 2009, DCFS

issued Laura Timmel a notice of intent to indicate a childcare worker and sent Laura Timmel an

Investigation Summary. Defendant Leggin avers that the summary speaks for itself and denies

Plaintiff's characterization of the summary is accurate. The remaining allegations contained in

Paragraph 71 of the Complaint improperly collectivize the actions of the Defendants and as such

do not apprise Defendant Leggin of what he is charged with, and therefore Defendant Leggin

denies the remaining allegations contained in Paragraph 71.

72. As was her right pursuant to the *Dupuy* decisions, Plaintiff Laura Timmel invoked her right to an Administrator's Conference and retained counsel, at significant continued expense, in order to present to the DCFS administrator the mountain of exculpatory evidence she had by now collected. On December 15, 2009, Defendant Miller convened an Administrator's Conference in which Defendants Griffin and Leggin participated.

ANSWER:     Defendant Leggin admits that Laura Timmel invoked her right to an

Administrator's Conference and retained counsel; and admits that Defendant Miller convened

the Administrator's Conference, and Defendants Leggin and Griffin participated. Defendant

Leggin denies each and every remaining allegation contained in Paragraph 72.

73. During the December 15 conference, Defendants Griffin and Leggin stated they still had not interviewed Dr. Sagan, they were not aware of Dr. Sagan's involvement in this case, and

they "[didn't] know who she [was]" even though the juvenile court's November 20 ruling specifically cites Dr. Sagan's opinion and her testimony.

ANSWER: Defendant Leggin admits that he and Defendant Griffin participated in the

December 15, 2009 Administrator's Conference. Defendant Leggin is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

Paragraph 73 and therefore denies the remaining allegations contained in Paragraph 73.

74. Defendant Griffin and Defendant Leggin asserted that they had read the juvenile court's final order in the case, but it was clear from their statements during the December 15 Administrator's Conference that they did not consider it, apply it, or obey it, and nor did Defendant Smith-Foote, who on November 24, 2009, had personally approved the indicated finding recommendation.

ANSWER: Defendant Leggin denies the allegations contained in Paragraph 74.

75. Despite the overwhelming and legally binding exculpatory evidence that had already been determined to preclude a finding of abuse as to Laura Timmel, including a binding and final court order, on or about January 8, 2010, Defendant Maria Miller affirmed the recommendation to indicate Laura Timmel as guilty of child abuse in causing the fracture of her son R.'s leg and as guilty of child neglect in creating a substantial risk of physical injury as to N. and B.. No rationale for overriding the juvenile court's final order was provided in Defendant Miller's decision to indicate Laura, nor have any of the Defendants provided any explanation for their decision to override and ignore the juvenile court's order (such as a claim of newly-discovered evidence, as there was none).

ANSWER: Defendant Leggin admits that on or about January 8, 2010, Defendant

Miller affirmed the recommendation to indicate Laura Timmel as guilty of child abuse in causing

the fracture of her son R.'s leg and as guilty of child neglect in creating a substantial risk of

physical injury as to N. and B. Defendant Leggin denies Plaintiff's characterization of

Defendant Miller's recommended opinion and avers that Defendant Miller's recommended

opinion speaks for itself. Defendant Leggin denies each and every remaining allegation

contained in Paragraph 75.

76. Based upon Defendant Miller's decision to affirm the recommended indicated finding, Laura Timmel's name was entered into the State Central Register as a perpetrator of child abuse and neglect. Absent a successful appeal, by operation of law the Registry would continue for 20 years and would bar Laura from working in any social work position during that time. It would also prevent her from volunteering at her children's school, becoming a scout

leader and had a chilling effect on Laura's ability to pursue activities with her children while the finding remained on the register.

ANSWER: Defendant Leggin admits that there was an indicated finding and that

Laura Timmel's name was placed on the State Central Register as a perpetrator of child abuse.

Defendant Leggin also admits that Defendant Miller affirmed the recommendation to indicate

Laura Timmel for child abuse. The remaining allegations in Paragraph 76 are hypothetical and

Defendant Leggin denies the remaining allegations contained in Paragraph 76.

77. Plaintiff Timmel appealed the indicated finding that had been registered against her and requested an expedited hearing as was her right as a *Dupuy* class member. She retained counsel at considerable expense to present her case for expungement to the assigned DCFS administrative law judge on her behalf.

ANSWER: Defendant Leggin admits that Plaintiff appealed the indicated finding,

requested and expedited hearing and retained counsel to present her case for expungement to the

assigned DCFS administrative law judge on her behalf. Defendant Leggin denies each and every

remaining allegation contained in Paragraph 77.

78. On or about February 19, 2010, DCFS Director Erwin McEwen approved the administrative law judge's recommended order granting Plaintiff Timmel's request for expungement of the indicated findings on the basis of the November 20, 2009, juvenile court order that exonerated Plaintiff Timmel of any alleged wrongdoing.

ANSWER: Defendant Leggin admits that on or about February 19, 2010, DCFS

Director Erwin McEwen approved the administrative law judge's recommended order granting

Plaintiff Timmel's request for expungement of the indicated findings on the basis of the

November 20, 2009 juvenile court order. Defendant Leggin denies the remaining allegations

contained in Paragraph 78.

79. On information and belief, Defendants Griffin, Leggin, and Smith-Foote recommended indicating Laura Timmel in retaliation for her assertion of her rights, for her refusal to turn her children over to DCFS on the evening of October 1, for her prevailing before the juvenile court, and/or in order to exercise arbitrary power against her, all in violation of her substantive due process rights.

ANSWER: Defendant Leggin denies the allegations contained in Paragraph 79.

80. In addition to causing her to expend money on legal fees in order to clear her name, the decision to indicate Plaintiff Laura Timmel caused her extreme emotional distress, including fear for her future ability to work in her chosen career (given an indicated finding of bone fractures is registered for 20 years), concern as to her ability to be involved in her children's schooling and after-school activities, intense fear about any future accidents that might occur to her children, and a reasonably-based belief that she was being persecuted and harassed by governmental officials who might again seize her children or undertake other unwarranted actions against her.

ANSWER: Defendant Leggin denies the allegations contained in Paragraph 80.

81. At all relevant times, Defendants Griffin, Leggin, Smith-Foote, and Miller acted with respect to Plaintiff Timmel under color of state law.

ANSWER: Defendant Leggin admits that he acted under color of state law. Defendant

Leggin denies each and every remaining allegation contained in Paragraph 81.

82. After the case with DCFS and Laura Timmel was completely closed, the Timmels continued to receive medical care and treatment for R. In early January, 2011, R. was diagnosed with a condition that is consistent with higher-than-normal pain tolerance, a symptom that the Timmels have consistently reported was the case for R. since he was a baby.

ANSWER: Defendant Leggin is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 82. To the extent an answer is

required, Defendant Leggin denies the allegations contained in Paragraph 82.

83. Defendants Griffin, Leggin, Smith-Foote, and Miller violated Plaintiff Laura Timmel's clearly established rights, about which a reasonable person in their position should have known.

ANSWER: Defendant Leggin denies the allegations contained in Paragraph 83.

84. In recommending and in issuing an indicated finding against Laura Timmel, Defendants Griffin, Leggin, Smith-Foote, and Miller each acted intentionally or recklessly or with deliberate indifference to the consequences of their actions.

ANSWER: Defendant Leggin denies the allegations contained in Paragraph 84.

85. Defendants' actions complained of herein have caused severe and long-lasting harm and long-lasting injury to Plaintiff. Plaintiff Timmel's right to pursue her career was seriously threatened without basis and without constitutionally required process. Defendants' actions complained of herein proximately caused her emotional and financial harm. Plaintiff is entitled to compensatory damages in an amount not less than $50,000 from each Defendant, jointly and severally.

ANSWER:     Defendant Leggin denies the allegations contained in Paragraph 85.

86. Defendants Griffin and Leggin acted with callous disregard for the rights of Plaintiff. Plaintiff seeks punitive damages against defendants Griffin and Leggin.

ANSWER:     Defendant Leggin denies the allegations contained in Paragraph 86.

87. Plaintiff also seeks a declaratory judgment in her favor as to the claims set forth in this Count, an award of civil rights attorneys' fees pursuant to 42 U.S.C. § 1988 and costs against all Defendants, jointly and severally, and such other relief as this Court deems just and equitable.

ANSWER:     Defendant Leggin denies the allegations contained in Paragraph 87.

## AFFIRMATIVE DEFENSES

For his affirmative defenses, Defendant Leggin states as follows:

### FIRST AFFIRMATIVE DEFENSE

The allegations in Plaintiffs' Amended Complaint against Defendant Leggin fail to state a

claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Defendant Leggin affirmatively states that actions taken relating to the underlying

allegations in this Amended Complaint were in conformance with all applicable constitutional,

statutory, and regulatory rules of law.

### THIRD AFFIRMATIVE DEFENSE

This Court lacks jurisdiction to award the relief requested in the Complaint.

### FOURTH AFFIRMATIVE DEFENSE

Defendant Leggin affirmatively states that his alleged conduct did not violate clearly

established statutory or constitutional rights of which a reasonable person would have known,

and he is therefore entitled to qualified immunity from civil damages.

### FIFTH AFFIRMATIVE DEFENSE

Defendant affirmative states that he is entitled to absolute prosecutorial immunity for actions taken in this matter related to the juvenile court matter.

SIXTH AFFIRMATIVE DEFENSE

Defendant affirmative states that he is entitled to absolute quasi-judicial immunity for actions taken in this matter pursuant to a court order.

JURY DEMAND

Defendant Leggin requests trial by jury.

Respectfully submitted,

LISA MADIGAN
Illinois Attorney General

By:   s/Barbara L. Greenspan
Barbara L. Greenspan
Teresa M. Cullen
Assistant Attorneys General
100 W. Randolph St., 11-200
Chicago, Illinois  60601
(312) 814-7087
(312) 814-6833

Erin R. Gard, Senior Law Clerk,
Assisted in the Preparation of this Answer.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LAURA TIMMEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 11 C 6034 |
| JANICE GRIFFIN, DCFS Investigator, in her individual | ) | James B. Zagel |
| capacity, KENNETH LEGGIN, DCFS Supervisor, | ) | Judge Presiding |
| in his individual capacity, KIMBERLY SMITH-FOOTE, | ) | |
| Child Protection Manager, in her individual capacity, | ) | |
| and MARIA MILLER, DCFS Administrator, in her | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>DEFENDANT KIMBERLY SMITH-FOOTE'S AMENDED ANSWER</u>**

1.      This civil rights complaint, brought pursuant to 42 U.S.C. § 1983, seeks redress for the actions of four employees of the Division of Child Protection of the Illinois Department of Children and Family Services ("DCFS") that deprived Plaintiff Laura Timmel of her rights to due process under the Fourteenth Amendment to the United States Constitution.  Defendants refused to consider plainly exculpatory evidence that any responsible child protection investigator or administrator in their position would consider and, in flagrant disregard of this evidence, unconstitutionally caused the impairment of Plaintiff Laura Timmel's constitutionally protected liberty interest in her career as a social worker.

ANSWER:    Defendant Smith-Foote admits that Plaintiff purports to bring this action

pursuant to 42 U.S.C. § 1983.  Defendant Smith-Foote denies each and every remaining

allegation contained in Paragraph 1.

2.      Laura Timmel sues all four Defendants for violation of their clearly-established constitutional duty to fully consider all available exculpatory evidence before they issue and register a so-called "indicated" finding of abuse or neglect against any professional pursuing a career working with children, such as a social worker. The Defendants also violated a basic principle of law by disregarding the state circuit court order finding "no probable cause" that had already exonerated Plaintiff Laura Timmel and, oblivious to the requirement that they respect final legal rulings, they proceeded to indicate Laura as guilty of child abuse, placing her name in the State Central Register ("Register") despite the state circuit court's order that had exonerated her of any wrongdoing as to her children.

ANSWER:    Defendant Smith-Foote admits that Laura Timmel sues all four

Defendants. Defendant Smith-Foote admits that she approved the recommendation to indicate

the report of abuse against Laura Timmel and that Laura Timmel was indicated for child abuse,

and that her name was placed on the State Central Register. Paragraph 2 of the Complaint

improperly collectivizes the actions of the Defendants and as such does not apprise Defendant

Smith-Foote of what she is charged with and she therefore denies each and every remaining

allegation contained in Paragraph 2.

3. The DCFS Defendants' decision to "indicate" Plaintiff for child abuse in derogation of
the juvenile court's order impaired her ability to function as a mother, threatened permanently to
ruin her career and her ability to support herself and her children, and caused her great emotional
distress. Plaintiff Timmel was compelled to expend thousands of dollars to exculpate herself
from this utterly baseless indicated finding, issued against her without due process of law. As
relief from these injuries in violation of Plaintiff's constitutional rights, she seeks compensatory
damages, an award of punitive damages, and an award of attorneys' fees under 42 U.S.C. § 1988
and costs.

ANSWER:    Defendant Smith-Foote denies the allegations contained in Paragraph 3.

4. This Court has jurisdiction over Plaintiff's claims below pursuant to 42 U.S.C. § 1983
and 28 U.S.C. §§ 1331 and 1343.

ANSWER:    Defendant Smith-Foote admits that if this action were proper, this Court

would have jurisdiction under 28 U.S.C. §§ 1331 and 1343(3). Defendant Smith-Foote denies

each and every remaining allegation contained in Paragraph 4.

5. Venue is proper in this district under 28 U.S.C. § 1391 because:

(a) the Northern District of Illinois is the judicial district in which substantially all of the
events or omissions giving rise to Plaintiff's claims occurred; and

(b) the Defendants Griffin, Leggin, and Smith-Foote are found or are employed in the
Northern District of Illinois.

ANSWER:  Defendant Smith-Foote admits the allegations contained in Paragraph 5 and

its subparts.

6. Plaintiff Laura Timmel, a licensed clinical social worker who holds a degree with
honors from Jane Addams School of Social Work at the University of Illinois, resides in Western
Springs, Illinois, with her husband Brian Timmel and her three children, N. and B., twins whose
birth date is in the summer of 2007, and R., whose birth date is in the late summer of 2009.

ANSWER:      Defendant Smith-Foote admits that Plaintiff Laura Timmel is a licensed

clinical social worker and that she resides with her husband and her three children, N. and B.,

twins whose birth date is in the summer of 2007, and R., whose birth date is in the late summer

of 2009.  Defendant Smith-Foote is without knowledge or information sufficient to form a belief

as to the truth of the allegations contained in Paragraph 6 and therefore denies the remaining

allegations in Paragraph 6.

7. Defendant Janice Griffin is the DCFS investigator who had primary responsibility for
the investigation as to R. Timmel and for making the determination that Laura Timmel should be
"indicated" for child abuse even after Plaintiff had been cleared of liability by the juvenile court.
She is sued in her individual capacity

ANSWER:      Defendant Smith-Foote admits that Defendant Griffin is a DCFS

investigator and that she was assigned to the investigation concerning R. Timmel.  Defendant

Smith-Foote admits that Plaintiff purports to sue Defendant Griffin in her individual capacity.

Defendant Smith-Foote denies each and every remaining allegation contained in Paragraph 7.

8. At all times relevant to this complaint, Defendant Kenneth Leggin was Defendant
Griffin's supervisor, and in that capacity he had responsibility for directing the investigation as
to R. Timmel and overseeing and approving the recommendations of Defendant Griffin. He is
sued in his individual capacity.

ANSWER:      Defendant Smith-Foote admits that Defendant Kenneth Leggin was

Defendant Griffin's supervisor, and in that capacity he had responsibility for directing the

investigation as to R. Timmel and overseeing and approving the recommendations of Defendant

Griffin.  Defendant Smith-Foote admits that Plaintiff purports to sue Defendant Leggin in his

individual capacity.

9. Defendant Kimberly Smith-Foote is a Child Protection Manager, and at all times
relevant to this complaint, she was the direct supervisor of Defendant Leggin. She approved the
decision to recommend indicating Laura Timmel for child abuse on November 24, four days
after the juvenile court exonerated Plaintiff.  Defendant Smith-Foote is sued in her individual
capacity.

ANSWER:      Defendant Smith-Foote admits that she is a Child Protection Manager and

was the direct supervisor of Defendant Leggin.  Defendant Smith-Foote admits that she approved

the recommendation to indicate Laura Timmel for child abuse on November 24.  Defendant

Smith-Foote admits that Plaintiff purports to sue her in her individual capacity and denies each

and every remaining allegation in Paragraph 9.

10.  At all times relevant to this complaint, Defendant Maria Miller was a DCFS administrator for the Central Region of DCFS.  Defendant Miller was the assigned administrator who made the final review of the recommendation to indicate Plaintiff Timmel and, as such, Defendant Miller made the ultimate decision to register Plaintiff Timmel as a perpetrator of child abuse.

ANSWER:      Defendant Smith-Foote admits that Defendant Maria Miller was a DCFS

administrator for the Central Region of DCFS, that Defendant Miller was the assigned

administrator who made the final review of the recommendation to indicate Plaintiff Timmel.

Defendant Smith-Foote avers that Defendant Miller concurred with the field recommendation to

indicate Plaintiff as a perpetrator of child abuse and denies each and every remaining allegation

in Paragraph 10.

11.  Pursuant to the Illinois Abused and Neglected Child Reporting Act ("ANCRA"), 325 ILCS 5/1 *et seq*, DCFS receives Hotline calls when any person makes a call based upon "reasonable cause to believe a child may be an abused child or a neglected child."  325 ILCS 5/4, 5/7, 5/7.6.

ANSWER:  Paragraph 11 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Smith-Foote avers that the

cited law speaks for itself.  Defendant Smith-Foote denies each and every remaining allegation

contained in Paragraph 11 inconsistent with the law.  To the extent an answer is required,

Defendant Smith-Foote denies the allegations contained in Paragraph 11.

12.  Under ANCRA, and consistent with a federal law known as the Child Abuse Prevention and Treatment Act (alternatively called "the Mondale Act,"), 42 U.S.C. 5101 *et seq.*, 42 U.S.C. 5116 *et seq.*, certain persons are "mandated reporters" of child abuse if a child known to them in their professional capacity is reasonably suspected of being an abused or neglected child.  Persons other than mandated reporters are permitted to make such reports, though they are not penalized by law for failure to report; however, mandated reporters may be subject to criminal and civil penalties if they fail to report reasonably suspected child abuse. 325 ILCS 5/4,

5/4.02.

ANSWER:  Paragraph 12 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Smith-Foote avers that the

cited law speaks for itself.  Defendant Smith-Foote denies each and every remaining allegation

contained in Paragraph 12 inconsistent with the law.  To the extent an answer is required,

Defendant Smith-Foote denies the allegations contained in Paragraph 12.

13.  ANCRA requires that DCFS promptly initiate an investigation of the merits of calls it
accepts, sometimes working jointly with law enforcement authorities if the allegations in the call
give rise to a potential criminal complaint.  *Id*. at 5/7, 5/7.3, 5/7.4.

ANSWER:  Paragraph 13 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Smith-Foote avers that the

cited law speaks for itself.  Defendant Smith-Foote denies each and every remaining allegation

contained in Paragraph 13 inconsistent with the law.  To the extent an answer is required,

Defendant Smith-Foote denies the allegations contained in Paragraph 13.

14.  To be accepted as a Hotline call and subject to an investigation, the specific incident
of harm alleged in the report must meet an allegation definition in the DCFS allegation system.
Each of these allegations is defined in DCFS Manual of Rules and Procedures 300, Appendix B.
*See* 89 Ill. Admin. Code § 300, App'x B.  Physical abuse allegations, which are coded with a
one- or two-digit number under 50 in the DCFS allegation coding system, include specific
allegations of harm alleged to have been caused by the direct action of an alleged perpetrator,
including "#2 Head Injuries"; "#5 Burns"; "#7 Wounds"; "#9 Bone Fractures"; "#10 Substantial
Risk of Physical Injury"; "#11 Cuts, Bruises, Welts, Abrasions and Oral Injuries"; "#12 Human
Bites"; and "#16 Torture." Neglect allegations of harm, which are coded with a two-digit number
greater than 50, include injuries that are alleged to have been caused by the blatant disregard of
the alleged perpetrator (such as "#52 Head Injuries," "#57 Bone Fractures," and "#62 Human
Bites") as well as additional defined areas of harm to children, such as "#74 Inadequate
Supervision" and "#79 Medical Neglect."

ANSWER:  Paragraph 14 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Smith-Foote avers that the

cited law speaks for itself.  Defendant Smith-Foote denies each and every remaining allegation

contained in Paragraph 14 inconsistent with the law.  To the extent an answer is required,

Defendant Smith-Foote denies the allegations contained in Paragraph 14.

15. The specific allegations relevant to the investigation and indicated findings involving the Timmel children are allegation of harm "#9 Bone Fractures by Abuse" (alleged as to R. Timmel due to a fracture he sustained to his left femur in September 2009) and allegation of harm "#60 Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect" (alleged as to N. and B. Timmel insofar as they were assumed to be at risk of harm as a result of the injury to R.).

ANSWER:  Defendant Smith-Foote admits the allegations in Paragraph 15 and avers that

Paragraph 15 calls for a legal conclusion to which no answer is required.  Also, Plaintiff is

attempting to paraphrase Illinois law and Defendant Smith-Foote avers that the cited law speaks

for itself.

16. DCFS regulations require DCFS to complete investigations of Hotline calls within 60 days, except where this time may be extended for good cause. 325 ILCS 5/7.12.  At the conclusion of the investigation, DCFS investigators determine if the allegations under investigation are "indicated"—meaning that some credible evidence of abuse or neglect was found—or "unfounded"—meaning that DCFS did not find credible evidence of abuse or neglect. *Id*.

ANSWER:  Paragraph 16 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Smith-Foote avers that the

cited law speaks for itself.  Defendant Smith-Foote denies each and every remaining allegation

contained in Paragraph 16 inconsistent with the law.  To the extent an answer is required,

Defendant Smith-Foote denies the allegations contained in Paragraph 16.

17. The final determination of "indicated" or "unfounded" must be reported forthwith to the Register. *Id* at 7/7, 7/12. However, if an individual is licensed to work with children or otherwise is engaged in employment involving the care of children, DCFS is not permitted to issue an indicated finding without first allowing the child care professional an opportunity to have the recommendation to "indicate" her reviewed by an administrator by way of an Administrator's Conference. The pre-deprivation Administrator's Conference is one of the procedural due process protections that the federal court, in *Dupuy v. McDonald*, directed DCFS to adopt in order to remedy the then-constitutionally inadequate indicated report decision-making policies as applied to child care professionals. *Dupuy v. McDonald*, 141 F. Supp. 2d 1090 (N.D. Ill. 2001); Preliminary Injunction Memorandum Opinion and Order at *Dupuy v. McDonald*, 2003 U.S. Dist. LEXIS 12019, at *21-26 (N.D. Ill. July 10, 2003), *aff'd in relevant part sub nom Dupuy v. Samuels*, 397 F. 3d 493, 512 (7th Cir. 2005).  The requirements for Administrator's Conferences are now codified in DCFS rules and procedures. *See* 89 Ill. Admin. Code § 300.160.

ANSWER:  Paragraph 17 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Smith-Foote avers that the

cited law speaks for itself.  Defendant Smith-Foote denies each and every remaining allegation

contained in Paragraph 17 inconsistent with the law.  To the extent an answer is required,

Defendant Smith-Foote denies the allegations contained in Paragraph 17.

18.   Only if the Administrator, after reviewing the basis for the recommended finding as well as any information or evidence the child care professional presents at the conference, determines that there is sufficient evidence of abuse or neglect, upon consideration of all of the inculpatory as well as the exculpatory evidence,  is DCFS authorized to issue an indicated report and register an individual's name identifying him or her as a perpetrator of child abuse or neglect in the State Central Register. *Dupuy*, U.S. LEXIS 12019, at *25; 89 Ill. Admin. Code § 300.160(c)(4).

ANSWER:  Paragraph 18 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Smith-Foote avers that the

cited law speaks for itself.  Defendant Smith-Foote denies each and every remaining allegation

contained in Paragraph 18 inconsistent with the law.  To the extent an answer is required,

Defendant Smith-Foote denies the allegations contained in Paragraph 18.

19.   Once registered, indicated findings for physical abuse such as bone fractures are registered for a period of 20 years, and indicated findings for most forms of neglect are registered for a period of 5 years.  325 ILCS 5/7.14; DCFS Procedures 300.100(c). These findings are registered and maintained unless the person named as a perpetrator appeals the finding and, at the subsequent administrative hearing, DCFS fails to meet is burden of proof (by a preponderance of the evidence) that the finding should be maintained. 325 ILCS 5/7.16.

ANSWER:  Paragraph 19 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Smith-Foote avers that the

cited law speaks for itself.  Defendant Smith-Foote denies each and every remaining allegation

contained in Paragraph 19 inconsistent with the law.  To the extent an answer is required,

Defendant Smith-Foote denies the allegations contained in Paragraph 19.

20.   At the same time as DCFS investigators are expected to make determinations as to whether allegations of abuse or neglect are "indicated" or "unfounded," they are also authorized by state law to take emergency protective custody of children whom they reasonably believe cannot be cared for at home without endangering their health or safety, but only if there is not time to apply for a court order requesting temporary custody. 325 ILCS 5/5. (Doctors and law

7

enforcement authorities also are given such authority by state law but it is DCFS that has the exclusive responsibility to hold a child in its custody after emergency protective custody has been taken. *Id.*)

ANSWER: Paragraph 20 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Smith-Foote avers that the

cited law speaks for itself. Defendant Smith-Foote denies each and every remaining allegation

contained in Paragraph 20 inconsistent with the law. To the extent an answer is required,

Defendant Smith-Foote denies the allegations contained in Paragraph 20.

21. If DCFS intends to maintain temporary custody after taking emergency protective custody of a child without a court order, however, the Juvenile Court Act requires: (a) that a Petition for Adjudication of Wardship as to the child be filed within 48 hours of the taking of custody, otherwise the child is to be released back to their parents' care, 705 ILCS 405/2-9; and (b) upon such petition, the court must find that there is "probable cause" to believe the child is abused or neglected, that there is "immediate and urgent necessity" for the safety of the child that he or she be placed outside the custody of his or her parents, and that "reasonable efforts" were made to avoid removing the child from his or her parent, 705 ILCS 405/2-10.

ANSWER: Paragraph 21 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Smith-Foote avers that the

cited law speaks for itself. Defendant Smith-Foote denies each and every remaining allegation

contained in Paragraph 21 inconsistent with the law. To the extent an answer is required,

Defendant Smith-Foote denies the allegations contained in Paragraph 21.

22. DCFS rules and regulations set forth detailed requirements as to the types of evidence to be considered in each type of investigation. For example, in an investigation of an allegation of "Bone Fractures," DCFS Procedures 300, Appendix B, provide that DCFS investigators must consider the opinion of radiologists or orthopedists and the procedures direct investigators to weight the opinion of doctors with higher degrees of relevant specialization more highly than the opinions of less specialized doctors.

ANSWER: Paragraph 22 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Smith-Foote avers that the

cited law speaks for itself. Defendant Smith-Foote denies each and every remaining allegation

contained in Paragraph 22 inconsistent with the law. To the extent an answer is required,

Defendant Smith-Foote denies the allegations contained in Paragraph 22.

23. Any person who is indicated for child abuse or neglect has the right to appeal the finding to a neutral decision-maker—a DCFS administrative law judge. 325 ILCS 5/7.16, 89 Ill. Admin. Code § 336, "Appeal of Child Abuse and Neglect Investigation Findings." Ordinarily, such appeals must be decided within 90 days, *Lyon v. Dep't of Children & Family Servs.*, 209 Ill. 2d 264, 807 N.E.2d 423 (Ill. 2004); 89 Ill. Admin. Code § 336.220, but for persons who work with children (i.e., *Dupuy* class members, *see* ¶ 17 *supra*), DCFS is required to issue a final administrative hearing decision within 35 days of the filing of an administrative appeal request if the child care professional has requested an expedited appeal, *Dupuy*, LEXIS 12019, at *26-29; 89 Ill. Admin. Code § 336.85.

ANSWER:  Paragraph 23 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Smith-Foote avers that the

cited law speaks for itself.  Defendant Smith-Foote denies each and every remaining allegation

contained in Paragraph 23 inconsistent with the law.  To the extent an answer is required,

Defendant Smith-Foote denies the allegations contained in Paragraph 23.

24. Prior to the Hotline call in this case, which occurred in the late evening on Thursday, September 10, 2009, Laura Timmel's sole contact with DCFS had been as a Licensed Clinical Social Worker herself: she had been employed as a social worker by the Division of Specialized Care for Children and, before that, as a school-based social worker. In these capacities, Laura Timmel herself had several occasions to contact the Hotline as a mandated child abuse reporter seeking help for children she reasonably believed were seriously abused or neglected and required DCFS's intervention.

ANSWER:     Defendant Smith-Foote admits that a hotline call was placed and avers that

it occurred on September 11, 2009 at 12:18 a.m. Defendant Smith-Foote is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

Paragraph 24.  To the extent an answer is required, Defendant Smith-Foote denies the remaining

allegations contained in Paragraph 24.

25.  Neither Plaintiff Laura Timmel nor her husband Brian ever had any prior interaction with law enforcement either, except for traffic stops.

ANSWER:     Defendant Smith-Foote is without knowledge or information sufficient to

form a belief as to the truth of the allegations contained in Paragraph 25.  To the extent an

answer is required, Defendant Smith-Foote denies the allegations contained in Paragraph 25.

26.  During the week leading up to the Hotline call that gave rise to this action, Laura Timmel had been the primary caregiver for her three children, except during a few hours when her husband Brian Timmel watched the children.

ANSWER:     Defendant Smith-Foote is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26.  To the extent an answer is required, Defendant Smith-Foote denies the allegations contained in Paragraph 26.

27. On the morning of Thursday, September 10, 2009, Laura took R., who was then four weeks old, to a medical appointment with an audiologist at Children's Memorial Hospital and left the twins, who were then two years old, at home with her husband for the day.  After the medical appointment, Laura visited friend and former neighbor John Matthew Peluse and changed R.'s diaper and nursed R. while there, then went for lunch at a Panera Bread restaurant before going to a hair salon appointment in the afternoon.  She returned home with R. in the late afternoon.

ANSWER:     Defendant Smith-Foote is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27. To the extent an answer is required, Defendant Smith-Foote denies the allegations contained in Paragraph 27.

28. While at the hair salon, Laura nursed R. and changed R.'s diaper.  As she placed R. in his car seat to leave, Laura noticed that R.'s leg seemed slightly swollen and asked the stylist, Sasha Staerkel, who had recently held R. for several minutes, if it appeared swollen to her. The stylist said that it did perhaps look a little different from the other leg. The stylist later testified that she did not think that R.'s leg looked injured.

ANSWER:     Defendant Smith-Foote is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28. To the extent an answer is required, Defendant Smith-Foote denies the allegations contained in Paragraph 28.

29. During the entire time Laura and R. were at the salon, R. appeared content and comfortable with no unusual crying or behaviors suggesting that he had been injured in any way. Indeed, despite Laura having been in public with R. all day on September 10, no one—including medical staff with whom Laura and R. had contact on September 10—had any concern about R.'s condition.

ANSWER:     Defendant Smith-Foote is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29. To the extent an answer is required, Defendant Smith-Foote denies the allegations contained in Paragraph 29.

30.  Laura and R. returned home in the late afternoon shortly before Brian and the twins came home. When Brian arrived home, he held R. because he hadn't seen him all day, and he did not notice anything unusual about R.

ANSWER:     Defendant Smith-Foote is without knowledge or information sufficient to

form a belief as to the truth of the allegations contained in Paragraph 30. To the extent an answer

is required, Defendant Smith-Foote denies the allegations contained in Paragraph 30.

31. At approximately 5:00 p.m., Laura fed R. and then changed R.'s diaper and clothes, taking note that his left leg still appeared as though it might be a little swollen. R. was not exhibiting any signs of distress or pain.

ANSWER:     Defendant Smith-Foote is without knowledge or information sufficient to

form a belief as to the truth of the allegations contained in Paragraph 31. To the extent an answer

is required, Defendant Smith-Foote denies the allegations contained in Paragraph 31.

32. That evening, Laura prepared dinner for the family and R. was placed in his swing while the family ate. At about 7:00 p.m., after dinner, Laura went to change R.'s diaper and noticed that his left leg had become extremely swollen and that his leg seemed slightly out of alignment.  When Laura moved his leg to change his diaper, he cried out in pain but he did not cry inconsolably.  She called to Brian to take a look at R.'s leg, whereupon both Laura and Brian agreed that it looked like R. might have been bitten by a spider or insect.

ANSWER:     Defendant Smith-Foote is without knowledge or information sufficient to

form a belief as to the truth of the allegations contained in Paragraph 32. To the extent an answer

is required, Defendant Smith-Foote denies the allegations contained in Paragraph 32.

33. Because the Timmels had just moved to the western suburbs from Chicago, they called one of their new neighbors for a recommendation as to where to take R. to be examined by a doctor.  Upon receiving the recommendation to take R. to Hinsdale Hospital, Brian Timmel took R. there while Laura remained home with the twins.

ANSWER:     Defendant Smith-Foote is without knowledge or information sufficient to

form a belief as to the truth of the allegations contained in Paragraph 33.  To the extent an

answer is required, Defendant Smith-Foote denies the allegations contained in Paragraph 33.

34.  While at Hinsdale Hospital, R. was examined by several medical personnel, including Nurse Robert Ditto and an emergency room doctor.  At approximately 11:00 p.m., the ER doctor informed Brian Timmel that an x-ray had identified a fracture to R.'s left femur and that DCFS would be called based on a suspicion that the fracture may have been caused by child

abuse.

ANSWER:     Defendant Smith-Foote is without knowledge or information sufficient to

form a belief as to the truth of the allegations contained in Paragraph 34.  To the extent an

answer is required, Defendant Smith-Foote denies the allegations contained in Paragraph 34.

35.   After Brian notified Laura that R. had a fracture to his leg, Laura arranged for a neighbor to sit with the twins and she met Brian at Hinsdale Hospital. Medical personnel at Hinsdale recommended transferring R. to Children's Memorial Hospital ("CMH") and Brian and Laura acted in accordance with this recommendation.  Laura travelled by ambulance to CMH with R. while Brian returned home to care for the twins.

ANSWER:     Defendant Smith-Foote is without knowledge or information sufficient to

form a belief as to the truth of the allegations contained in Paragraph 35. To the extent an answer

is required, Defendant Smith-Foote denies the allegations contained in Paragraph 35.

36. Upon arriving at CMH at approximately 1:00 a.m. on Friday, September 11, Laura was interviewed by the DCFS on-call investigator Moises Cruz, who was considered the "mandate worker"—i.e., the DCFS investigator who was assigned to see R. within 24 hours of the Hotline Call.  Mr. Cruz directed Laura to immediately arrange for someone to supervise Brian's and her own contact with their children at all times. Mr. Cruz threatened Laura that if she did not immediately make such an arrangement, he would take protective custody of all of her children.

ANSWER:     Defendant Smith-Foote admits the first sentence of Paragraph 36.

Defendant Smith-Foote denies the remaining allegations contained in Paragraph 36.

37. During the early morning hours of September 11, Mr. Cruz also visited the family home and spoke with Brian. Brian and Laura made immediate arrangements for Brian's mother, Janice Timmel, to travel to Chicago from Cincinnati, Ohio, in order to supervise Brian and Laura, and also arranged for a neighbor to supervise their contact until Janice Timmel could arrive.

ANSWER:     Defendant Smith-Foote admits the allegations contained in Paragraph 37.

38. While at the hospital on September 11, Laura was also interviewed by Dr. Sarah Monahan-Estes ("Estes"), a non-board-certified fellow with CMH's Child Protective Unit. This unit is part of MPEEC (Multidisciplinary Pediatric Education and Evaluation Consortium), a consortium of child abuse divisions at area hospitals that provide evaluations to DCFS. Unbeknownst to Laura at the time, pursuant to a pre-existing contract between CMH and DCFS, Dr. Estes would be reporting her conclusions directly to DCFS, and specifically to Defendant Griffin, and not to them as parents.

ANSWER: Defendant Smith-Foote admits that on September 11, Laura Timmel was interviewed by Dr. Sarah Monahan-Estes with CMH's child protective unit and that this unit is part of MPEEC (Multidisciplinary Pediatric Education and Evaluation Consortium), a consortium of child abuse divisions at area hospitals that provide evaluations to DCFS and avers that Dr. Estes is a Fellow with the protective services team at CMH. Defendant Smith-Foote is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 38. To the extent an answer is required, Defendant Smith-Foote denies the remaining allegations.

39. Dr. Michelle Sagan was the treating pediatric orthopedist for R. while he was admitted at CMH. At no point during the ensuing DCFS investigation did any person with DCFS, including the Defendants to this action, make any attempt to speak with Dr. Sagan despite the DCFS requirement that in a bone fracture investigation, DCFS must contact all treating physicians and must obtain "[v]erification of the injury . . . from a physician, preferably an orthopedist or radiologist." 89 Ill. Admin. Code, § 300, App'x B, "# 9/59 Bone Fractures." Further, DCFS procedures require that DCFS investigators give the greatest weight to the specialist with the greatest expertise in the relevant area of medicine, which Defendant Griffin acknowledged would be the area of orthopedics in the present case, but none of the DCFS Defendants sought or considered Dr. Sagan's opinion at any relevant time.

ANSWER: Defendant Smith-Foote admits the first sentence of Paragraph 39. Defendant Smith-Foote avers that Defendant Griffin's testimony at the juvenile court proceedings on October 14, 2009 speaks for itself. The remaining allegations of Paragraph 39 of the Complaint improperly collectivize the actions of the Defendants and as such do not apprise Defendant Smith-Foote of what she is charged with. Plaintiff is attempting to paraphrase Illinois law and Defendant Smith-Foote avers that the cited law speaks for itself. Defendant Smith-Foote denies the remaining allegations contained in Paragraph 39.

40. R. was discharged from CMH on the evening of Friday, September 11.

ANSWER: Defendant Smith-Foote admits that R. was discharged from CMH on September 11 and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore denies the remaining allegations contained in Paragraph 40.

13

41. Officer Craig Balon with the LaGrange Police Department interviewed both Brian and Laura at the family home, on September 11 and September 12, respectively. On September 15, Officer Wardlaw with the LaGrange Police reported to Defendant Griffin that after speaking with the family, the police department "did not have a sense of abuse."

ANSWER:     Defendant Smith-Foote admits the first sentence of Paragraph 41 and

admits that on September 15, Officer Wardlaw with the LaGrange Police reported to Defendant

Griffin and avers that the initial police "investigator did not have a sense of abuse."  Defendant

Smith-Foote denies the remaining allegations contained in Paragraph 41.

42.  On September 11, 2009, DCFS Supervisor Lucia Greer directed that the ensuing investigation in this case should include "an exact description of the fracture," interviews with "all physicians directly involved with the treatment of the reported injury (e.g., attending physician, radiologist or orthopedist)," and "a TIME LINE starting with when they noticed the injury; activity throughout the past week [] with both parents." [emphasis in original]. In addition, she directed that "any other person with knowledge" should be interviewed.

ANSWER:     Defendant Smith-Foote admits the allegations contained in Paragraph 42.

43.  On Friday, September 11, 2009, DCFS assigned Janice Griffin as the primary investigator of the allegations against Brian and Laura Timmel. Griffin was obligated to conduct the investigation in accordance with DCFS Rules and Procedures and in accordance with the *Dupuy* orders, cited at  ¶¶17 and 18,  above and she later testified in the juvenile court action that ensued on October 2 that she handled the investigation in accordance with her understanding of the applicable policies and procedures.  However, her understanding of these requirements was lacking, as described below.

ANSWER:     Defendant Smith-Foote admits the first sentence of Paragraph 43.

Defendant Smith-Foote admits Defendant Griffin was obligated to conduct the investigation in

accordance with DCFS rules, procedures, the law and any applicable court orders and that she

later testified in the juvenile court action that ensued on October 2, 2009 and Defendant Griffin's

testimony speaks for itself.  Defendant Smith-Foote avers that the cited law speaks for itself and

denies the remaining allegations contained in Paragraph 43.

44. Between September 11, 2009, the day Griffin was assigned as the primary investigator, and October 1, 2009, which was the day that Griffin decided (with Defendant Leggin, Defendant Smith-Foote, and Division of Child Protection Associate Deputy Director Meryl Paniak) to take protective custody of the Timmels' children, she had conducted very little investigation of the facts either supporting or refuting the allegations that Brian or Laura Timmel had abused or neglected their children. Indeed, not *one* of Supervisor Greer's September 11

14

directives had been satisfied, nor had the directive of Defendant Leggin, dated September 23, 2009, to secure additional information including "how old is the fracture" been satisfied.

ANSWER:     Defendant Smith-Foote admits that on September 11, 2009 Defendant

Griffin was assigned as the primary investigator and avers that she approved the decision to take

protective custody along with Defendant Leggin in consultation with Associate Deputy Director

Meryl Paniak.  Defendant Smith-Foote denies each and every remaining allegation contained in

Paragraph 44.

45.  Between September 11 and October 1, only the following minimal investigative steps had occurred:

(i) On September 11, Griffin spoke briefly with two CMH social workers merely to learn that the case had been assigned to Dr. Estes for MPEEC review and confirm that R. was ready for discharge and that, pursuant to Griffin's direction, he would be discharged to the care of Janice Timmel and not to Brian or Laura;

(ii) On September 11, Griffin spoke briefly with Janice Timmel, Brian's mother, merely to confirm that she would supervise any contact Laura and Brian had with their own children per DCFS directive that during the investigation they could no longer have unsupervised contact with their own children;

(iii) On September 15, Griffin spoke with Office Wardlaw from the LaGrange Police Department, who informed Griffin that after speaking with the family, the police "did not have a sense of abuse;"

(iv) On September 15, Griffin visited the home where she interviewed Brian Timmel and Laura Timmel, though the interview of Laura Timmel did not comport with a number of DCFS requirements, including the requirement that DCFS ask her for collateral contacts and conduct a domestic violence and substance abuse screen;

(v) On September 15 and September 22, Griffin observed the children in their home (where they were found to be healthy except for R.'s fracture);

(vi) On September 16, Griffin spoke with Nurse Ditto, who reported that while at Hinsdale Hospital, R. did not cry inconsolably but, rather, would cry while he was repositioned but would not cry while at rest; and

(vii) During this time period of September 11 through October 1, Griffin spoke to only a single doctor: Dr. Estes, a non-board-certified child abuse fellow who offered her opinion that based merely on the absence of an explanation for the fracture, she concluded that the injury was more than likely caused by abuse. Dr. Estes' opinion was based upon the theory that the fracture would have been so painful that R. would have cried inconsolably.

ANSWER: The allegations contained in Paragraph 45 of the Complaint improperly

collectivize the actions of the Defendants and as such do not apprise Defendant Smith-Foote of

what she is charged with.  Defendant Smith-Foote answers the subparts of Paragraph 45 as

follows:

15

(i) Defendant Smith-Foote admits that on September 11, Defendant Griffin spoke with two CMH social workers and avers that CMH social worker Hickey told her that the case was assigned to Estes for MPEEC review at 11:30 a.m. and further avers that at 3:30 p.m. CMH social worker Gronin told Defendant Griffin that R. was ready for discharge "pending the results of the background check, R. would be discharged in the care of paternal grandmother, Janice Timmel." Defendant Smith-Foote denies the remaining allegations contained in subpart (i) of Paragraph 45.

(ii) Defendant Smith-Foote admits that Defendant Griffin spoke with Janice Timmel, admits that she confirmed that Janice Timmel would supervise contact between Laura and Brian and their three children. Defendant Smith-Foote denies the remaining allegations contained in subpart (ii) of Paragraph 45.

(iii) Defendant Smith-Foote admits that Defendant Griffin spoke to Office [sic] Wardlaw from the LaGrange Police Department and avers that he informed her that after speaking with the family, "the initial investigator did not have a sense of abuse." Defendant Smith-Foote denies the remaining allegations contained in subpart (iii) of Paragraph 45.

(iv) Defendant Smith-Foote admits that on September 15 Defendant Griffin visited the home where she interviewed Brian Timmel and Laura Timmel and admits that Defendant Griffin did not conduct a domestic violence and substance abuse screen on that date. Defendant Smith-Foote denies that the interview of Laura Timmel did not comport with a number of DCFS requirements and denies the remaining allegations contained in subpart (iv) of Paragraph 45.

(v) Defendant Smith-Foote denies the allegations contained in subpart (v) of Paragraph 45 and avers that on September 15, 2009, Defendant Griffin observed N. in her home and saw no signs of abuse or neglect and further avers that on September 22, 2009, Defendant Griffin observed R. and B. in their home and saw no signs of abuse or neglect.

16

(vi) Defendant Smith-Foote admits that Defendant Griffin spoke with Ditto who reported that R. would cry when he was repositioned but not while he was at rest. Defendant Smith-Foote denies the remaining allegations contained in subpart (vi) of Paragraph 45.

(vii) Defendant Smith-Foote admits that Defendant Griffin spoke to Dr. Estes who offered her opinion that the injury was more than likely caused by abuse. Defendant Smith-Foote denies the remaining allegations contained in subpart (vii) of Paragraph 45 and avers that Dr. Estes is a Fellow with the Protective Services Team at CMH.

46. The following investigative steps were not taken between September 11 and October 1, 2009, despite the clear requirements of DCFS rules and procedures and the due process requirement, as directed by the *Dupuy* orders, that DCFS investigators are to gather and consider all available exculpatory evidence:

(i) Identification of and contact with two eyewitnesses who saw R. on the date his fracture was discovered (i.e., John Matthew Peluse, who saw R. at approximately 11:00 a.m. on September 10, and Sasha Staerkel, the hairstylist who observed R. from approximately 1:00 p.m. to 3:30 p.m. on September 10 and held him briefly herself). Eye witness contacts are required by DCFS Procedures 300, Appendix B (defining direct evidence as "a statement taken from an eyewitness . . . **It is imperative that the CPSW seeks objective corroboration of . . . self-reports**" and "consider information developed through personal observation . . . or required interviews that will establish the accuracy of [parents'] reports. . . . **There is no substitute for independent verification of this sort of information.**") (bold in original). *See also* DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, (subsection (C)(4)(F), requiring the investigator to "[i]nterview all identified witnesses who are reported to have knowledge of the incident that resulted in a bone fracture");

(ii) contact with *all* pediatric orthopedists, radiologists, or attending physicians who treated the injury as required by DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, at subsections (C)(2)(F) and (C)(4)(E). Such doctors were Dr. Michelle Sagan, the pediatric orthopedist who had treated R.'s fracture at CMH, and Dr. Christopher Sullivan, the Chief of Pediatric Orthopedics at University of Chicago's Comer Children's Hospital, who provided further treatment for R.'s fracture on September 30, 2009. Griffin later denied knowing that Dr. Sullivan was a treating physician, but acknowledged she knew he had put a new splint on R.'s leg;

(iii) contact with R.'s primary care pediatrician, Dr. Danielle Cherian, required by DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, subsection (C)(4)(L);

(iv) contact with Laura Timmel's obstetrician, Dr. Brian Foley, as required by *id*. (insofar as he was a physician who had seen the child in past six months). Griffin did not even request consents from Ms. Timmel to speak to any of her own doctors or secure her own medical records, including her obstetrical records;

(v) assessment of the credentials of the doctors upon whom DCFS was relying for its opinion as required by DCFS Procedures 300 (specifying that a professional's expertise is to be assessed according to their amount of training, experience, and specialization, specifically stating that the opinion of a pediatric radiologist is more credible than that of a radiologist, and the

opinion of a radiologist as to a bone fracture is more credible than that of a pediatrician; also
stating that the opinion of a doctor on "hospital staff is more credible than a pediatric resident.")
Griffin later testified that she N.r took steps to identify any doctors Dr. Estes may have
consulted, while wrongly assuming that Dr. Estes had "consulted with an orthopedic doctor" and
"other doctors who have training in [radiology];"

(vi) determination as to the relative weight to be given to the opposing opinions of
doctors when their opinions were in conflict, based on the specific expertise and level of
experience of the opposing doctors. Griffin later acknowledged that the "relevant specialization"
in a case involving bone fractures would be orthopedics;

(vii) consideration of whether a *third* opinion is needed to reconcile divergent medical
views and render a sound determination as to the likelihood of abuse versus accidental trauma
where experts disagree, as required by Procedures 300, Appendix B, #9/59, Bone Fractures,
(subsection (C)(5)(F)).

ANSWER:     The allegations contained in Paragraph 46 of the Complaint improperly

collectivize the actions of the Defendants and as such do not apprise Defendant Smith-Foote of

what she is charged with.  Defendant Smith-Foote avers that the cited law in each subpart speaks

for itself and that the Department's rules and procedures set forth the applicable time frames for

all aspects of the child abuse investigation.  Defendant Smith-Foote answers the subparts of

Paragraph 46 as follows:

(i) Defendant Smith-Foote admits that Defendant Griffin did not have contact with John

Peluse or Sasha Staerkel between September 11 and October 1, 2009.  Defendant Smith-Foote

denies the remaining allegations and avers that the cited law speaks for itself.

(ii) Defendant Smith-Foote admits that between September 11 and October 1, 2009

Defendant Griffin did not contact Dr. Michelle Sagan who was the pediatric orthopedist who

treated R.'s fracture at CMH or Dr. Christopher Sullivan, the chief of Pediatric Orthopedics at

University of Chicago's Comer Children's Hospital, who provided further treatment for R.'s

fracture on September 30, 2009.  Defendant Smith-Foote avers that Defendant Griffin's

testimony in the juvenile court proceedings concerning her understanding of Dr. Sullivan's

treatment of R. speaks for itself in the context in which it was given and she therefore denies

each and every remaining allegation contained in subpart (ii) of Paragraph 46.

18

(iii) Defendant Smith-Foote admits that Defendant Griffin did not contact R.'s primary care pediatrician, Dr. Danielle Cherian between September 11 and October 1, 2009.  Defendant Smith-Foote avers that the cited law speaks for itself and denies the remaining allegations contained in subpart (iii) of Paragraph 46.

(iv) Defendant Smith-Foote admits that Defendant Griffin did not contact Dr. Brian Foley between September 11 and October 1, 2009.  Defendant Smith-Foote admits that between September 11 and October 1, 2009 Defendant Griffin did not request consents from Ms. Timmel to speak to any of her own doctors or secure her own medical records, including her obstetrical records.  Defendant Smith-Foote denies the remaining allegations contained in subpart (iv) of Paragraph 46.

(v) Defendant Smith-Foote avers that the cited law speaks for itself and Defendant Griffin's testimony at the juvenile court proceeding speaks for itself in the context in which it was given.  Defendant Smith-Foote denies the remaining allegations contained in subpart (v) of Paragraph 46.

(vi) Defendant Smith-Foote avers that Defendant Griffin's testimony at the juvenile court proceedings speaks for itself in the context in which it was given as to the allegations set forth in the second sentence of subpart (vi) of Paragraph 46.  Defendant Smith-Foote denies the remaining allegations contained in subpart (vi) of Paragraph 46.

(vii) Defendant Smith-Foote denies each and every allegation contained in subpart (vii) of Paragraph 46.  Defendant Smith-Foote avers that the cited law speaks for itself.

47.  Defendant Griffin made only *pro forma* contact with the police officers who were also investigating the case and the initial child abuse reporter, Nurse Robert Ditto. Neither she nor Defendants Leggin or Smith-Foote, nor Defendant Miller at the later Administrator's Conference, considered the information these persons had to provide that was exculpatory. Specifically:

(i) On September 15, Officer Wardlaw informed Griffin that after speaking with the family, the police department officials did not have a "sense of abuse."

(ii) Nurse Ditto at Hinsdale Hospital made observations of R. that *supported* the

Timmels' contentions that R. was not inconsolable (Nurse Ditto ultimately testified that when R.'s leg was manipulated, he would cry for only 10-20 seconds) and discounted the claim of Dr. Estes (which was that the fracture would have been so painful and so obvious thereafter that R. would have cried inconsolably and, therefore, the lack of an explanation for the fracture by the parents was not credible).

ANSWER:     Defendant Smith-Foote denies the allegations contained in Paragraph 47

and its subparts.

48.  On September 30, R. was examined and treated by Dr. Christopher Sullivan, Chief of Pediatric Orthopedics, University of Chicago Comer Children's Hospital. On September 30, Dr. Sullivan reported to the Timmels his expert opinion that R.'s fracture was *unlikely* to be due to abuse.

ANSWER:     Defendant Smith-Foote admits the first sentence of Paragraph 48.

Defendant Smith-Foote lacks knowledge or information sufficient to form a belief as to the truth

of the remaining allegations contained in Paragraph 48. To the extent an answer is required,

Defendant Smith-Foote denies the remaining allegations contained in Paragraph 48.

49. On the afternoon of October 1, 2009, Defendant Griffin contacted Brian Timmel and requested that he come to the DCFS offices the next day with Laura and their children.  That morning, Defendant Griffin had received a written report from Dr. Estes documenting her opinion. Though Defendant Griffin concealed her true motives from Brian Timmel, her intention was to take protective custody of the Timmels' children during the next day's meeting.

ANSWER:     Defendant Smith-Foote admits the allegations contained in the first two

sentences of Paragraph 49.  Defendant Smith-Foote lacks knowledge sufficient to form a belief

as to the truth of the last sentence in Paragraph 49 and therefore denies the allegations contained

in the last sentence of Paragraph 49.

50. On the afternoon of October 1, 2009,  upon learning of the request that Brian Timmel bring the children to the DCFS offices the next day, the Timmels' counsel called Defendant Griffin at approximately 4:30 p.m. and spoke to her and her supervisor, Defendant Leggin. The counsel (Diane L. Redleaf and Melissa L. Staas, both attorneys with the Family Defense Center) confirmed  to Defendants Griffin and Leggin the availability of Dr. Sullivan's opinion that the injury was more than likely *not* caused by abuse and urged Defendants to contact him immediately. While the Timmels' counsel offered a phone number for Dr. Sullivan's office so that the DCFS investigative staff could speak to him immediately about his opinion, Defendants Griffin and Leggin deliberately ignored this information.

ANSWER:     Defendant Smith-Foote admits that on the afternoon of October 1, 2009,

the Timmels' counsel called Defendant Griffin at approximately 4:30 p.m. and spoke to

Defendant Griffin and her supervisor, Defendant Leggin. Defendant Smith-Foote is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in the first sentence of Paragraph 50.  Defendant Smith-Foote admits that the Timmels' counsel

stated to Defendants Griffin and Leggin the availability of a second opinion from Dr. Sullivan at

University of Chicago.  Defendant Smith-Foote avers that Plaintiff's counsel stated that the

opinion would be ready the following week and further avers that Plaintiff's counsel stated to

Defendants Griffin and Leggin that Dr. Sullivan's opinion was that the injury could have been

caused by other means than abuse.  Defendant Smith-Foote denies each and every remaining

allegation contained in Paragraph 50.

51. Instead of calling Dr. Sullivan or reviewing his opinion or seeking out further opinion of the MPEEC doctors or other medical opinions, Defendants Griffin and Leggin, with the approval of Defendant Kimberly Smith-Foote, decided to "go with our MPEEC doctor" without so much as any serious efforts to notify Dr. Estes, their own MPEEC consultant, that a second opinion disagreed with hers.

ANSWER:     Defendant Smith-Foote admits that, with her approval, Defendants Griffin

and Leggin followed the opinion of the MPEEC doctor.  Defendant Smith-Foote denies each and

every remaining allegation contained in Paragraph 51.

52.  At 4:51 p.m. on October 1, Defendants Griffin, Leggin, and Smith-Foote consulted with each other and with their superiors and decided to take protective custody of the Timmel children that very night instead of waiting until the following day as had been originally planned, showing that the DCFS Defendants refused to wait even a few *hours* for the newly-available evidence that the Timmels had secured from the head of pediatric orthopedics at the University of Chicago. By contrast, the DCFS Defendants had by that point waited for Dr. Estes' report for *twenty* days after the date on which Dr. Estes examined R. Timmel (*i.e.*, from September 11 to October 1). Their refusal to wait even *one* hour to fulfill the requirement under DCFS policy that they consult with a pediatric orthopedic expert demonstrates their disregard for the truth and their rush to judgment against the Timmels as guilty of child abuse.  Griffin and Leggin made these decisions in consultation with their superiors, Defendant Smith-Foote and Division of Child Protection Associate Deputy Director Meryl Paniak.

ANSWER:     Defendant Smith-Foote admits that at 4:51 p.m. on October 1, 2009,

Defendants Griffin and Leggin consulted with her and Division of Child Protection Associate

Deputy Director Meryl Paniak and decided to take protective custody of the Timmel children.

Defendant Smith-Foote admits that she received Dr. Estes's MPEEC report on October 1, 2009.

Defendant Smith-Foote denies each and every remaining allegation contained in Paragraph 52.

53.  After deciding to take protective custody, Defendant Griffin arranged for police squad cars to assist her in removing the Timmels' three children from their home.  Griffin went to the home at approximately 6:30 p.m. Janice Timmel, who was at the home with Laura and the children, answered the door but would not allow Griffin to enter.  Griffin saw N. in the window and observed that N. looked healthy and happy.

ANSWER:    Defendant Smith-Foote admits that Defendant Griffin went to the Timmel

home at approximately 6:30 p.m. and admits that Defendant Griffin arranged for police to assist

her.  Defendant Smith-Foote admits that Janice Timmel was at home with Laura Timmel and that

Defendant Griffin saw N. in the window and observed her.  Defendant Smith-Foote denies each

and every remaining allegation contained in Paragraph 53.

54. Brian Timmel, who had not yet arrived home from work, contacted his counsel. Based on the advice of counsel, Janice Timmel notified Defendant Griffin that she would not be allowed into the home without a warrant.  Lacking a warrant to remove the children from their home, the police and Griffin left.

ANSWER:    Defendant Smith-Foote admits that Defendant Griffin was notified that

she would not be allowed into the home without a warrant and that Defendant Griffin and the

police left.  Defendant Smith-Foote lacks knowledge sufficient to form a belief as to the truth of

the first sentence of Paragraph 54 and therefore denies the first sentence as well as the remaining

allegations in Paragraph 54.

55. Fearful that the children would be seized from them in the middle of the night, the family found shelter with a family friend for the evening and awaited word from their counsel in the morning as to DCFS's intended actions concerning their family. Throughout that night, DCFS personnel went to the family home in La Grange on at least two additional occasions—at approximately 10:45 p.m. on October 1, and again at 3:30 a.m. on October 2—in an attempt to seize the Timmel children without a warrant or court order.

ANSWER:    Defendant Smith-Foote admits that DCFS personnel went to the family

home in LaGrange on at least two occasions at approximately 10:45 p.m. on October 1, 2009 and

22

again at 3:30 a.m. on October 2, 2009.  Defendant Smith-Foote denies each and every remaining

allegation contained in Paragraph 55.

56. On the morning of October 2, 2009, counsel for the Timmels sent a letter to
Defendants Griffin, Leggin, and Smith-Foote documenting that Dr. Sullivan had determined that
the fracture was fully consistent with accidental causes and urging the Defendants to refrain from
making critical decisions in the case until they had received and reviewed Dr. Sullivan's written
medical opinion, which was at that time forthcoming.

ANSWER:     Defendant Smith-Foote admits that on October 2, 2009, the Timmels'

counsel sent a letter to Defendants Griffin, Leggin and Smith-Foote documenting that Dr.

Sullivan had an opinion and urging them to refrain from making critical decisions in the case

until they had received and reviewed Dr. Sullivan's written medical opinion, which was at that

time forthcoming.  Defendant Smith-Foote denies each and every remaining allegation contained

in Paragraph 56.

57. On October 2, 2009, Defendant Griffin sought, and the Cook County State's
Attorney's Office approved, without any review or consideration of the orthopedic opinions of
Drs. Sullivan and Sagan undermining the conclusion that R.'s fracture was likely to be due to
child abuse, the filing of petitions for Adjudication of Warship and Temporary Custody as to all
three Timmel children. These petitions cited only the opinion of Dr. Estes and omitted the
contrary opinions of Drs. Sullivan and Sagan.  Furthermore, these petitions were filed upon the
false representation of Defendant Griffin that she had made "reasonable efforts" to keep the
family together though no such efforts were documented and none had been made.

ANSWER:     Defendant Smith-Foote admits that Petitions for Adjudication of Wardship

and Temporary Custody were filed.  Defendant Smith-Foote denies each and every remaining

allegation contained in Paragraph 57.

58.  In the afternoon of October 2, based solely on the representations the State and
DCFS had made in the petitions, an order taking the children into DCFS temporary custody was
entered "without prejudice," albeit with the agreement that the children would remain in their
home with their grandparents, either Tim and Janice Timmel (Brian's parents) or Hon. Nancy
Dreher and Roger Dreher (Laura's parents), as their caregivers while the parents, Laura and
Brian Timmel, were required to reside elsewhere.  As of that date, no DCFS employee, including
Defendants, and no person employed by the State's Attorney's office had spoken to any
orthopedist or radiologist regarding the likelihood of the fracture being caused by child abuse.

ANSWER:     Plaintiff is attempting to paraphrase and quote a court order and Defendant

Smith-Foote avers that the court order speaks for itself.  Defendant Smith-Foote admits that on

October 2, 2009, the juvenile court entered an order for DCFS to take temporary custody of the

children and that order speaks for itself.  Defendant Smith-Foote admits that as of October 2,

2009, she had not spoken to any orthopedist or radiologist regarding the likelihood of the fracture

being caused by abuse.  The last sentence of Paragraph 58 of the Complaint improperly

collectivizes the actions of the Defendants and as such does not apprise Defendant Smith-Foote

of what she is charged with.  Defendant Smith-Foote lacks knowledge sufficient to form a belief

as to the truth of the allegations contained in the last sentence of Paragraph 58 and therefore

denies those allegations.

59. On October 2, the court scheduled the preliminary temporary custody hearing to
commence on October 14, 2009. Pursuant to 705 ILCS 405/2-10, this hearing was held to
determine: (a) whether there was any probable cause to believe that the Timmel children had
been abused or neglected and, if so; (b) whether it was a matter of immediate and urgent
necessity that the Timmel children be placed in the temporary custody of DCFS and, if so; (c)
whether DCFS made reasonable efforts to prevent or eliminate the necessity of removing the
Timmel children from the custody of their parents. *See* ¶ 21 *supra*. As is discussed below, *see* ¶
69 *infra*, at the conclusion of the temporary custody hearing regarding the Timmel family, the
juvenile court found no probable cause to believe that any of the Timmel children had been
abused or neglect.

ANSWER:      Defendant Smith-Foote admits the first sentence in Paragraph 59.  Plaintiff

is attempting to paraphrase Illinois law and Defendant Smith-Foote avers that the cited law

speaks for itself.  Defendant Smith-Foote admits that at the conclusion of the temporary custody

hearing regarding the Timmel family, the juvenile court found no probable cause. Defendant

Smith-Foote further avers that Plaintiff is attempting to paraphrase the November 20, 2009

juvenile court order dismissing the petition for temporary custody which speaks for itself.

Defendant Smith-Foote denies each and every remaining allegation contained in Paragraph 59.

60. On October 7, 2009, counsel for the Timmels sent to Defendants Griffin and Leggin
the written report of Dr. Sullivan in which he concluded that the probability that the fracture to
R.'s left femur was caused by abuse was extremely low.

ANSWER:      Defendant Smith-Foote admits that on October 7, 2009, counsel for the

Timmels sent to Defendants Griffin, Leggin and Smith-Foote the written report of Dr. Sullivan.

Defendant Smith-Foote avers that Dr. Sullivan concluded as to the fracture to R.'s left femur that

"the probability that this is due to non-accidental trauma is extremely low and the child is at low

risk of further injury." Defendant Smith-Foote denies the remaining allegations contained in

Paragraph 60.

61. Among the opinions and references Defendants ignored was that of Dr. Brian Foley, Laura Timmel's obstetrician. In a letter to DCFS dated October 8, 2009, he stated:

> I was shocked to hear that DCFS was investigating this couple for abuse. I understand the situation warrants attention, and I can understand the unknown cause of the injury could raise suspicion on your department's behalf. However, being a caregiver for this couple for the last four plus years and seeing their interpersonal interactions with each other and their children I found it unfathomable that either is capable of inflicting that type of injury on any child. I would expect your department to do a more thorough investigation and follow up with myself and the Timmel's [sic] pediatrician as to their personalities and parenting skills.

During the DCFS investigation, DCFS Defendants made no attempt to speak with Dr. Foley.

ANSWER: The allegations contained in Paragraph 61 of the Complaint improperly

collectivize the actions of the Defendants and as such do not apprise Defendant Smith-Foote of

what she is charged with. Defendant Smith-Foote admits that during the DCFS investigation she

made no attempt to speak to Dr. Foley. Defendant Smith-Foote denies that she ignored Dr.

Foley's October 8, 2009 letter which speaks for itself and denies each and every remaining

allegation contained in Paragraph 61.

62. During the DCFS investigation, nobody from DCFS, including the Defendants, spoke with Dr. Danielle Cherian, the primary care pediatrician for R. and the other two Timmel children.

ANSWER: Defendant Smith-Foote admits that Dr. Danielle Cherian was the primary

care physician for R. and the other Timmel children. Defendant Smith-Foote admits that she did

not speak to Dr. Cherian during the DCFS investigation. The remaining allegations contained in

Paragraph 62 of the Complaint improperly collectivize the actions of the Defendants and as such

do not apprise Defendant Smith-Foote of what she is charged with, and therefore Defendant

Smith-Foote denies the remaining allegations contained in Paragraph 62.

63. Throughout the ensuing juvenile court hearing as to whether there was probable cause to believe R. was abused by either Brian or Laura Timmel (or both), Defendants Griffin and Leggin pointed exclusively to Estes' MPEEC report and opinions as the exclusive source of the factual allegations throughout this case. On October 14, 2009, Defendant Griffin testified that DCFS did not need to consider the opinions of orthopedists because "we had our MPEEC report" and "we decided to go with our MPEEC report." This exclusive reliance on Dr. Estes' opinion, and refusal to consider the opinions and testimony of others, was unreasonable on its own terms for Dr. Estes herself acknowledged, in testimony given on October 16, that an MPEEC report is *not* by itself a complete child abuse investigation. It was the responsibility of DCFS, assigned to Defendants Griffin and Leggin, and not of the MPEEC team, to make investigative contacts confirming or rebutting a parents' account of the facts.

ANSWER: Defendant Smith-Foote admits that in the juvenile court hearing as to

whether there was probable cause to believe R. was abused by either Brian or Laura Timmel,

Defendant Griffin and Dr. Estes testified and that their testimony speaks for itself in the context

in which it was given. Defendant Smith-Foote admits that she relied on Dr. Estes's MPEEC

report and admits that it was the responsibility of DCFS, assigned to Defendants Griffin and

Leggin to make investigative contacts and not the responsibility of the MPEEC team. Defendant

Smith-Foote denies that Defendant Leggin testified in the juvenile court proceeding and denies

each and every remaining allegation contained in Paragraph 63.

64. In addition to failing to investigate medical evidence and eyewitness accounts, the DCFS Defendants failed to investigate any facts that would either confirm or refute the credibility and good character of the Timmels, as persons and as parents. Indeed, they held it as a mark against them that they had personal relationships with federal judges, lawyers, and doctors and refused to speak to any of these individuals prior to taking protective custody, and for days after initiating the juvenile court action. At the same time, Defendant Griffin claimed she had "no opinion" as to Laura's denial of abuse and acknowledged that the parents acted appropriately with their children and that she had no reports that they had ever behaved other than as model parents. In addition, the DCFS Defendants also refused to consider at all relevant the fact that Laura Timmel had a career working extensively with children as a school social worker and as a social worker in the Division of Specialized Services for Children.

ANSWER: Defendant Smith-Foote admits that Defendant Griffin testified in the

juvenile court hearing as to Laura's denial of abuse and that testimony speaks for itself in the

context in which it was given. The remaining allegations contained in Paragraph 64 of the

Complaint improperly collectivize the actions of the Defendants and as such do not apprise

Defendant Smith-Foote of what she is charged with, and Defendant Smith-Foote denies the

remaining allegations contained in Paragraph 64.

65. Even though Dr. Este's opinion was the sole opinion upon which the DCFS
Defendants relied, Dr. Estes' opinion was not as strongly inculpatory as the Defendants Griffin
and Leggin assumed: she had no opinion as to *who* had abused R., nor as to whether custody of
the children should have been taken, nor as to whether either parent posed any danger to the
children, nor as to whether the parents should be allowed to be alone with their children and she
acknowledged that siblings can cause a fracture in a newborn baby and that infants being
removed from car seats or baby carriers can experience a leg fracture.

ANSWER: Defendant Smith-Foote denies Plaintiff's characterization of Dr. Estes'

testimony Dr. Estes' testimony in the juvenile court hearing and avers that her testimony speaks

for itself in the context in which it was given. Defendant Smith-Foote denies the remaining

allegations contained in Paragraph 65.

66. On October 16, 2009, though the juvenile court "probable cause" hearing had not yet
concluded, the juvenile court directed that the Timmels should be allowed to return to their home
under supervision, over the objection of DCFS counsel, representing Defendants Leggin, Griffin,
and Smith-Foote. On November 4, 2009, the juvenile court allowed the Timmels unsupervised
visits with their children, again over the objection of DCFS counsel. Throughout the proceedings
in the juvenile court, Defendants Griffin and Leggin continued to press for a finding of abuse
against both of the Timmels, even though they had failed to consider all the exculpatory evidence
set forth above.

ANSWER: Defendant Smith-Foote admits that the juvenile court held a "probable

cause" hearing on October 16, 2009 which did not conclude on that date and admits that the

juvenile court entered an order on that date which speaks for itself. Defendant Smith-Foote

admits that on November 4, 2009, the juvenile court entered an order and that order speaks for

itself. Defendant Smith-Foote denies that DCFS counsel represented Defendants Griffin, Leggin

and Smith-Foote in the juvenile court proceedings and avers that the Cook County State's

Attorney represented the People of the State of Illinois in the Petitions for Adjudication of

Wardship of the Timmel children and that Defendant Griffin testified as a witness in those

proceedings. Defendant Smith-Foote denies each and every remaining allegation contained in

Paragraph 66.

67. In the course of the juvenile court proceedings, while claiming to follow the law governing her investigation, *see* ¶ 43 *supra*, Defendant Griffin testified she was not aware of the DCFS requirement that she obtain the opinion of an orthopedist. DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, at subsections (C)(2)(F) and (C)(4)(E).

ANSWER: Plaintiff is attempting to paraphrase DCFS Procedure and Defendant

Smith-Foote avers that the cited DCFS Procedure speaks for itself. Defendant Smith-Foote

admits that Defendant Griffin testified in the juvenile court proceedings to following the law

governing her investigation and that her testimony speaks for itself in the context in which it was

given. Defendant Smith-Foote denies each and every remaining allegation contained in

Paragraph 67.

68. On November 4, R.'s treating orthopedist at CMH, Dr. Sagan, testified in the juvenile court proceedings that she could not conclude R. was more likely than not to have been abused based on available evidence. Dr. Sagan also disagreed with the "inconsolable cry" theory put forth by Dr. Estes as the linchpin of her contention that R. was abused.

ANSWER: Defendant Smith-Foote admits that on November 4, 2009, Dr. Sagan

testified in the juvenile court proceedings and her testimony speaks for itself in the context in

which it was given. Defendant Smith-Foote denies Plaintiff's characterization of Dr. Sagan's

testimony and Dr. Estes's testimony in juvenile court proceedings and avers that their testimony

speaks for itself in the context in which it was given. Defendant Smith-Foote denies Plaintiff's

characterization of Dr. Estes' theory and denies each and every remaining allegation contained in

Paragraph 68.

69. On November 20, 2009, after five separate days of hearing and closing arguments, the juvenile court ruled that there was no probable cause to believe R. Timmel had been abused. The court found the testimony of Brian and Laura Timmel "clear and compelling." The court also found Dr. Sullivan's testimony to be "convincing." Upon finding no probable cause, the court dismissed the Petition for Adjudication of Wardship as to the Timmel children.

ANSWER: Defendant Smith-Foote admits that on November 20, 2009 after five

separate days of hearing and closing argument, the juvenile court ruled that there was no

probable cause and dismissed the Petition for Adjudication of Wardship as to the Timmel

children.  Defendant Smith-Foote denies that Plaintiff's quotation is accurate as to the court's

finding regarding the testimony of Brian and Laura Timmel and the testimony of Dr. Sullivan

and therefore denies each and every remaining allegation contained in Paragraph 69.

70. Despite the judicial finding that R. was not abused and that there was not even probable cause to believe that he had been abused, DCFS Defendants Griffin, Leggin, and Smith-Foote continued to pursue the investigation they had started on September 10 rather than close it out immediately, as the finding of no probable cause required. The sole change in the focus of the ongoing investigation they started on September 10 was that they narrowed their focus to only Plaintiff Laura Timmel, not Brian Timmel.

ANSWER:    Defendant Smith-Foote denies the allegations contained in Paragraph 70.

71. On December 3, 2009, Defendant Griffin issued a recommended decision, approved by Defendants Leggin and Smith-Foote, that the report of abuse be "indicated" as to Laura Timmel only. The Defendants issued a notice of their intent to indicate the report against her and sent her an Investigation Summary. This Summary recites their continuing reliance on the opinion of Dr. Estes and omits mention of Dr. Sagan altogether.

ANSWER:    Defendant Smith-Foote admits that Defendant Griffin recommended that

the report of abuse against Laura Timmel be indicated and that she and Defendant Leggin

approved the recommendation.  Defendant Smith-Foote admits that on December 3, 2009, DCFS

issued Laura Timmel a notice of intent to indicate a childcare worker and sent Laura Timmel an

Investigation Summary.  Defendant Smith-Foote avers that the summary speaks for itself and

denies Plaintiff's characterization of the summary is accurate.  The remaining allegations

contained in Paragraph 71 of the Complaint improperly collectivize the actions of the Defendants

and as such do not apprise Defendant Smith-Foote of what she is charged with, and therefore

Defendant Smith-Foote denies the remaining allegations contained in Paragraph 71.

72. As was her right pursuant to the *Dupuy* decisions, Plaintiff Laura Timmel invoked her right to an Administrator's Conference and retained counsel, at significant continued expense, in order to present to the DCFS administrator the mountain of exculpatory evidence she had by now collected. On December 15, 2009, Defendant Miller convened an Administrator's Conference in which Defendants Griffin and Leggin participated.

ANSWER:      Defendant Smith-Foote admits that Laura Timmel invoked her right to an

Administrator's Conference and retained counsel; and admits that Defendant Miller convened

the Administrator's Conference, and admits that Defendants Griffin and Leggin participated.

Defendant Smith-Foote denies each and every remaining allegation contained in Paragraph 72.

73. During the December 15 conference, Defendants Griffin and Leggin stated they still had not interviewed Dr. Sagan, they were not aware of Dr. Sagan's involvement in this case, and they "[didn't] know who she [was]" even though the juvenile court's November 20 ruling specifically cites Dr. Sagan's opinion and her testimony.

ANSWER:      Defendant Smith-Foote admits that Defendant Griffin and Defendant

Leggin participated in the December 15, 2009 Administrator's Conference.  Defendant Smith-

Foote is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations contained in Paragraph 73 and therefore denies the remaining allegations

contained in Paragraph 73.

74. Defendant Griffin and Defendant Leggin asserted that they had read the juvenile court's final order in the case, but it was clear from their statements during the December 15 Administrator's Conference that they did not consider it, apply it, or obey it, and nor did Defendant Smith-Foote, who on November 24, 2009, had personally approved the indicated finding recommendation.

ANSWER:  Defendant Smith-Foote denies the allegations contained in Paragraph 74.

75. Despite the overwhelming and legally binding exculpatory evidence that had already been determined to preclude a finding of abuse as to Laura Timmel, including a binding and final court order, on or about January 8, 2010, Defendant Maria Miller affirmed the recommendation to indicate Laura Timmel as guilty of child abuse in causing the fracture of her son R.'s leg and as guilty of child neglect in creating a substantial risk of physical injury as to N. and B..  No rationale for overriding the juvenile court's final order was provided in Defendant Miller's decision to indicate Laura, nor have any of the Defendants provided any explanation for their decision to override and ignore the juvenile court's order (such as a claim of newly-discovered evidence, as there was none).

ANSWER:      Defendant Smith-Foote admits that Defendant Miller affirmed the

recommendation to indicate Laura Timmel as guilty of child abuse in causing the fracture of her

son R.'s leg and as guilty of child neglect in creating a substantial risk of physical injury as to N.

and B.  Defendant Smith-Foote denies Plaintiff's characterization of Defendant Miller's

recommended opinion and avers that Defendant Miller's recommended opinion speaks for itself.

Defendant Smith-Foote denies each and every remaining allegation contained in Paragraph 75.

76.     Based upon Defendant Miller's decision to affirm the recommended indicated
finding, Laura Timmel's name was entered into the State Central Register as a perpetrator of
child abuse and neglect.  Absent a successful appeal, by operation of law the Registry would
continue for 20 years and would bar Laura from working in any social work position during that
time.  It would also prevent her from volunteering at her children's school, becoming a scout
leader and had a chilling effect on Laura's ability to pursue activities with her children while the
finding remained on the register.

ANSWER:     Defendant Smith-Foote admits that there was an indicated finding and that

Laura Timmel's name was placed on the State Central Register as a perpetrator of child abuse.

Defendant Smith-Foote also admits that Defendant Miller affirmed the recommendation to

indicate Laura Timmel for child abuse.  The remaining allegations in Paragraph 76 are

hypothetical and Defendant Smith-Foote denies the remaining allegations.

77.     Plaintiff Timmel appealed the indicated finding that had been registered against
her and requested an expedited hearing as was her right as a *Dupuy* class member.  She retained
counsel at considerable expense to present her case for expungement to the assigned DCFS
administrative law judge on her behalf.

ANSWER:     Defendant Smith-Foote admits that Plaintiff appealed the indicated

finding, requested and expedited hearing and retained counsel to present her case for

expungement to the assigned DCFS administrative law judge on her behalf.  Defendant Smith-

Foote denies each and every remaining allegation contained in Paragraph 77.

78.     On or about February 19, 2010, DCFS Director Erwin McEwen approved the
administrative law judge's recommended order granting Plaintiff Timmel's request for
expungement of the indicated findings on the basis of the November 20, 2009, juvenile court
order that exonerated Plaintiff Timmel of any alleged wrongdoing.

ANSWER:     Defendant Smith-Foote admits that on or about February 19, 2010, DCFS

Director Erwin McEwen approved the administrative law judge's recommended order granting

Plaintiff Timmel's request for expungement of the indicated findings on the basis of the

November 20, 2009 juvenile court order. Defendant Smith-Foote denies the remaining

allegations contained in Paragraph 78.

79. On information and belief, Defendants Griffin, Leggin, and Smith-Foote recommended indicating Laura Timmel in retaliation for her assertion of her rights, for her refusal to turn her children over to DCFS on the evening of October 1, for her prevailing before the juvenile court, and/or in order to exercise arbitrary power against her, all in violation of her substantive due process rights.

ANSWER:     Defendant Smith-Foote denies the allegations contained in Paragraph 79.

80.  In addition to causing her to expend money on legal fees in order to clear her name, the decision to indicate Plaintiff Laura Timmel caused her extreme emotional distress, including fear for her future ability to work in her chosen career (given an indicated finding of bone fractures is registered for 20 years), concern as to her ability to be involved in her children's schooling and after-school activities,  intense fear about any future accidents that might occur to her children,  and a reasonably-based belief that she was being persecuted and harassed by governmental officials who might again seize her children or undertake other unwarranted actions against her.

ANSWER:     Defendant Smith-Foote denies the allegations contained in Paragraph 80.

81. At all relevant times, Defendants Griffin, Leggin, Smith-Foote, and Miller acted with respect to Plaintiff Timmel under color of state law.

ANSWER:  Defendant Smith-Foote admits that she acted under color of state law.

Defendant Smith-Foote denies each and every remaining allegation contained in Paragraph 81.

82. After the case with DCFS and Laura Timmel was completely closed, the Timmels continued to receive medical care and treatment for R.  In early January, 2011, R. was diagnosed with a condition that is consistent with higher-than-normal pain tolerance, a symptom that the Timmels have consistently reported was the case for R. since he was a baby.

ANSWER:     Defendant Smith-Foote is without knowledge or information sufficient to

form a belief as to the truth of the allegations contained in Paragraph 82. To the extent an answer

is required, Defendant Smith-Foote denies the allegations contained in Paragraph 82.

83.     Defendants Griffin, Leggin, Smith-Foote, and Miller violated Plaintiff Laura Timmel's clearly established rights, about which a reasonable person in their position should have known.

ANSWER:     Defendant Smith-Foote denies the allegations contained in Paragraph 83.

84.  In recommending and in issuing an indicated finding against Laura Timmel,

32

Defendants Griffin, Leggin, Smith-Foote, and Miller each acted intentionally or recklessly or with deliberate indifference to the consequences of their actions.

      ANSWER:     Defendant Smith-Foote denies the allegations contained in Paragraph 84.

      85.   Defendants' actions complained of herein have caused severe and long-lasting harm and long-lasting injury to Plaintiff. Plaintiff Timmel's right to pursue her career was seriously threatened without basis and without constitutionally required process. Defendants' actions complained of herein proximately caused her emotional and financial harm. Plaintiff is entitled to compensatory damages in an amount not less than $50,000 from each Defendant, jointly and severally.

      ANSWER:     Defendant Smith-Foote denies the allegations contained in Paragraph 85.

      86.   Defendants Griffin and Leggin acted with callous disregard for the rights of Plaintiff. Plaintiff seeks punitive damages against defendants Griffin and Leggin.

      ANSWER:     Defendant Smith-Foote denies the allegations contained in Paragraph 86.

      87.   Plaintiff also seeks a declaratory judgment in her favor as to the claims set forth in this Count, an award of civil rights attorneys' fees pursuant to 42 U.S.C. § 1988 and costs against all Defendants, jointly and severally, and such other relief as this Court deems just and equitable.

      ANSWER:     Defendant Smith-Foote denies the allegations contained in Paragraph 87.

## AFFIRMATIVE DEFENSES

For her affirmative defenses, Defendant Smith-Foote states as follows:

### FIRST AFFIRMATIVE DEFENSE

The allegations in Plaintiffs' Amended Complaint against Defendant Smith-Foote fail to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Defendant Smith-Foote affirmatively states that actions taken relating to the underlying allegations in this Amended Complaint were in conformance with all applicable constitutional, statutory, and regulatory rules of law.

### THIRD AFFIRMATIVE DEFENSE

This Court lacks jurisdiction to award the relief requested in the Complaint.

### FOURTH AFFIRMATIVE DEFENSE

Defendant Smith-Foote affirmatively states that her alleged conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known, and she is therefore entitled to qualified immunity from civil damages.

### FIFTH AFFIRMATIVE DEFENSE

Defendant affirmative states that she is entitled to absolute prosecutorial immunity for actions taken in this matter related to the juvenile court matter.

### SIXTH AFFIRMATIVE DEFENSE

Defendant affirmative states that she is entitled to absolute quasi-judicial immunity for actions taken in this matter pursuant to a court order.

### JURY DEMAND

Defendant Smith-Foote requests trial by jury.

Respectfully submitted,

LISA MADIGAN
Illinois Attorney General

By:   s/Barbara L. Greenspan
Barbara L. Greenspan
Teresa M. Cullen
Assistant Attorneys General
100 W. Randolph St., 11-200
Chicago, Illinois  60601
(312) 814-7087
(312) 814-6833

Erin R. Gard, Senior Law Clerk,
Assisted in the preparation of this Answer.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LAURA TIMMEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 11 C 6034 |
| JANICE GRIFFIN, DCFS Investigator, in her individual | ) | James B. Zagel |
| capacity, KENNETH LEGGIN, DCFS Supervisor, | ) | Judge Presiding |
| in his individual capacity, KIMBERLY SMITH-FOOTE, | ) | |
| Child Protection Manager, in her individual capacity, | ) | |
| and MARIA MILLER, DCFS Administrator, in her | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>DEFENDANT MARIA MILLER'S AMENDED ANSWER</u>

1.      This civil rights complaint, brought pursuant to 42 U.S.C. § 1983, seeks redress
for the actions of four employees of the Division of Child Protection of the Illinois Department
of Children and Family Services ("DCFS") that deprived Plaintiff Laura Timmel of her rights to
due process under the Fourteenth Amendment to the United States Constitution.  Defendants
refused to consider plainly exculpatory evidence that any responsible child protection
investigator or administrator in their position would consider and, in flagrant disregard of this
evidence, unconstitutionally caused the impairment of Plaintiff Laura Timmel's constitutionally
protected liberty interest in her career as a social worker.

     ANSWER:      Defendant Miller admits that Plaintiff purports to bring this action

pursuant to 42 U.S.C. § 1983. Defendant Miller denies each and every remaining allegation

contained in Paragraph 1.

2.      Laura Timmel sues all four Defendants for violation of their clearly-established
constitutional duty to fully consider all available exculpatory evidence before they issue and
register a so-called "indicated" finding of abuse or neglect against any professional pursuing a
career working with children, such as a social worker. The Defendants also violated a basic
principle of law by disregarding the state circuit court order finding "no probable cause" that had
already exonerated Plaintiff Laura Timmel and, oblivious to the requirement that they respect
final legal rulings, they proceeded to indicate Laura as guilty of child abuse, placing her name in
the State Central Register ("Register") despite the state circuit court's order that had exonerated
her of any wrongdoing as to her children.

     ANSWER:      Defendant Miller admits that Laura Timmel sues all four Defendants and

admits that Laura Timmel was indicated of child abuse, and that her name was placed on the State Central Register. Paragraph 2 of the Complaint improperly collectivizes the actions of the Defendants and as such does not apprise Defendant Miller of what she is charged with and she therefore denies each and every remaining allegation contained in Paragraph 2.

3. The DCFS Defendants' decision to "indicate" Plaintiff for child abuse in derogation of the juvenile court's order impaired her ability to function as a mother, threatened permanently to ruin her career and her ability to support herself and her children, and caused her great emotional distress. Plaintiff Timmel was compelled to expend thousands of dollars to exculpate herself from this utterly baseless indicated finding, issued against her without due process of law. As relief from these injuries in violation of Plaintiff's constitutional rights, she seeks compensatory damages, an award of punitive damages, and an award of attorneys' fees under 42 U.S.C. § 1988 and costs.

ANSWER: Defendant Miller denies the allegations contained in Paragraph 3.

4. This Court has jurisdiction over Plaintiff's claims below pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343.

ANSWER: Defendant Miller admits that if this action were proper, this Court would have jurisdiction under 28 U.S.C. §§ 1331 and 1343(3). Defendant Miller denies each and every remaining allegation contained in Paragraph 4.

5. Venue is proper in this district under 28 U.S.C. § 1391 because:

(a) the Northern District of Illinois is the judicial district in which substantially all of the events or omissions giving rise to Plaintiff's claims occurred; and

(b) the Defendants Griffin, Leggin, and Smith-Foote are found or are employed in the Northern District of Illinois.

ANSWER: Defendant Miller admits the allegations contained in Paragraph 5 and its subparts.

6. Plaintiff Laura Timmel, a licensed clinical social worker who holds a degree with honors from Jane Addams School of Social Work at the University of Illinois, resides in Western Springs, Illinois, with her husband Brian Timmel and her three children, N. and B., twins whose birth date is in the summer of 2007, and R., whose birth date is in the late summer of 2009.

ANSWER: Defendant Miller admits that Plaintiff Laura Timmel is a licensed clinical social worker and that she resides with her husband and her three children, N. and B., twins

2

whose birth date is in the summer of 2007, and R., whose birth date is in the late summer of

2009. Defendant Miller is without knowledge or information sufficient to form a belief as to the

truth of the allegations contained in Paragraph 6 and therefore denies the remaining allegations in

Paragraph 6.

7. Defendant Janice Griffin is the DCFS investigator who had primary responsibility for
the investigation as to R. Timmel and for making the determination that Laura Timmel should be
"indicated" for child abuse even after Plaintiff had been cleared of liability by the juvenile court.
She is sued in her individual capacity

ANSWER: Defendant Miller admits that Defendant Griffin is a DCFS investigator

and that she was assigned to the investigation concerning R. Timmel. Defendant Miller admits

that Plaintiff purports to sue Defendant Griffin in her individual capacity. Defendant Miller

denies each and every remaining allegation contained in Paragraph 7.

8. At all times relevant to this complaint, Defendant Kenneth Leggin was Defendant
Griffin's supervisor, and in that capacity he had responsibility for directing the investigation as
to R. Timmel and overseeing and approving the recommendations of Defendant Griffin. He is
sued in his individual capacity.

ANSWER: Defendant Miller admits that Defendant Kenneth Leggin was Defendant

Griffin's supervisor, and in that capacity he had responsibility for directing the investigation as

to R. Timmel and overseeing and approving the recommendations of Defendant Griffin.

Defendant Miller admits that Plaintiff purports to sue Defendant Leggin in his individual

capacity.

9. Defendant Kimberly Smith-Foote is a Child Protection Manager, and at all times
relevant to this complaint, she was the direct supervisor of Defendant Leggin. She approved the
decision to recommend indicating Laura Timmel for child abuse on November 24, four days
after the juvenile court exonerated Plaintiff. Defendant Smith-Foote is sued in her individual
capacity.

ANSWER: Defendant Miller admits that Defendant Smith-Foote is a Child Protection

Manager and was the direct supervisor of Defendant Leggin. Defendant Miller admits that

Defendant Smith-Foote approved the decision to recommend indicating Laura Timmel for child

abuse on November 24. Defendant Miller admits that Plaintiff purports to sue Defendant Smith-Foote in her individual capacity and denies each and every remaining allegation in Paragraph 9.

10.   At all times relevant to this complaint, Defendant Maria Miller was a DCFS administrator for the Central Region of DCFS. Defendant Miller was the assigned administrator who made the final review of the recommendation to indicate Plaintiff Timmel and, as such, Defendant Miller made the ultimate decision to register Plaintiff Timmel as a perpetrator of child abuse.

ANSWER:   Defendant Miller admits that she was a DCFS administrator for the

Central Region of DCFS, that she was the assigned administrator who made the final review of

the recommendation to indicate Plaintiff Timmel. Defendant Miller avers that she concurred with

the field recommendation to indicate Plaintiff as a perpetrator of child abuse and denies each and

every remaining allegation in Paragraph 10.

11.   Pursuant to the Illinois Abused and Neglected Child Reporting Act ("ANCRA"), 325 ILCS 5/1 *et seq*, DCFS receives Hotline calls when any person makes a call based upon "reasonable cause to believe a child may be an abused child or a neglected child." 325 ILCS 5/4, 5/7, 5/7.6.

ANSWER:   Paragraph 11 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Miller avers that the cited

law speaks for itself. Defendant Miller denies each and every remaining allegation contained in

Paragraph 11 inconsistent with the law. To the extent an answer is required, Defendant Miller

denies the allegations contained in Paragraph 11.

12.   Under ANCRA, and consistent with a federal law known as the Child Abuse Prevention and Treatment Act (alternatively called "the Mondale Act,"), 42 U.S.C. 5101 *et seq.*, 42 U.S.C. 5116 *et seq.*, certain persons are "mandated reporters" of child abuse if a child known to them in their professional capacity is reasonably suspected of being an abused or neglected child. Persons other than mandated reporters are permitted to make such reports, though they are not penalized by law for failure to report; however, mandated reporters may be subject to criminal and civil penalties if they fail to report reasonably suspected child abuse. 325 ILCS 5/4, 5/4.02.

ANSWER:   Paragraph 12 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Miller avers that the cited

law speaks for itself. Defendant Miller denies each and every remaining allegation contained in

Paragraph 12 inconsistent with the law. To the extent an answer is required, Defendant Miller

denies the allegations contained in Paragraph 12.

13. ANCRA requires that DCFS promptly initiate an investigation of the merits of calls it accepts, sometimes working jointly with law enforcement authorities if the allegations in the call give rise to a potential criminal complaint. *Id.* at 5/7, 5/7.3, 5/7.4.

ANSWER: Paragraph 13 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Miller avers that the cited

law speaks for itself. Defendant Miller denies each and every remaining allegation contained in

Paragraph 13 inconsistent with the law. To the extent an answer is required, Defendant Miller

denies the allegations contained in Paragraph 13.

14. To be accepted as a Hotline call and subject to an investigation, the specific incident of harm alleged in the report must meet an allegation definition in the DCFS allegation system. Each of these allegations is defined in DCFS Manual of Rules and Procedures 300, Appendix B. *See* 89 Ill. Admin. Code § 300, App'x B. Physical abuse allegations, which are coded with a one- or two-digit number under 50 in the DCFS allegation coding system, include specific allegations of harm alleged to have been caused by the direct action of an alleged perpetrator, including "#2 Head Injuries"; "#5 Burns"; "#7 Wounds"; "#9 Bone Fractures"; "#10 Substantial Risk of Physical Injury"; "#11 Cuts, Bruises, Welts, Abrasions and Oral Injuries"; "#12 Human Bites"; and "#16 Torture." Neglect allegations of harm, which are coded with a two-digit number greater than 50, include injuries that are alleged to have been caused by the blatant disregard of the alleged perpetrator (such as "#52 Head Injuries," "#57 Bone Fractures," and "#62 Human Bites") as well as additional defined areas of harm to children, such as "#74 Inadequate Supervision" and "#79 Medical Neglect."

ANSWER: Paragraph 14 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Miller avers that the cited

law speaks for itself. Defendant Miller denies each and every remaining allegation contained in

Paragraph 14 inconsistent with the law. To the extent an answer is required, Defendant Miller

denies the allegations contained in Paragraph 14.

15. The specific allegations relevant to the investigation and indicated findings involving the Timmel children are allegation of harm "#9 Bone Fractures by Abuse" (alleged as to R. Timmel due to a fracture he sustained to his left femur in September 2009) and allegation of harm "#60 Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by

Neglect" (alleged as to N. and B. Timmel insofar as they were assumed to be at risk of harm as a result of the injury to R.).

ANSWER: Defendant Miller admits the allegations in Paragraph 15 and avers that

Paragraph 15 calls for a legal conclusion to which no answer is required. Also, Plaintiff is

attempting to paraphrase Illinois law and Defendant Miller avers that the cited law speaks for

itself.

16. DCFS regulations require DCFS to complete investigations of Hotline calls within 60 days, except where this time may be extended for good cause. 325 ILCS 5/7.12. At the conclusion of the investigation, DCFS investigators determine if the allegations under investigation are "indicated"—meaning that some credible evidence of abuse or neglect was found—or "unfounded"—meaning that DCFS did not find credible evidence of abuse or neglect. *Id*.

ANSWER: Paragraph 16 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Miller avers that the cited

law speaks for itself. Defendant Miller denies each and every remaining allegation contained in

Paragraph 16 inconsistent with the law. To the extent an answer is required, Defendant Miller

denies the allegations contained in Paragraph 16.

17. The final determination of "indicated" or "unfounded" must be reported forthwith to the Register. *Id* at 7/7, 7/12. However, if an individual is licensed to work with children or otherwise is engaged in employment involving the care of children, DCFS is not permitted to issue an indicated finding without first allowing the child care professional an opportunity to have the recommendation to "indicate" her reviewed by an administrator by way of an Administrator's Conference. The pre-deprivation Administrator's Conference is one of the procedural due process protections that the federal court, in *Dupuy v. McDonald*, directed DCFS to adopt in order to remedy the then-constitutionally inadequate indicated report decision-making policies as applied to child care professionals. *Dupuy v. McDonald*, 141 F. Supp. 2d 1090 (N.D. Ill. 2001); Preliminary Injunction Memorandum Opinion and Order at *Dupuy v. McDonald*, 2003 U.S. Dist. LEXIS 12019, at *21-26 (N.D. Ill. July 10, 2003), *aff'd in relevant part sub nom Dupuy v. Samuels*, 397 F. 3d 493, 512 (7th Cir. 2005). The requirements for Administrator's Conferences are now codified in DCFS rules and procedures. *See* 89 Ill. Admin. Code § 300.160.

ANSWER: Paragraph 17 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Miller avers that the cited

law speaks for itself. Defendant Miller denies each and every remaining allegation contained in

Paragraph 17 inconsistent with the law. To the extent an answer is required, Defendant Miller

denies the allegations contained in Paragraph 17.

18.  Only if the Administrator, after reviewing the basis for the recommended finding as well as any information or evidence the child care professional presents at the conference, determines that there is sufficient evidence of abuse or neglect, upon consideration of all of the inculpatory as well as the exculpatory evidence,  is DCFS authorized to issue an indicated report and register an individual's name identifying him or her as a perpetrator of child abuse or neglect in the State Central Register. *Dupuy*, U.S. LEXIS 12019, at \*25; 89 Ill. Admin. Code § 300.160(c)(4).

ANSWER:  Paragraph 18 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Miller avers that the cited

law speaks for itself.  Defendant Miller denies each and every remaining allegation contained in

Paragraph 18 inconsistent with the law.  To the extent an answer is required, Defendant Miller

denies the allegations contained in Paragraph 18.

19. Once registered, indicated findings for physical abuse such as bone fractures are registered for a period of 20 years, and indicated findings for most forms of neglect are registered for a period of 5 years. 325 ILCS 5/7.14; DCFS Procedures 300.100(c). These findings are registered and maintained unless the person named as a perpetrator appeals the finding and, at the subsequent administrative hearing, DCFS fails to meet is burden of proof (by a preponderance of the evidence) that the finding should be maintained. 325 ILCS 5/7.16.

ANSWER:  Paragraph 19 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Miller avers that the cited

law speaks for itself.  Defendant Miller denies each and every remaining allegation contained in

Paragraph 19 inconsistent with the law.  To the extent an answer is required, Defendant Miller

denies the allegations contained in Paragraph 19.

20.  At the same time as DCFS investigators are expected to make determinations as to whether allegations of abuse or neglect are "indicated" or "unfounded," they are also authorized by state law to take emergency protective custody of children whom they reasonably believe cannot be cared for at home without endangering their health or safety, but only if there is not time to apply for a court order requesting temporary custody. 325 ILCS 5/5. (Doctors and law enforcement authorities also are given such authority by state law but it is DCFS that has the exclusive responsibility to hold a child in its custody after emergency protective custody has been taken. *Id*.)

ANSWER:  Paragraph 20 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Miller avers that the cited

law speaks for itself.  Defendant Miller denies each and every remaining allegation contained in

Paragraph 20 inconsistent with the law.  To the extent an answer is required, Defendant Miller

denies the allegations contained in Paragraph 20.

21.  If DCFS intends to maintain temporary custody after taking emergency protective custody of a child without a court order, however, the Juvenile Court Act requires: (a) that a Petition for Adjudication of Wardship as to the child be filed within 48 hours of the taking of custody, otherwise the child is to be released back to their parents' care, 705 ILCS 405/2-9; and (b) upon such petition, the court must find that there is "probable cause" to believe the child is abused or neglected, that there is "immediate and urgent necessity" for the safety of the child that he or she be placed outside the custody of his or her parents, and that "reasonable efforts" were made to avoid removing the child from his or her parent, 705 ILCS 405/2-10.

ANSWER:  Paragraph 21 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Miller avers that the cited

law speaks for itself.  Defendant Miller denies each and every remaining allegation contained in

Paragraph 21 inconsistent with the law.  To the extent an answer is required, Defendant Miller

denies the allegations contained in Paragraph 21.

22.  DCFS rules and regulations set forth detailed requirements as to the types of evidence to be considered in each type of investigation.  For example, in an investigation of an allegation of "Bone Fractures," DCFS Procedures 300, Appendix B, provide that DCFS investigators must consider the opinion of radiologists or orthopedists and the procedures direct investigators to weight the opinion of doctors with higher degrees of relevant specialization more highly than the opinions of less specialized doctors.

ANSWER:  Paragraph 22 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Miller avers that the cited

law speaks for itself.  Defendant Miller denies each and every remaining allegation contained in

Paragraph 22 inconsistent with the law.  To the extent an answer is required, Defendant Miller

denies the allegations contained in Paragraph 22.

23. Any person who is indicated for child abuse or neglect has the right to appeal the finding to a neutral decision-maker—a DCFS administrative law judge. 325 ILCS 5/7.16, 89 Ill. Admin. Code § 336, "Appeal of Child Abuse and Neglect Investigation Findings." Ordinarily, such appeals must be decided within 90 days, *Lyon v. Dep't of Children & Family Servs.*, 209 Ill.

2d 264, 807 N.E.2d 423 (Ill. 2004); 89 Ill. Admin. Code § 336.220, but for persons who work with children (i.e., *Dupuy* class members, *see* ¶ 17 *supra*), DCFS is required to issue a final administrative hearing decision within 35 days of the filing of an administrative appeal request if the child care professional has requested an expedited appeal, *Dupuy*, LEXIS 12019, at \*26-29; 89 Ill. Admin. Code § 336.85.

ANSWER:  Paragraph 23 calls for a legal conclusion to which no answer is required.

Also, Plaintiff is attempting to paraphrase Illinois law and Defendant Miller avers that the cited

law speaks for itself.  Defendant Miller denies each and every remaining allegation contained in

Paragraph 23 inconsistent with the law.  To the extent an answer is required, Defendant Miller

denies the allegations contained in Paragraph 23.

24. Prior to the Hotline call in this case, which occurred in the late evening on Thursday, September 10, 2009, Laura Timmel's sole contact with DCFS had been as a Licensed Clinical Social Worker herself: she had been employed as a social worker by the Division of Specialized Care for Children and, before that, as a school-based social worker. In these capacities, Laura Timmel herself had several occasions to contact the Hotline as a mandated child abuse reporter seeking help for children she reasonably believed were seriously abused or neglected and required DCFS's intervention.

ANSWER:     Defendant Miller admits that a hotline call was placed and avers that it

occurred on September 11, 2009 at 12:18 a.m. Defendant Miller is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

Paragraph 24.  To the extent an answer is required, Defendant Miller denies the remaining

allegations contained in Paragraph 24.

25.  Neither Plaintiff Laura Timmel nor her husband Brian ever had any prior interaction with law enforcement either, except for traffic stops.

ANSWER:     Defendant Miller is without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 25.  To the extent an answer is

required, Defendant Miller denies the allegations contained in Paragraph 25.

26.  During the week leading up to the Hotline call that gave rise to this action, Laura Timmel had been the primary caregiver for her three children, except during a few hours when her husband Brian Timmel watched the children.

ANSWER:     Defendant Miller is without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 26. To the extent an answer is

required, Defendant Miller denies the allegations contained in Paragraph 26.

27. On the morning of Thursday, September 10, 2009, Laura took R., who was then four weeks old, to a medical appointment with an audiologist at Children's Memorial Hospital and left the twins, who were then two years old, at home with her husband for the day. After the medical appointment, Laura visited friend and former neighbor John Matthew Peluse and changed R.'s diaper and nursed R. while there, then went for lunch at a Panera Bread restaurant before going to a hair salon appointment in the afternoon. She returned home with R. in the late afternoon.

ANSWER: Defendant Miller is without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 27. To the extent an answer is

required, Defendant Miller denies the allegations contained in Paragraph 27.

28. While at the hair salon, Laura nursed R. and changed R.'s diaper. As she placed R. in his car seat to leave, Laura noticed that R.'s leg seemed slightly swollen and asked the stylist, Sasha Staerkel, who had recently held R. for several minutes, if it appeared swollen to her. The stylist said that it did perhaps look a little different from the other leg. The stylist later testified that she did not think that R.'s leg looked injured.

ANSWER: Defendant Miller is without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 28. To the extent an answer is

required, Defendant Miller denies the allegations contained in Paragraph 28.

29. During the entire time Laura and R. were at the salon, R. appeared content and comfortable with no unusual crying or behaviors suggesting that he had been injured in any way. Indeed, despite Laura having been in public with R. all day on September 10, no one—including medical staff with whom Laura and R. had contact on September 10—had any concern about R.'s condition.

ANSWER: Defendant Miller is without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 29. To the extent an answer is

required, Defendant Miller denies the allegations contained in Paragraph 29.

30. Laura and R. returned home in the late afternoon shortly before Brian and the twins came home. When Brian arrived home, he held R. because he hadn't seen him all day, and he did not notice anything unusual about R.

ANSWER: Defendant Miller is without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 30. To the extent an answer is

required, Defendant Miller denies the allegations contained in Paragraph 30.

31. At approximately 5:00 p.m., Laura fed R. and then changed R.'s diaper and clothes, taking note that his left leg still appeared as though it might be a little swollen. R. was not exhibiting any signs of distress or pain.

ANSWER:    Defendant Miller is without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 31. To the extent an answer is

required, Defendant Miller denies the allegations contained in Paragraph 31.

32. That evening, Laura prepared dinner for the family and R. was placed in his swing while the family ate. At about 7:00 p.m., after dinner, Laura went to change R.'s diaper and noticed that his left leg had become extremely swollen and that his leg seemed slightly out of alignment.  When Laura moved his leg to change his diaper, he cried out in pain but he did not cry inconsolably.  She called to Brian to take a look at R.'s leg, whereupon both Laura and Brian agreed that it looked like R. might have been bitten by a spider or insect.

ANSWER:    Defendant Miller is without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 32. To the extent an answer is

required, Defendant Miller denies the allegations contained in Paragraph 32.

33. Because the Timmels had just moved to the western suburbs from Chicago, they called one of their new neighbors for a recommendation as to where to take R. to be examined by a doctor.  Upon receiving the recommendation to take R. to Hinsdale Hospital, Brian Timmel took R. there while Laura remained home with the twins.

ANSWER:    Defendant Miller is without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 33.  To the extent an answer is

required, Defendant Miller denies the allegations contained in Paragraph 33.

34.  While at Hinsdale Hospital, R. was examined by several medical personnel, including Nurse Robert Ditto and an emergency room doctor.  At approximately 11:00 p.m., the ER doctor informed Brian Timmel that an x-ray had identified a fracture to R.'s left femur and that DCFS would be called based on a suspicion that the fracture may have been caused by child abuse.

ANSWER:    Defendant Miller is without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 34.  To the extent an answer is

required, Defendant Miller denies the allegations contained in Paragraph 34.

35.  After Brian notified Laura that R. had a fracture to his leg, Laura arranged for a neighbor to sit with the twins and she met Brian at Hinsdale Hospital. Medical personnel at Hinsdale recommended transferring R. to Children's Memorial Hospital ("CMH") and Brian and Laura acted in accordance with this recommendation.  Laura travelled by ambulance to CMH with R. while Brian returned home to care for the twins.

ANSWER:     Defendant Miller is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35. To the extent an answer is required, Defendant Miller denies the allegations contained in Paragraph 35.

36. Upon arriving at CMH at approximately 1:00 a.m. on Friday, September 11, Laura was interviewed by the DCFS on-call investigator Moises Cruz, who was considered the "mandate worker"—i.e., the DCFS investigator who was assigned to see R. within 24 hours of the Hotline Call.  Mr. Cruz directed Laura to immediately arrange for someone to supervise Brian's and her own contact with their children at all times. Mr. Cruz threatened Laura that if she did not immediately make such an arrangement, he would take protective custody of all of her children.

ANSWER:     Defendant Miller admits the first sentence of Paragraph 36.  Defendant Miller denies the remaining allegations contained in Paragraph 36.

37. During the early morning hours of September 11, Mr. Cruz also visited the family home and spoke with Brian. Brian and Laura made immediate arrangements for Brian's mother, Janice Timmel, to travel to Chicago from Cincinnati, Ohio, in order to supervise Brian and Laura, and also arranged for a neighbor to supervise their contact until Janice Timmel could arrive.

ANSWER:     Defendant Miller admits the allegations contained in Paragraph 37.

38. While at the hospital on September 11, Laura was also interviewed by Dr. Sarah Monahan-Estes ("Estes"), a non-board-certified fellow with CMH's Child Protective Unit. This unit is part of MPEEC (Multidisciplinary Pediatric Education and Evaluation Consortium), a consortium of child abuse divisions at area hospitals that provide evaluations to DCFS. Unbeknownst to Laura at the time, pursuant to a pre-existing contract between CMH and DCFS, Dr. Estes would be reporting her conclusions directly to DCFS, and specifically to Defendant Griffin, and not to them as parents.

ANSWER:     Defendant Miller admits that on September 11, Laura Timmel was interviewed by Dr. Sarah Monahan-Estes with CMH's child protective unit and that this unit is part of MPEEC (Multidisciplinary Pediatric Education and Evaluation Consortium), a

consortium of child abuse divisions at area hospitals that provide evaluations to DCFS and avers

that Dr. Estes is a Fellow with the protective services team at CMH.  Defendant Miller is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

contained in Paragraph 38.  To the extent an answer is required, Defendant Miller denies the

remaining allegations.

39. Dr. Michelle Sagan was the treating pediatric orthopedist for R. while he was
admitted at CMH. At no point during the ensuing DCFS investigation did any person with
DCFS, including the Defendants to this action, make any attempt to speak with Dr. Sagan despite
the DCFS requirement that in a bone fracture investigation, DCFS must contact all treating
physicians and must obtain "[v]erification of the injury . . . from a physician, preferably an
orthopedist or radiologist." 89 Ill. Admin. Code, § 300, App'x B, "# 9/59 Bone Fractures."
Further, DCFS procedures require that DCFS investigators give the greatest weight to the
specialist with the greatest expertise in the relevant area of medicine, which Defendant Griffin
acknowledged would be the area of orthopedics in the present case, but none of the DCFS
Defendants sought or considered Dr. Sagan's opinion at any relevant time.

ANSWER:  Defendant Miller admits the first sentence of Paragraph 39.  Defendant

Miller avers that Defendant Griffin's testimony at the juvenile court proceedings on October 14,

2009 speaks for itself.  The remaining allegations of Paragraph 39 of the Complaint improperly

collectivize the actions of the Defendants and as such do not apprise Defendant Miller of what

she is charged with. Plaintiff is attempting to paraphrase Illinois law and Defendant Miller avers

that the cited law speaks for itself.  Defendant Miller denies the remaining allegations contained

in Paragraph 39.

40. R. was discharged from CMH on the evening of Friday, September 11.

ANSWER:     Defendant Miller admits that R. was discharged from CMH on September

11 and lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations and therefore denies the remaining allegations contained in Paragraph 40.

41. Officer Craig Balon with the LaGrange Police Department interviewed both Brian
and Laura at the family home, on September 11 and September 12, respectively. On September
15, Officer Wardlaw with the LaGrange Police reported to Defendant Griffin that after speaking
with the family, the police department "did not have a sense of abuse."

ANSWER: Defendant Miller admits the first sentence of Paragraph 41 and admits that

on September 15, Officer Wardlaw with the LaGrange Police reported to Defendant Griffin and

avers that the initial police "investigator did not have a sense of abuse." Defendant Miller denies

the remaining allegations contained in Paragraph 41.

42. On September 11, 2009, DCFS Supervisor Lucia Greer directed that the ensuing investigation in this case should include "an exact description of the fracture," interviews with "all physicians directly involved with the treatment of the reported injury (e.g., attending physician, radiologist or orthopedist)," and "a TIME LINE starting with when they noticed the injury; activity throughout the past week [] with both parents." [emphasis in original]. In addition, she directed that "any other person with knowledge" should be interviewed.

ANSWER: Defendant Miller admits the allegations contained in Paragraph 42.

43. On Friday, September 11, 2009, DCFS assigned Janice Griffin as the primary investigator of the allegations against Brian and Laura Timmel. Griffin was obligated to conduct the investigation in accordance with DCFS Rules and Procedures and in accordance with the *Dupuy* orders, cited at ¶¶17 and 18, above and she later testified in the juvenile court action that ensued on October 2 that she handled the investigation in accordance with her understanding of the applicable policies and procedures. However, her understanding of these requirements was lacking, as described below.

ANSWER: Defendant Miller admits the first sentence of Paragraph 43. Defendant

Miller admits Defendant Griffin was obligated to conduct the investigation in accordance with

DCFS rules, procedures, the law and any applicable court orders and that Defendant Griffin's

later testified in the juvenile court action that ensued on October 2, 2009, and that her testimony

speaks for itself in the context in which it was given. Defendant Miller avers that the cited law

speaks for itself and denies the remaining allegations contained in Paragraph 43.

44. Between September 11, 2009, the day Griffin was assigned as the primary investigator, and October 1, 2009, which was the day that Griffin decided (with Defendant Leggin, Defendant Smith-Foote, and Division of Child Protection Associate Deputy Director Meryl Paniak) to take protective custody of the Timmels' children, she had conducted very little investigation of the facts either supporting or refuting the allegations that Brian or Laura Timmel had abused or neglected their children. Indeed, not *one* of Supervisor Greer's September 11 directives had been satisfied, nor had the directive of Defendant Leggin, dated September 23, 2009, to secure additional information including "how old is the fracture" been satisfied.

ANSWER: Defendant Miller admits that on September 11, 2009 Defendant Griffin

was assigned as the primary investigator and avers that the decision to take protective custody

was approved by Defendant Leggin and Defendant Smith-Foote in consultation with Associate

Deputy Director Meryl Paniak.  Defendant Miller denies each and every remaining allegation

contained in Paragraph 44.

45.  Between September 11 and October 1, only the following minimal investigative
steps had occurred:

(i) On September 11, Griffin spoke briefly with two CMH social workers merely to learn
that the case had been assigned to Dr. Estes for MPEEC review and confirm that R. was ready
for discharge and that, pursuant to Griffin's direction, he would be discharged to the care of
Janice Timmel and not to Brian or Laura;

(ii) On September 11, Griffin spoke briefly with Janice Timmel, Brian's mother, merely
to confirm that she would supervise any contact Laura and Brian had with their own children per
DCFS directive that during the investigation they could no longer have unsupervised contact
with their own children;

(iii) On September 15, Griffin spoke with Office Wardlaw from the LaGrange Police
Department, who informed Griffin that after speaking with the family, the police "did not have a
sense of abuse;"

(iv) On September 15, Griffin visited the home where she interviewed Brian Timmel and
Laura Timmel, though the interview of Laura Timmel did not comport with a number of DCFS
requirements, including the requirement that DCFS ask her for collateral contacts and conduct a
domestic violence and substance abuse screen;

(v) On September 15 and September 22, Griffin observed the children in their home
(where they were found to be healthy except for R.'s fracture);

(vi) On September 16, Griffin spoke with Nurse Ditto, who reported that while at
Hinsdale Hospital, R. did not cry inconsolably but, rather, would cry while he was repositioned
but would not cry while at rest; and

(vii) During this time period of September 11 through October 1, Griffin spoke to only a
single doctor: Dr. Estes, a non-board-certified child abuse fellow who offered her opinion that
based merely on the absence of an explanation for the fracture, she concluded that the injury was
more than likely caused by abuse. Dr. Estes' opinion was based upon the theory that the fracture
would have been so painful that R. would have cried inconsolably.

ANSWER: The allegations contained in Paragraph 45 of the Complaint improperly

collectivize the actions of the Defendants and as such do not apprise Defendant Miller of what

she is charged with.  Defendant Miller answers the subparts of Paragraph 45 as follows:

(i) Defendant Miller admits that on September 11, Defendant Griffin spoke with two

CMH social workers and avers that CMH social worker Hickey told her that the case was

assigned to Estes for MPEEC review at 11:30 a.m. and further avers that at 3:30 p.m. CMH

social worker Gronin told Defendant Griffin that R. was ready for discharge "pending the results of the background check, R. would be discharged in the care of paternal grandmother, Janice Timmel." Defendant Miller denies the remaining allegations contained in subpart (i) of Paragraph 45.

(ii) Defendant Miller admits that Defendant Griffin spoke with Janice Timmel, admits that she confirmed that Janice Timmel would supervise contact between Laura and Brian and their three children. Defendant Miller denies the remaining allegations contained in subpart (ii) of Paragraph 45.

(iii) Defendant Miller admits that Defendant Griffin spoke to Office [sic] Wardlaw from the LaGrange Police Department and avers that he informed her that after speaking with the family, "the initial investigator did not have a sense of abuse." Defendant Miller denies the remaining allegations contained in subpart (iii) of Paragraph 45.

(iv) Defendant Miller admits that on September 15 Defendant Griffin visited the home where she interviewed Brian Timmel and Laura Timmel and admits that Defendant Griffin did not conduct a domestic violence and substance abuse screen on that date. Defendant Miller denies that the interview of Laura Timmel did not comport with a number of DCFS requirements and denies the remaining allegations contained in subpart (iv) of Paragraph 45.

(v) Defendant Miller denies the allegations contained in subpart (v) of Paragraph 45 and avers that on September 15, 2009, Defendant Griffin observed N. in her home and saw no signs of abuse or neglect and further avers that on September 22, 2009, Defendant Griffin observed R. and B. in their home and saw no signs of abuse or neglect.

(vi) Defendant Miller admits that Defendant Griffin spoke with Ditto who reported that R. would cry when he was repositioned but not while he was at rest. Defendant Miller denies the remaining allegations contained in subpart (vi) of Paragraph 45.

16

(vii) Defendant Miller admits that Defendant Griffin spoke to Dr. Estes who offered her opinion that the injury was more than likely caused by abuse. Defendant Miller denies the remaining allegations contained in subpart (vii) of Paragraph 45 and avers that Dr. Estes is a Fellow with the Protective Services Team at CMH.

46. The following investigative steps were not taken between September 11 and October 1, 2009, despite the clear requirements of DCFS rules and procedures and the due process requirement, as directed by the *Dupuy* orders, that DCFS investigators are to gather and consider all available exculpatory evidence:

(i) Identification of and contact with two eyewitnesses who saw R. on the date his fracture was discovered (i.e., John Matthew Peluse, who saw R. at approximately 11:00 a.m. on September 10, and Sasha Staerkel, the hairstylist who observed R. from approximately 1:00 p.m. to 3:30 p.m. on September 10 and held him briefly herself). Eye witness contacts are required by DCFS Procedures 300, Appendix B (defining direct evidence as "a statement taken from an eyewitness . . . **It is imperative that the CPSW seeks objective corroboration of . . . self-reports**" and "consider information developed through personal observation . . . or required interviews that will establish the accuracy of [parents'] reports. . . . **There is no substitute for independent verification of this sort of information.**") (bold in original). *See also* DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, (subsection (C)(4)(F), requiring the investigator to "[i]nterview all identified witnesses who are reported to have knowledge of the incident that resulted in a bone fracture");

(ii) contact with *all* pediatric orthopedists, radiologists, or attending physicians who treated the injury as required by DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, at subsections (C)(2)(F) and (C)(4)(E). Such doctors were Dr. Michelle Sagan, the pediatric orthopedist who had treated R.'s fracture at CMH, and Dr. Christopher Sullivan, the Chief of Pediatric Orthopedics at University of Chicago's Comer Children's Hospital, who provided further treatment for R.'s fracture on September 30, 2009. Griffin later denied knowing that Dr. Sullivan was a treating physician, but acknowledged she knew he had put a new splint on R.'s leg;

(iii) contact with R.'s primary care pediatrician, Dr. Danielle Cherian, required by DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, subsection (C)(4)(L);

(iv) contact with Laura Timmel's obstetrician, Dr. Brian Foley, as required by *id.* (insofar as he was a physician who had seen the child in past six months). Griffin did not even request consents from Ms. Timmel to speak to any of her own doctors or secure her own medical records, including her obstetrical records;

(v) assessment of the credentials of the doctors upon whom DCFS was relying for its opinion as required by DCFS Procedures 300 (specifying that a professional's expertise is to be assessed according to their amount of training, experience, and specialization, specifically stating that the opinion of a pediatric radiologist is more credible than that of a radiologist, and the opinion of a radiologist as to a bone fracture is more credible than that of a pediatrician; also stating that the opinion of a doctor on "hospital staff is more credible than a pediatric resident.") Griffin later testified that she N.r took steps to identify any doctors Dr. Estes may have consulted, while wrongly assuming that Dr. Estes had "consulted with an orthopedic doctor" and "other doctors who have training in [radiology];"

(vi) determination as to the relative weight to be given to the opposing opinions of

doctors when their opinions were in conflict, based on the specific expertise and level of experience of the opposing doctors. Griffin later acknowledged that the "relevant specialization" in a case involving bone fractures would be orthopedics;

(vii) consideration of whether a *third* opinion is needed to reconcile divergent medical views and render a sound determination as to the likelihood of abuse versus accidental trauma where experts disagree, as required by Procedures 300, Appendix B, #9/59, Bone Fractures, (subsection (C)(5)(F)).

ANSWER:     The allegations contained in Paragraph 46 of the Complaint improperly collectivize the actions of the Defendants and as such do not apprise Defendant Miller of what she is charged with.  Defendant Miller avers that the cited law in each subpart speaks for itself and that the Department's rules and procedures set forth the applicable time frames for all aspects of the child abuse investigation.  Defendant Miller answers the subparts of Paragraph 46 as follows:

(i) Defendant Miller admits that Defendant Griffin did not have contact with John Peluse or Sasha Staerkel between September 11 and October 1, 2009.  Defendant Miller denies the remaining allegations and avers that the cited law speaks for itself.

(ii) Defendant Miller admits that between September 11 and October 1, 2009 Defendant Griffin did not contact Dr. Michelle Sagan who was the pediatric orthopedist who treated R.'s fracture at CMH or Dr. Christopher Sullivan, the chief of Pediatric Orthopedics at University of Chicago's Comer Children's Hospital, who provided further treatment for R.'s fracture on September 30, 2009.  Defendant Miller avers that Defendant Griffin's testimony in the juvenile court proceedings concerning her understanding of Dr. Sullivan's treatment of R. speaks for itself in context and she therefore denies each and every remaining allegation contained in subpart (ii) of Paragraph 46.

(iii) Defendant Miller admits that Defendant Griffin did not contact R.'s primary care pediatrician, Dr. Danielle Cherian between September 11 and October 1, 2009.  Defendant Miller avers that the cited law speaks for itself and denies the remaining allegations contained in

subpart (iii) of Paragraph 46.

(iv) Defendant Miller admits that Defendant Griffin did not contact Dr. Brian Foley

between September 11 and October 1, 2009. Defendant Miller admits that between September

11 and October 1, 2009 Defendant Griffin did not request consents from Ms. Timmel to speak to

any of her own doctors or secure her own medical records, including her obstetrical records.

Defendant Miller denies the remaining allegations contained in subpart (iv) of Paragraph 46.

(v) Defendant Miller avers that the cited law speaks for itself and Defendant Griffin's

testimony at the juvenile court proceeding speaks for itself in the context of the questions asked.

Defendant Miller denies the remaining allegations contained in subpart (v) of Paragraph 46.

(vi) Defendant Miller avers that Defendant Griffin's testimony at the juvenile court

proceedings speaks for itself in the context of the questions asked as to the allegations set forth in

the second sentence of subpart (vi) of Paragraph 46. Defendant Miller denies the remaining

allegation in subpart (vi) Of Paragraph 46.

(vii) Defendant Miller denies each and every allegation contained in subpart (vii) of

Paragraph 46. Defendant Miller avers that the cited law speaks for itself.

47. Defendant Griffin made only *pro forma* contact with the police officers who were
also investigating the case and the initial child abuse reporter, Nurse Robert Ditto. Neither she
nor Defendants Leggin or Smith-Foote, nor Defendant Miller at the later Administrator's
Conference, considered the information these persons had to provide that was exculpatory.
Specifically:

(i) On September 15, Officer Wardlaw informed Griffin that after speaking with the
family, the police department officials did not have a "sense of abuse."

(ii) Nurse Ditto at Hinsdale Hospital made observations of R. that *supported* the
Timmels' contentions that R. was not inconsolable (Nurse Ditto ultimately testified that when
R.'s leg was manipulated, he would cry for only 10-20 seconds) and discounted the claim of Dr.
Estes (which was that the fracture would have been so painful and so obvious thereafter that R.
would have cried inconsolably and, therefore, the lack of an explanation for the fracture by the
parents was not credible).

ANSWER:     Defendant Miller denies the allegations contained in Paragraph 47 and its

subparts.

48. On September 30, R. was examined and treated by Dr. Christopher Sullivan, Chief of Pediatric Orthopedics, University of Chicago Comer Children's Hospital. On September 30, Dr. Sullivan reported to the Timmels his expert opinion that R.'s fracture was *unlikely* to be due to abuse.

ANSWER: Defendant Miller admits the first sentence of Paragraph 48. Defendant

Miller lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations contained in Paragraph 48. To the extent an answer is required, Defendant Miller

denies the remaining allegations contained in Paragraph 48.

49. On the afternoon of October 1, 2009, Defendant Griffin contacted Brian Timmel and requested that he come to the DCFS offices the next day with Laura and their children. That morning, Defendant Griffin had received a written report from Dr. Estes documenting her opinion. Though Defendant Griffin concealed her true motives from Brian Timmel, her intention was to take protective custody of the Timmels' children during the next day's meeting.

ANSWER: Defendant Miller admits the allegations contained in the first two

sentences of Paragraph 49. Defendant Miller lacks knowledge or information sufficient to form

a belief as to the truth of the remaining allegations. To the extent an answer is required,

Defendant Miller denies the remaining allegations contained in Paragraph 49.

50. On the afternoon of October 1, 2009, upon learning of the request that Brian Timmel bring the children to the DCFS offices the next day, the Timmels' counsel called Defendant Griffin at approximately 4:30 p.m. and spoke to her and her supervisor, Defendant Leggin. The counsel (Diane L. Redleaf and Melissa L. Staas, both attorneys with the Family Defense Center) confirmed to Defendants Griffin and Leggin the availability of Dr. Sullivan's opinion that the injury was more than likely *not* caused by abuse and urged Defendants to contact him immediately. While the Timmels' counsel offered a phone number for Dr. Sullivan's office so that the DCFS investigative staff could speak to him immediately about his opinion, Defendants Griffin and Leggin deliberately ignored this information.

ANSWER: Defendant Miller admits that on the afternoon of October 1, 2009, the

Timmels' counsel called Defendant Griffin at approximately 4:30 p.m. and spoke toDefendant

Griffin and her supervisor, Defendant Leggin. Defendant Miller is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in the first

sentence of Paragraph 50. Defendant Miller admits that the Timmels' counsel stated to

Defendants Griffin and Leggin the availability of a second opinion from Dr. Sullivan at

20

University of Chicago. Defendant Miller avers that Plaintiff's counsel stated that the opinion

would be ready the following week and further avers that Plaintiff's counsel stated to Defendants

Griffin and Leggin that Dr. Sullivan's opinion was that the injury could have been caused by

other means than abuse. Defendant Miller denies each and every remaining allegation contained

in Paragraph 50.

51. Instead of calling Dr. Sullivan or reviewing his opinion or seeking out further opinion of the MPEEC doctors or other medical opinions, Defendants Griffin and Leggin, with the approval of Defendant Kimberly Smith-Foote, decided to "go with our MPEEC doctor" without so much as any serious efforts to notify Dr. Estes, their own MPEEC consultant, that a second opinion disagreed with hers.

ANSWER: Defendant Miller admits that Defendants Griffin and Leggin followed the

opinion of the MPEEC doctor with Defendant Smith-Foote's approval. Defendant Miller denies

each and every remaining allegation contained in Paragraph 51.

52. At 4:51 p.m. on October 1, Defendants Griffin, Leggin, and Smith-Foote consulted with each other and with their superiors and decided to take protective custody of the Timmel children that very night instead of waiting until the following day as had been originally planned, showing that the DCFS Defendants refused to wait even a few *hours* for the newly-available evidence that the Timmels had secured from the head of pediatric orthopedics at the University of Chicago. By contrast, the DCFS Defendants had by that point waited for Dr. Estes' report for *twenty* days after the date on which Dr. Estes examined R. Timmel (*i.e.*, from September 11 to October 1). Their refusal to wait even *one* hour to fulfill the requirement under DCFS policy that they consult with a pediatric orthopedic expert demonstrates their disregard for the truth and their rush to judgment against the Timmels as guilty of child abuse. Griffin and Leggin made these decisions in consultation with their superiors, Defendant Smith-Foote and Division of Child Protection Associate Deputy Director Meryl Paniak.

ANSWER: Defendant Miller admits that at 4:51 p.m. on October 1, 2009, Defendants

Griffin and Leggin consulted with Defendant Smith-Foote and Division of Child Protection

Associate Deputy Director Meryl Paniak and decided to take protective custody of the Timmel

children. Defendant Miller admits that Defendants Griffin, Leggin and Smith-Foote received Dr.

Estes's MPEEC report on October 1, 2009. The remaining allegations contained in Paragraph 52

of the Complaint improperly collectivize the actions of the Defendants and as such do not

apprise Defendant Miller of what she is charged with and Defendant Miller therefore denies each

and every remaining allegation contained in Paragraph 52.

53. After deciding to take protective custody, Defendant Griffin arranged for police squad cars to assist her in removing the Timmels' three children from their home. Griffin went to the home at approximately 6:30 p.m. Janice Timmel, who was at the home with Laura and the children, answered the door but would not allow Griffin to enter. Griffin saw N. in the window and observed that N. looked healthy and happy.

ANSWER: Defendant Miller admits that Defendant Griffin went to the Timmel home

at approximately 6:30 p.m. and admits that Defendant Griffin arranged for police to assist her.

Defendant Miller admits that Janice Timmel was at home with Laura Timmel and that Defendant

Griffin saw N. in the window and observed her. Defendant Miller denies each and every

remaining allegation contained in Paragraph 53.

54. Brian Timmel, who had not yet arrived home from work, contacted his counsel. Based on the advice of counsel, Janice Timmel notified Defendant Griffin that she would not be allowed into the home without a warrant. Lacking a warrant to remove the children from their home, the police and Griffin left.

ANSWER: Defendant Miller admits that Defendant Griffin was notified that she

would not be allowed into the home without a warrant and that Defendant Griffin and the police

left. Defendant Miller lacks knowledge sufficient to form a belief as to the truth of the first

sentence of Paragraph 54 and therefore denies the first sentence as well as the remaining

allegations in Paragraph 54.

55. Fearful that the children would be seized from them in the middle of the night, the family found shelter with a family friend for the evening and awaited word from their counsel in the morning as to DCFS's intended actions concerning their family. Throughout that night, DCFS personnel went to the family home in La Grange on at least two additional occasions—at approximately 10:45 p.m. on October 1, and again at 3:30 a.m. on October 2—in an attempt to seize the Timmel children without a warrant or court order.

ANSWER: Defendant Miller admits that DCFS personnel went to the family home in

La Grange on at least two occasions at approximately 10:45 p.m. on October 1, 2009 and again

at 3:30 a.m. on October 2, 2009. Defendant Miller denies each and every remaining allegation

contained in Paragraph 55.

56. On the morning of October 2, 2009, counsel for the Timmels sent a letter to Defendants Griffin, Leggin, and Smith-Foote documenting that Dr. Sullivan had determined that the fracture was fully consistent with accidental causes and urging the Defendants to refrain from making critical decisions in the case until they had received and reviewed Dr. Sullivan's written medical opinion, which was at that time forthcoming.

ANSWER:    Defendant Miller admits that on October 2, 2009, the Timmels' counsel

sent a letter to Defendants Griffin, Leggin and Smith-Foote documenting that Dr. Sullivan had an

opinion and urging them to refrain from making critical decisions in the case until they had

received and reviewed Dr. Sullivan's written medical opinion, which was at that time

forthcoming.  Defendant Miller denies each and every remaining allegation contained in

Paragraph 56.

57. On October 2, 2009, Defendant Griffin sought, and the Cook County State's Attorney's Office approved, without any review or consideration of the orthopedic opinions of Drs. Sullivan and Sagan undermining the conclusion that R.'s fracture was likely to be due to child abuse, the filing of petitions for Adjudication of Warship and Temporary Custody as to all three Timmel children. These petitions cited only the opinion of Dr. Estes and omitted the contrary opinions of Drs. Sullivan and Sagan.  Furthermore, these petitions were filed upon the false representation of Defendant Griffin that she had made "reasonable efforts" to keep the family together though no such efforts were documented and none had been made.

ANSWER:    Defendant Miller admits that Petitions for Adjudication of Wardship and

Temporary Custody were filed.  Defendant Miller denies each and every remaining allegation

contained in Paragraph 57.

58.  In the afternoon of October 2, based solely on the representations the State and DCFS had made in the petitions, an order taking the children into DCFS temporary custody was entered "without prejudice," albeit with the agreement that the children would remain in their home with their grandparents, either Tim and Janice Timmel (Brian's parents) or Hon. Nancy Dreher and Roger Dreher (Laura's parents), as their caregivers while the parents, Laura and Brian Timmel, were required to reside elsewhere.  As of that date, no DCFS employee, including Defendants, and no person employed by the State's Attorney's office had spoken to any orthopedist or radiologist regarding the likelihood of the fracture being caused by child abuse.

ANSWER:    Plaintiff is attempting to paraphrase and quote a court order and Defendant

Miller avers that the court order speaks for itself.  Defendant Miller admits that on October 2,

2009, the juvenile court entered an order for DCFS to take temporary custody of the children and

that order speaks for itself. Defendant Miller admits that as of October 2, 2009, she had not

spoken to any orthopedist or radiologist regarding the likelihood of the fracture being caused by

child abuse. The last sentence of Paragraph 58 of the Complaint improperly collectivizes the

actions of the Defendants and as such does not apprise Defendant Miller of what she is charged

with and she therefore denies the remaining allegations in the last sentence of Paragraph 58.

59. On October 2, the court scheduled the preliminary temporary custody hearing to
commence on October 14, 2009. Pursuant to 705 ILCS 405/2-10, this hearing was held to
determine: (a) whether there was any probable cause to believe that the Timmel children had
been abused or neglected and, if so; (b) whether it was a matter of immediate and urgent
necessity that the Timmel children be placed in the temporary custody of DCFS and, if so; (c)
whether DCFS made reasonable efforts to prevent or eliminate the necessity of removing the
Timmel children from the custody of their parents. *See* ¶ 21 *supra*. As is discussed below, *see* ¶
69 *infra*, at the conclusion of the temporary custody hearing regarding the Timmel family, the
juvenile court found no probable cause to believe that any of the Timmel children had been
abused or neglect.

ANSWER: Defendant Miller admits the first sentence in Paragraph 59. Plaintiff is

attempting to paraphrase Illinois law and Defendant Miller avers that the cited law speaks for

itself. Defendant Miller admits that at the conclusion of the temporary custody hearing regarding

the Timmel family, the juvenile court found no probable cause. Defendant Miller further avers

that Plaintiff is attempting to paraphrase the November 20, 2009 juvenile court order dismissing

the petition for temporary custody which speaks for itself. Defendant Miller denies each and

every remaining allegation contained in Paragraph 59.

60. On October 7, 2009, counsel for the Timmels sent to Defendants Griffin and Leggin
the written report of Dr. Sullivan in which he concluded that the probability that the fracture to
R.'s left femur was caused by abuse was extremely low.

ANSWER: Defendant Miller admits that on October 7, 2009, counsel for the Timmels

sent to Defendants Griffin, Leggin and Smith-Foote the written report of Dr. Sullivan. Defendant

Miller avers that Dr. Sullivan concluded as to the fracture to R.'s left femur that "the probability

that this is due to non-accidental trauma is extremely low and the child is at low risk of further

injury." Defendant Miller denies the remaining allegations contained in Paragraph 60.

61.   Among the opinions and references Defendants ignored was that of Dr. Brian Foley, Laura Timmel's obstetrician.  In a letter to DCFS dated October 8, 2009, he stated:

> I was shocked to hear that DCFS was investigating this couple for abuse. I understand the situation warrants attention, and I can understand the unknown cause of the injury could raise suspicion on your department's behalf. However, being a caregiver for this couple for the last four plus years and seeing their interpersonal interactions with each other and their children I found it unfathomable that either is capable of inflicting that type of injury on any child. I would expect your department to do a more thorough investigation and follow up with myself and the Timmel's [sic] pediatrician as to their personalities and parenting skills.

During the DCFS investigation, DCFS Defendants made no attempt to speak with Dr. Foley.

ANSWER:      The allegations contained in Paragraph 61 of the Complaint improperly collectivize the actions of the Defendants and as such do not apprise Defendant Miller of what she is charged with.  Defendant Miller avers that she did not participate in the DCFS investigation of Plaintiff and accordingly admits that during the DCFS investigation she made no attempt to speak to Dr. Foley.  Defendant Miller denies that she ignored Dr. Foley's October 8, 2009 letter which speaks for itself and denies each and every remaining allegation contained in Paragraph 61.

62.   During the DCFS investigation, nobody from DCFS, including the Defendants, spoke with Dr. Danielle Cherian, the primary care pediatrician for R. and the other two Timmel children.

ANSWER:      Defendant Miller admits that Dr. Danielle Cherian was the primary care physician for R. and the other Timmel children.  Defendant Miller avers that she did not participate in the DCFS investigation of Plaintiff.  The remaining allegations contained in Paragraph 62 of the Complaint improperly collectivize the actions of the Defendants and as such do not apprise Defendant Miller of what she is charged with, and therefore Defendant Miller denies the remaining allegations contained in Paragraph 62.

63.   Throughout the ensuing juvenile court hearing as to whether there was probable cause to believe R. was abused by either Brian or Laura Timmel (or both), Defendants Griffin and Leggin pointed exclusively to Estes' MPEEC report and opinions as the exclusive source of the factual allegations throughout this case.  On October 14, 2009, Defendant Griffin testified

25

that DCFS did not need to consider the opinions of orthopedists because "we had our MPEEC report" and "we decided to go with our MPEEC report." This exclusive reliance on Dr. Estes' opinion, and refusal to consider the opinions and testimony of others, was unreasonable on its own terms for Dr. Estes herself acknowledged, in testimony given on October 16, that an MPEEC report is *not* by itself a complete child abuse investigation. It was the responsibility of DCFS, assigned to Defendants Griffin and Leggin, and not of the MPEEC team, to make investigative contacts confirming or rebutting a parents' account of the facts.

ANSWER:    Defendant Miller admits that in the juvenile court hearing as to whether

there was probable cause to believe R. was abused by either Brian or Laura Timmel, Defendant

Griffin and Dr. Estes testified and that their testimony speaks for itself in the context in which it

was given.  Defendant Miller admits that Defendants Griffin, Leggin and Smith-Foote relied on

Dr. Estes' MPEEC report.  Defendant Miller admits that it was the responsibility of DCFS,

assigned to Defendants Griffin and Leggin to make investigative contacts and not the

responsibility of the MPEEC team.  Defendant Miller denies that Defendant Leggin testified in

the juvenile court proceeding and denies each and every remaining allegation in Paragraph 63.

64. In addition to failing to investigate medical evidence and eyewitness accounts, the DCFS Defendants failed to investigate any facts that would either confirm or refute the credibility and good character of the Timmels, as persons and as parents.  Indeed, they held it as a mark against them that they had personal relationships with federal judges, lawyers, and doctors and refused to speak to any of these individuals prior to taking protective custody, and for days after initiating the juvenile court action. At the same time, Defendant Griffin claimed she had "no opinion" as to Laura's denial of abuse and acknowledged that the parents acted appropriately with their children and that she had no reports that they had ever behaved other than as model parents.  In addition, the DCFS Defendants also refused to consider at all relevant the fact that Laura Timmel had a career working extensively with children as a school social worker and as a social worker in the Division of Specialized Services for Children.

ANSWER:    Defendant Miller admits that Defendant Griffin testified in the juvenile

court hearing as to Laura's denial of abuse and that testimony speaks for itself in the context in

which it was given.  The remaining allegations contained in Paragraph 64 of the Complaint

improperly collectivize the actions of the Defendants and as such do not apprise Defendant

Miller of what she is charged with, and Defendant Miller denies the remaining allegations

contained in Paragraph 64.

26

65.  Even though Dr. Este's opinion was the sole opinion upon which the DCFS Defendants relied, Dr. Estes' opinion was not as strongly inculpatory as the Defendants Griffin and Leggin assumed:  she had no opinion as to *who* had abused R., nor as to whether custody of the children should have been taken, nor as to whether either parent posed any danger to the children, nor as to whether the parents should be allowed to be alone with their children and she acknowledged that siblings can cause a fracture in a newborn baby and that infants being removed from car seats or baby carriers can experience a leg fracture.

ANSWER:    Defendant Miller denies Plaintiff's characterization of Dr. Estes'

testimony in the juvenile court proceedings and avers that Dr. Estes' testimony speaks for itself

in the context in which it was given.  Defendant Miller denies the remaining allegations

contained in Paragraph 65.


66.  On October 16, 2009, though the juvenile court "probable cause" hearing had not yet concluded, the juvenile court directed that the Timmels should be allowed to return to their home under supervision, over the objection of DCFS counsel, representing Defendants Leggin, Griffin, and Smith-Foote.  On November 4, 2009, the juvenile court allowed the Timmels unsupervised visits with their children, again over the objection of DCFS counsel. Throughout the proceedings in the juvenile court, Defendants Griffin and Leggin continued to press for a finding of abuse against both of the Timmels, even though they had failed to consider all the exculpatory evidence set forth above.

ANSWER:    Defendant Miller admits that the juvenile court held a "probable cause"

hearing on October 16, 2009 which did not conclude on that date and admits that the juvenile

court entered an order on that date which speaks for itself.  Defendant Miller admits that on

November 4, 2009, the juvenile court entered an order which speaks for itself.  Defendant Miller

denies that DCFS counsel represented Defendants Griffin, Leggin and Smith-Foote in the

juvenile court proceedings and avers that the Cook County State's Attorney represented the

People of the State of Illinois in the Petitions for Adjudication of Wardship of the Timmel

children and that Defendant Griffin testified as a witness in those proceedings.  Defendant Miller

denies each and every remaining allegation contained in Paragraph 66.

67.  In the course of the juvenile court proceedings, while claiming to follow the law governing her investigation, *see* ¶ 43 *supra*, Defendant Griffin testified she was not aware of the DCFS requirement that she obtain the opinion of an orthopedist.  DCFS Procedures 300, Appendix B, #9/59 Bone Fractures, at subsections (C)(2)(F) and (C)(4)(E).

ANSWER:    Plaintiff is attempting to paraphrase DCFS Procedure and Defendant

Miller avers that the cited DCFS Procedure speaks for itself.  Defendant Miller admits that

Defendant Griffin testified in the juvenile court proceedings and her testimony speaks for itself

in the context in which it was given.  Defendant Miller denies each and every remaining

allegation contained in Paragraph 67.

68. On November 4, R.'s treating orthopedist at CMH, Dr. Sagan, testified in the juvenile
court proceedings that she could not conclude R. was more likely than not to have been abused
based on available evidence. Dr. Sagan also disagreed with the "inconsolable cry" theory put
forth by Dr. Estes as the linchpin of her contention that R. was abused.

ANSWER:    Defendant Miller admits that on November 4, 2009, Dr. Sagan testified in

the juvenile court proceedings and her testimony speaks for itself in the context in which it was

given.  Defendant Miller denies Plaintiff's characterization of Dr. Sagan's testimony and Dr.

Estes' testimony in juvenile court proceedings and avers that their testimony speaks for itself in

the context in which it was given.  Defendant Miller denies Plaintiff's characterization of Dr.

Estes' testimony and denies each and every remaining allegation contained in Paragraph 68.

69.  On November 20, 2009, after five separate days of hearing and closing arguments,
the juvenile court ruled that there was no probable cause to believe R. Timmel had been abused.
The court found the testimony of Brian and Laura Timmel "clear and compelling."  The court
also found Dr. Sullivan's testimony to be "convincing."  Upon finding no probable cause, the
court dismissed the Petition for Adjudication of Wardship as to the Timmel children.

ANSWER:    Defendant Miller admits that on November 20, 2009 after five separate

days of hearing and closing argument, the juvenile court ruled that there was no probable cause

and dismissed the Petition for Adjudication of Wardship as to the Timmel children.  Defendant

Miller denies that Plaintiff's quotation is accurate as to the court's finding regarding the

testimony of Brian and Laura Timmel and the testimony of Dr. Sullivan and therefore denies

each and every remaining allegation contained in Paragraph 69.

70. Despite the judicial finding that R. was not abused and that there was not even
probable cause to believe that he had been abused, DCFS Defendants Griffin, Leggin, and

Smith-Foote continued to pursue the investigation they had started on September 10 rather than close it out immediately, as the finding of no probable cause required. The sole change in the focus of the ongoing investigation they started on September 10 was that they narrowed their focus to only Plaintiff Laura Timmel, not Brian Timmel.

ANSWER:     Defendant Miller denies the allegations contained in Paragraph 70.

71. On December 3, 2009, Defendant Griffin issued a recommended decision, approved by Defendants Leggin and Smith-Foote, that the report of abuse be "indicated" as to Laura Timmel only. The Defendants issued a notice of their intent to indicate the report against her and sent her an Investigation Summary. This Summary recites their continuing reliance on the opinion of Dr. Estes and omits mention of Dr. Sagan altogether.

ANSWER:     Defendant Miller admits that Defendant Griffin recommended that the

report of abuse against Laura Timmel be indicated and that Defendant Smith-Foote and

Defendant Leggin approved the recommendation.  Defendant Miller admits that on December 3,

2009, DCFS issued Laura Timmel a notice of intent to indicate a childcare worker and sent

Laura Timmel an Investigation Summary.  Defendant Miller avers that the summary speaks for

itself and denies Plaintiff's characterization of the summary is accurate.  The remaining

allegations contained in Paragraph 71 of the Complaint improperly collectivize the actions of the

Defendants and as such do not apprise Defendant Miller of what she is charged with, and

therefore Defendant Miller denies the remaining allegations contained in Paragraph 71.

72. As was her right pursuant to the *Dupuy* decisions, Plaintiff Laura Timmel invoked her right to an Administrator's Conference and retained counsel, at significant continued expense, in order to present to the DCFS administrator the mountain of exculpatory evidence she had by now collected. On December 15, 2009, Defendant Miller convened an Administrator's Conference in which Defendants Griffin and Leggin participated.

ANSWER:     Defendant Miller admits that Laura Timmel invoked her right to an

Administrator's Conference and retained counsel; admits that she convened the Administrator's

Conference in which Defendants Griffin and Leggin participated.  Defendant Miller denies each

and every remaining allegation contained in Paragraph 72.

73. During the December 15 conference, Defendants Griffin and Leggin stated they still had not interviewed Dr. Sagan, they were not aware of Dr. Sagan's involvement in this case, and they "[didn't] know who she [was]" even though the juvenile court's November 20 ruling

29

specifically cites Dr. Sagan's opinion and her testimony.

ANSWER: Defendant Miller admits that Defendant Griffin and Defendant Leggin participated in the December 15, 2009 Administrator's Conference. Defendant Miller is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 73 and therefore denies the remaining allegations contained in Paragraph 73.

74. Defendant Griffin and Defendant Leggin asserted that they had read the juvenile court's final order in the case, but it was clear from their statements during the December 15 Administrator's Conference that they did not consider it, apply it, or obey it, and nor did Defendant Smith-Foote, who on November 24, 2009, had personally approved the indicated finding recommendation.

ANSWER: Defendant Miller denies the allegations contained in Paragraph 74.

75. Despite the overwhelming and legally binding exculpatory evidence that had already been determined to preclude a finding of abuse as to Laura Timmel, including a binding and final court order, on or about January 8, 2010, Defendant Maria Miller affirmed the recommendation to indicate Laura Timmel as guilty of child abuse in causing the fracture of her son R.'s leg and as guilty of child neglect in creating a substantial risk of physical injury as to N. and B.. No rationale for overriding the juvenile court's final order was provided in Defendant Miller's decision to indicate Laura, nor have any of the Defendants provided any explanation for their decision to override and ignore the juvenile court's order (such as a claim of newly-discovered evidence, as there was none).

ANSWER: Defendant Miller admits that she affirmed the recommendation to indicate Laura Timmel as guilty of child abuse in causing the fracture of her son R.'s leg and as guilty of child neglect in creating a substantial risk of physical injury as to N. and B. Defendant Miller avers that her recommended opinion speaks for itself and denies Plaintiff's characterization of that recommendation and denies each and every remaining allegation in Paragraph 75.

76. Based upon Defendant Miller's decision to affirm the recommended indicated finding, Laura Timmel's name was entered into the State Central Register as a perpetrator of child abuse and neglect. Absent a successful appeal, by operation of law the Registry would continue for 20 years and would bar Laura from working in any social work position during that time. It would also prevent her from volunteering at her children's school, becoming a scout leader and had a chilling effect on Laura's ability to pursue activities with her children while the finding remained on the register.

ANSWER: Defendant Miller admits that there was an indicated finding and that Laura

Timmel's name was placed on the State Central Register as a perpetrator of child abuse or

neglect. Defendant Miller also admits that she affirmed the recommendation to indicate Laura

Timmel for child abuse. The remaining allegations in Paragraph 76 are hypothetical and

Defendant Miller denies the remaining allegations.

77. Plaintiff Timmel appealed the indicated finding that had been registered against
her and requested an expedited hearing as was her right as a *Dupuy* class member. She retained
counsel at considerable expense to present her case for expungement to the assigned DCFS
administrative law judge on her behalf.

ANSWER: Defendant Miller admits that Plaintiff appealed the indicated finding and

requested an expedited hearing and retained counsel to present her case for expungement to the

assigned DCFS administrative law judge. Defendant Miller denies each and every remaining

allegation contained in Paragraph 77.

78. On or about February 19, 2010, DCFS Director Erwin McEwen approved the
administrative law judge's recommended order granting Plaintiff Timmel's request for
expungement of the indicated findings on the basis of the November 20, 2009, juvenile court
order that exonerated Plaintiff Timmel of any alleged wrongdoing.

ANSWER: Defendant Miller admits that on or about February 19, 2010, DCFS

Director Erwin McEwen approved the administrative law judge's recommended order granting

Plaintiff Timmel's request for expungement of the indicated findings on the basis of the

November 20, 2009 juvenile court order. Defendant Miller denies the remaining allegations

contained in Paragraph 78.

79. On information and belief, Defendants Griffin, Leggin, and Smith-Foote
recommended indicating Laura Timmel in retaliation for her assertion of her rights, for her
refusal to turn her children over to DCFS on the evening of October 1, for her prevailing before
the juvenile court, and/or in order to exercise arbitrary power against her, all in violation of her
substantive due process rights.

ANSWER: Defendant Miller denies the allegations contained in Paragraph 79.

80. In addition to causing her to expend money on legal fees in order to clear her name,
the decision to indicate Plaintiff Laura Timmel caused her extreme emotional distress, including

31

fear for her future ability to work in her chosen career (given an indicated finding of bone fractures is registered for 20 years), concern as to her ability to be involved in her children's schooling and after-school activities, intense fear about any future accidents that might occur to her children, and a reasonably-based belief that she was being persecuted and harassed by governmental officials who might again seize her children or undertake other unwarranted actions against her.

ANSWER: Defendant Miller denies the allegations contained in Paragraph 80.

81. At all relevant times, Defendants Griffin, Leggin, Smith-Foote, and Miller acted with respect to Plaintiff Timmel under color of state law.

ANSWER: Defendant Miller admits that she acted under color of state law. Defendant

Miller denies each and every remaining allegation contained in Paragraph 81.

82. After the case with DCFS and Laura Timmel was completely closed, the Timmels continued to receive medical care and treatment for R. In early January, 2011, R. was diagnosed with a condition that is consistent with higher-than-normal pain tolerance, a symptom that the Timmels have consistently reported was the case for R. since he was a baby.

ANSWER: Defendant Miller is without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in Paragraph 82. To the extent an answer is

required, Defendant Miller denies the allegations contained in Paragraph 82.

83. Defendants Griffin, Leggin, Smith-Foote, and Miller violated Plaintiff Laura Timmel's clearly established rights, about which a reasonable person in their position should have known.

ANSWER: Defendant Miller denies the allegations contained in Paragraph 83.

84. In recommending and in issuing an indicated finding against Laura Timmel, Defendants Griffin, Leggin, Smith-Foote, and Miller each acted intentionally or recklessly or with deliberate indifference to the consequences of their actions.

ANSWER: Defendant Miller denies the allegations contained in Paragraph 84.

85. Defendants' actions complained of herein have caused severe and long-lasting harm and long-lasting injury to Plaintiff. Plaintiff Timmel's right to pursue her career was seriously threatened without basis and without constitutionally required process. Defendants' actions complained of herein proximately caused her emotional and financial harm. Plaintiff is entitled to compensatory damages in an amount not less than $50,000 from each Defendant, jointly and severally.

ANSWER: Defendant Miller denies the allegations contained in Paragraph 85.

86.  Defendants Griffin and Leggin acted with callous disregard for the rights of Plaintiff. Plaintiff seeks punitive damages against defendants Griffin and Leggin.

ANSWER:     Defendant Miller denies the allegations contained in Paragraph 86.

87.  Plaintiff also seeks a declaratory judgment in her favor as to the claims set forth in this Count, an award of civil rights attorneys' fees pursuant to 42 U.S.C. § 1988 and costs against all Defendants, jointly and severally, and such other relief as this Court deems just and equitable.

ANSWER:     Defendant Miller denies the allegations contained in Paragraph 87.

**AFFIRMATIVE DEFENSES**

For her affirmative defenses, Defendant Miller states as follows:

FIRST AFFIRMATIVE DEFENSE

The allegations in Plaintiffs' Amended Complaint against Defendant Miller fail to state a claim upon which relief may be granted.

SECOND AFFIRMATIVE DEFENSE

Defendant Miller affirmatively states that actions taken relating to the underlying allegations in this Amended Complaint were in conformance with all applicable constitutional, statutory, and regulatory rules of law.

THIRD AFFIRMATIVE DEFENSE

This Court lacks jurisdiction to award the relief requested in the Complaint.

FOURTH AFFIRMATIVE DEFENSE

Defendant Miller affirmatively states that her alleged conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known, and she is therefore entitled to qualified immunity from civil damages.

FIFTH AFFIRMATIVE DEFENSE

Defendant Miller affirmatively states that she is entitled to absolute immunity for her actions taken in this matter all of which were quasi-judicial and in an adjudicatory capacity.

JURY DEMAND

33

The Defendant Miller requests trial by jury.

Respectfully submitted,

LISA MADIGAN
Illinois Attorney General

By:   s/Barbara L. Greenspan
Barbara L. Greenspan
Teresa M. Cullen
Assistant Attorneys General
100 W. Randolph St., 11-200
Chicago, Illinois  60601
(312) 814-7087
(312) 814-6833

Erin R. Gard, Senior Law Clerk,
Assisted in the Preparation of this Answer.

## CERTIFICATE OF SERVICE

The undersigned, an attorney, deposes and states that a copy of the attached **Agreed Motion For Leave to File Amended Answers** was served upon counsel of record by electronic filing this 9th day of February, 2012.

_s/Barbara L. Greenspan
Attorney